# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ALYSSA BERG, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| | JURY TRIAL DEMANDED |
| ROBERT BOSCH LLC, ROBERT BOSCH GMBH, JC RESIDENTIAL AND LIGHT COMMERCIAL LLC, JOHNSON CONTROLS HITACHI AIR CONDITIONING NORTH AMERICA LLC, TRANE TECHNOLOGIES PLC, TRANE U.S. INC., MITSUBISHI ELECTRIC TRANE HVAC US, CARRIER GLOBAL CORP., VIESSMANN MANUFACTURING CO. (U.S.), INC., DAIKIN INDUSTRIES, LTD., DAIKIN COMFORT TECHNOLOGIES NORTH AMERICA, DAIKIN APPLIED AMERICAS, THERMALNETICS, LLC, LENNOX INTERNATIONAL, INC., LENNOX INDUSTRIES INC., ALLIED AIR ENTERPRISES LLC, RHEEM MANUFACTURING CO., HEAT TRANSFER PRODUCTS GROUP, LLC, AAON, INC., a Nevada Corporation, AAON, INC., an Oklahoma Corporation, AAON COIL PRODUCTS, INC., and BASX, INC., | |
| Defendants. | |

**TABLE OF CONTENTS**

**Page**

I.    NATURE OF THE ACTION ........................................................................1

II.   JURISDICTION AND VENUE.................................................................6

III.  PARTIES ....................................................................................................8

     A.    Plaintiff ...........................................................................................8

     B.    Defendants......................................................................................8

          1.    The Bosch Defendants. ........................................................8

          2.    The Trane Defendants. .......................................................10

          3.    The Carrier Defendants.......................................................12

          4.    The Daikin Defendants. ......................................................14

          5.    The Lennox Defendants.......................................................16

          6.    The Rheem Defendants........................................................17

          7.    The AAON Defendants........................................................18

IV.  AGENTS AND CO-CONSPIRATORS......................................................20

V.   FACTUAL ALLEGATIONS ....................................................................22

     A.    A Description of HVAC Equipment ..............................................22

          1.    Residential HVAC Equipment.............................................22

          2.    Commercial HVAC Equipment............................................24

     B.    Market Distribution and Size for HVAC Equipment........................27

     C.    Pricing Basics in the HVAC Equipment Industry ............................28

     D.    Overview of Which HVAC Equipment Each Defendant
          Manufactures ..................................................................................28

E.	The Air-Conditioning, Heating, and Refrigeration
Institute ...................................................................................................31

F.	Pre-2020: Relatively Stable Pricing That Tracked the CPI
and Household Appliance PPI..................................................................35

G.	2020: The Onset of the COVID-19 Pandemic and the
Phasedown of HFCs Under the AIM Act Provided the
Perfect Opportunity and Pretext for the Conspiracy to
Succeed....................................................................................................36

H.	2021: The Conspiracy Gathers Steam....................................................40

I.	2022: The Conspiracy Takes Off ............................................................44

J.	2023: The Conspiracy Hits Its Stride.....................................................47

K.	2024: Defendants Maintain Their Conspiracy .......................................49

L.	2025: Defendants Keep the Price Increases Coming and
Publicly Embrace "Price Discipline" ......................................................50

M.	2026: Lennox's CFO: "The industry's generally been
disciplined for the past several years … we're gonna
continue to increase our pricing" ...........................................................54

VI.	OTHER ASPECTS OF THE CONSPIRACY SUPPORT ITS
PLAUSIBILITY ................................................................................................57

A.	Defendants' Record Profits Demonstrate the
Conspiracy's Success ..............................................................................57

B.	A Preliminary Regression Analysis Supports
Anticompetitive Harm to the Price of HVAC Equipment
Caused by the Conspiracy .......................................................................61

C.	Plus Factors Support the Plausibility of Defendants'
Conspiracy...............................................................................................64

1.	There are no close substitutes for HVAC
Equipment. ...................................................................................65

2.	The demand for HVAC Equipment is inelastic........................66

3. The HVAC Equipment industry is highly concentrated and consolidated. ..................................................67

4. The HVAC Equipment industry has high barriers to entry. ...............................................................69

5. HVAC Equipment is largely commoditized. ............................70

6. Defendants had numerous opportunities to collude.................72

    a. The Air-Conditioning, Heating, and Refrigeration Institute......................................................72

    b. Other industry conferences..........................................75

    c. ACHR News. ................................................................75

    d. HARDI...........................................................................76

VII. DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONSPIRACY, DIVERTING ATTENTION FROM AND PREVENTING DISCOVERY OF THE CONSPIRACY ...........................77

VIII. CLASS ACTION ALLEGATIONS ..............................................82

IX. ANTITRUST INJURY ................................................................86

X. CLAIMS FOR RELIEF ..............................................................88

XI. VIOLATIONS OF STATE ANTITRUST LAWS FOR INDIRECT PURCHASES ..........................................................90

XII. PRAYER FOR RELIEF .............................................................146

XIII. JURY TRIAL DEMANDED.......................................................147

Plaintiff, Alyssa Berg, brings this civil antitrust action on behalf of herself individually and on behalf of proposed Classes of all persons and entities who indirectly purchased HVAC Equipment[1] manufactured by the Defendants for end use in the United States beginning at least as early as January 1, 2020 through the present (the "Class Period").

## I.      NATURE OF THE ACTION

1.      The global COVID-19 pandemic triggered one of the most severe (though short-lived) economic crises in modern history, characterized by supply chain disruptions, demand fluctuations, and price volatility. In the wake of persistent price increases initially stemming from supply chain disruptions caused by the pandemic, the Antitrust Division of the U.S. Department of Justice ("DOJ") became concerned about persons and entities seeking to exploit the supply chain disruptions to engage in unlawful, anticompetitive behavior.

2.      Plaintiff brings this private enforcement action against Defendants alleging that they did exactly what the DOJ feared: they exploited the COVID-19 supply chain disruptions and regulatory transitions to fix prices and overcharge for HVAC Equipment. As Defendant Lennox's CFO, Michael Quenzer, recently stated in February 2026: "[T]he industry's generally been disciplined for the past several

---

[1] For purposes of this Complaint, HVAC Equipment is defined as the appliances used in residential and commercial ducted heating, ventilation, and cooling systems.

years … . [W]e're gonna continue to increase our pricing to maintain our margins. I think others have generally been as well. You know, we, as an industry, have realized that, you know, pricing, you know, taking it away, does not win market share."

3.    The following chart compares the Producer Price Index by Industry: Air-Conditioning, Refrigeration, and Forced Air Heating Equipment Manufacturing: Primary Products (the "HVAC PPI") to the Consumer Price Index ("CPI"). There is no doubt Defendants were incredibly disciplined, driving prices up to record levels from 2020 through the present, and far exceeding the CPI:

**Figure 1**



4.    Through a series of frequent and repeated secret meetings, information sharing, communications, and public signaling, Defendants drove the prices of

HVAC Equipment to historic levels. Additionally, Defendants used two key organizations to facilitate their conspiracy. First, Defendants used the Air-Conditioning, Heating, and Refrigeration Institute ("AHRI"), a trade association for the HVAC industry they largely control, to implement extensive sharing of information available only to AHRI members who also agreed to share their own data with their competitors. Second, Defendants used a niche HVAC industry publication—Air Conditioning, Heating & Refrigeration ("ACHR") News—to each announce their price increases to and provide commentary on their pricing and supply plans.

5. HVAC Equipment regulates indoor environments by providing thermal comfort, managing humidity, and improving air quality in residential and commercial buildings. HVAC stands for heating, ventilation, and air conditioning. HVAC Equipment functions by heating, cooling, and circulating air, often using furnaces for heat, air conditioners for cooling, and ductwork to distribute air through a space. There are several types of HVAC Equipment, including air conditioner condensers, heat pumps, furnaces, air handlers, rooftop units, split systems, chillers, and variable refrigerant flow systems.

6. HVAC Equipment is necessary and expensive. For example, Defendant Carrier estimates that on average, heat pump installation costs and HVAC replacements for existing heat pumps cost range from $6,000 to $25,000. Defendant

Trane estimates that on average, air conditioning installation and replacement costs range from $5,000 to over $10,000. These costs often require consumers and businesses to take out financing to afford HVAC Equipment. These prices, as detailed herein, have skyrocketed in just the last few years.

7. While the purchase of HVAC Equipment is necessary, consumers and businesses have no ability to push back on soaring prices. As one industry participant stated in July 2021 as prices skyrocketed, "I don't think there's been much pushback from the consumer at all … . The consumer doesn't know what the -- what a price is. It's not a frequent purchase for the consumer."

8. In the United States, the manufacturing of HVAC Equipment is highly regulated by industry standards that have been in place for many years, leading to limited product differentiation. The technology and processes for manufacturing HVAC Equipment are well-established. Demand for HVAC Equipment is relatively stable due to their frequency of use in residential and commercial properties and the life cycle of HVAC Equipment, which require periodic maintenance and replacement. The market for HVAC Equipment in the United States was approximately $31.26 billion in 2024. HVAC Equipment, as standardized, mass-produced units, sold on the basis of price, is a commodity product.

9. During the Class Period, Plaintiff alleges that Defendants conspired to fix, raise, maintain, and stabilize the price of HVAC Equipment in the United States.

Defendants' anticompetitive actions widened the spread between the price that they pay to manufacture HVAC Equipment and the price at which they sold HVAC Equipment.

10. Defendants offered many pretextual excuses for their conspiracy: cost increases from COVID-19, updated energy efficiency standards, and the phasedown of hydrofluorocarbons ("HFCs") mandated by the American Innovation and Manufacturing ("AIM") Act of 2020. Yet, the COVID-19 pandemic does not explain the substantial HVAC Equipment price increases during the Class Period as the HVAC PPI rose faster than both the CPI (as shown above) and the Producer Price Index by Industry: Major Household Appliance Manufacturing ("Household Appliance PPI"), as seen in Figure 2 below. Neither does the new SEER2 energy conservation standards—Defendants had, at a minimum, six years to develop compliant HVAC Equipment. Finally, the HVAC Equipment industry itself led domestic efforts to phase out HFCs, investing billions in the transition and beginning their advocacy over 20 years before the restrictions took effect in 2025.

**Figure 2**



11.    Plaintiff and members of the Classes are individuals and entities who purchased HVAC Equipment as the end-purchaser in the distribution chain. Plaintiff brings this action on behalf of herself individually and on behalf of various state classes consisting of all persons and entities who purchased HVAC Equipment indirectly from a Defendant for end use in the United States during the Class Period.

12.    Defendants in this case are the leading manufacturers of HVAC Equipment in the United States: Trane, Carrier, Daikin, Bosch, Lennox, Rheem, and AAON. These seven Defendants control over 90% of the market for HVAC Equipment in the United States.

## II.    JURISDICTION AND VENUE

13.    Plaintiff brings this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained

by Plaintiff and members of the Classes by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to enjoin further violations.

14.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

15.     Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26 and 28 U.S.C. § 1391(b), (c), and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District (*e.g.*, Defendant Bosch's American corporate headquarters, and its American affiliate, Defendant Robert Bosch LLC, are located in this District at 38000 Hills Tech Drive, Farmington Hills, MI 48331), and because a substantial portion of the anticompetitive conduct described herein was carried out in this District.

16.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) has manufactured, sold, shipped, and/or delivered substantial quantities of HVAC Equipment throughout the United States, including this District; (c) has substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing

-7-

in, located in, or doing business throughout the United States, including in this District.

17.    The activities of Defendants, as explained in this Complaint, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

18.    No other forum would be more convenient for the parties and witnesses to litigate this case.

### III.    PARTIES

#### A.    Plaintiff

19.    Plaintiff Alyssa Berg is a resident of Minnesota. During the Class Period, Ms. Berg purchased HVAC Equipment produced by one or more of the Defendants in Minnesota through an HVAC installer, and Ms. Berg is therefore an indirect end-user purchaser of HVAC Equipment. Ms. Berg suffered injury as a result of Defendants' conduct as alleged herein.

#### B.    Defendants

##### 1.    The Bosch Defendants.

20.    Defendant Robert Bosch LLC is a wholly owned subsidiary of Robert Bosch GmbH and serves as the corporate headquarters for North America. It is located in this District, in Farmington Hills, Michigan.

21.    Defendant Robert Bosch GmbH is a publicly traded corporation headquartered and incorporated in Gerlingen, Baden-Wurttemberg, Germany.

Robert Bosch GmbH's United States corporate headquarters are located in Farmington Hills, Michigan. Robert Bosch GmbH manufactures and markets HVAC Equipment under several different brands and product lines, including Bosch, York, Champion, Coleman IVT, Luxaire, Hitachi, TempMaster, Guardian, and others. During the Class Period, Robert Bosch GmbH and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

22.     Defendant JC Residential and Light Commercial LLC ("JC RLC") is a subsidiary of Robert Bosch GmbH, and according to the Michigan Secretary of State's website is licensed to transact business in the State of Michigan. JC RLC was acquired by Robert Bosch GmbH in 2024 from Johnson Controls International plc's Residential and Light Commercial HVAC business in an all-cash transaction valued at $8.1 billion.

23.     Defendant Johnson Controls-Hitachi Air Conditioning North America LLC ("JCH North America") is a subsidiary of Robert Bosch GmbH. JCH North America was acquired by Robert Bosch GmbH; it was formerly a joint-venture between Johnson Controls and Hitachi Global Life Solutions, Inc. JCH North America remains a subsidiary of Robert Bosch GmbH, and according to the

Michigan Secretary of State's website is licensed to transact business in the State of Michigan.

24.    Defendants Robert Bosch GmbH, Robert Bosch LLC, JC RLC, and JCH North America are referred to collectively as "Bosch" or the "Bosch Defendants" in this Complaint. The Bosch Defendants are manufacturers of HVAC Equipment in the United States, including, both residential and commercial HVAC Equipment. During the Class Period, Bosch and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Bosch supplied HVAC Equipment to distributors, including Johnstone Supply, which has many locations in this District, including in Detroit, Ann Arbor, Farmington Hills, Flint, Kalamazoo, and many others.

### 2.    The Trane Defendants.

25.    Defendant Trane Technologies plc ("Trane Technologies") is a publicly traded corporation headquartered and incorporated in Dublin, Ireland. Trane's North American and United States headquarters are located in Davidson, North Carolina. Trane's common stock is listed and traded on the New York Stock Exchange under the ticker symbol "TT." In 2008, Ingersoll Rand Inc. acquired Trane Technologies plc for $10.1 billion, holding it as a subsidiary before spinning it off into a dedicated

-10-

climate control company in March 2020. Trane Technologies operates commercial sales offices for HVAC Equipment in both Flint and Livonia, Michigan. Trane Technologies also operates an HVAC Equipment commercial manufacturing operation in Grand Rapids, Michigan. Indeed, Trane Technologies' website includes a page entitled "Contact a Trane HVAC Dealer in Michigan," and lists over 40 locations in the State of Michigan. Trane Technologies manufactures and markets HVAC Equipment under several different brands and product lines, including Trane, American Standard, RunTru, Ameristar, Oxbox, and others. During the Class Period, Trane and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

26. In 2008, Ingersoll Rand Inc. acquired Trane for $10.1 billion, holding it as a subsidiary before spinning it off into a dedicated climate control company in March 2020.

27. Defendant Trane U.S. Inc. is a manufacturer of HVAC systems, building management controls, and energy-efficient indoor climate solutions for residential and commercial applications. Trane U.S. Inc. is a subsidiary of Trane Technologies plc, and according to the Michigan Secretary of State's website, is licensed to do business in the State of Michigan.

-11-

28.     Defendant Mitsubishi Electric Trane HVAC US is a 50/50 joint venture between Trane Technologies plc and Mitsubishi Electric US, Inc., formed in 2018. The joint venture distributes products under the Mitsubishi Electric brand, as well as specific Trane and American Standard branded systems. Mitsubishi Electric Trane HVAC US is headquartered in Suwanee, Georgia.

29.     Defendants Trane Technologies, Trane U.S. Inc., and Mitsubishi Electric Trane HVAC US are referred to collectively as "Trane" or the "Trane Defendants" in this Complaint. The Trane Defendants are manufacturers of HVAC Equipment in the United States, including, both residential and commercial HVAC Equipment. During the Class Period, Trane and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Trane supplied HVAC Equipment to distributors, including in the State of Michigan and in this District.

### 3.     The Carrier Defendants.

30.     Defendant Carrier Global Corp. ("Carrier Global") is a publicly traded Delaware corporation headquartered in Palm Beach Gardens, Florida. Carrier's common stock is listed and traded on the New York Stock Exchange under the ticker symbol "CARR." Carrier Global operates a commercial servicer for HVAC Equipment in Novi, Michigan. Indeed, Carrier Global's website includes a page

entitled "Find a Carrier Expert – Michigan," which identifies over 100 locations in the State of Michigan. Carrier Global manufactures and markets HVAC Equipment under several different brands and product lines, including Carrier, Bryant, Toshiba, Payne, Tempstar, Airquest, Arcoaire, Beretta, Comfortmaker, Heil, Keeprite, Day & Night, Viessmann, and others.

31.     Defendant Viessmann Manufacturing Co. (U.S.), Inc. is part of the larger Viessmann Climate Solutions entity that Carrier acquired in 2024 and was Viessmann's primary manufacturing and distribution facility in the United States. It is now a subsidiary of Carrier and is located in Warwick, Rhode Island. Carrier, as used herein, includes Viessmann Manufacturing Co. (U.S.), Inc.

32.     Defendants Carrier Global Corp. and Viessmann Manufacturing Co. (U.S.), Inc. are referred to collectively as "Carrier" or the "Carrier Defendants" in this Complaint. The Carrier Defendants are manufacturers of HVAC Equipment in the United States, including, both residential and commercial HVAC Equipment. During the Class Period, Carrier and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Carrier supplied HVAC Equipment to distributors, including in the State of Michigan and in this District.

### 4.    The Daikin Defendants.

33.    Defendant Daikin Industries, Ltd. ("Daikin") is a publicly traded corporation headquartered and incorporated in Osaka, Japan. Daikin's United States corporate headquarters are located in New York, New York. In 2022, Daikin acquired ThermalNetics, an HVAC Equipment sales and services provider that is headquartered in Auburn Hills, Michigan. Daikin manufactures and markets HVAC Equipment under several different brands and product lines, including Daikin, Amana, Goodman, and others. During the Class Period, Daikin and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

34.    Defendant Daikin Comfort Technologies North America, Inc. is a subsidiary of Daikin Industries, Ltd., based in Waller, Texas. At its "Daikin Texas Technology Park" outside Houston, Texas, Daikin Comfort Technologies North America, Inc. engineers, manufactures, markets, and sells HVAC Equipment under several brand and product lines including Daikin, Goodman, Quietflex, and Amana. Daikin Industries, Ltd. changed the name of its United States subsidiary Goodman Global Group, Inc. to Daikin Comfort Technologies North America, Inc., in April 2022.

35.     Defendant Daikin Applied Americas is a subsidiary of Daikin Industries, Ltd., based in Minneapolis, Minnesota. Daikin Applied Americas manufactures and markets HVAC Equipment under the Daikin brand and several product lines.

36.     Defendant ThermalNetics, LLC is a subsidiary of Daikin Industries, Ltd., based in Auburn Hills, Michigan. ThermalNetics manufactures and markets HVAC Equipment under the Daikin brand and several product lines.

37.     Defendants Daikin Industries, Ltd., Daikin Comfort Technologies North America, Daikin Applied Americas, and ThermalNetics, LLC are referred to collectively as "Daikin" or the "Daikin Defendants" in this Complaint. The Daikin Defendants are manufacturers of HVAC Equipment in the United States, including, both residential and commercial HVAC Equipment. During the Class Period, Daikin and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Daikin supplied HVAC Equipment to distributors, including in the State of Michigan and in this District.

### 5.    The Lennox Defendants.[2]

38.    Defendant Lennox International, Inc. ("Lennox International") is a publicly traded Delaware corporation headquartered in Richardson, Texas. Lennox's common stock is listed and traded on the New York Stock Exchange under the ticker symbol "LII." Lennox International, either itself or by/through its subsidiaries, operates stores selling its HVAC Equipment products in Livonia and Madison Hights, Michigan. During the Class Period, Lennox International and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

39.    Defendant Lennox Industries Inc. ("Lennox Industries") is a wholly owned subsidiary of Lennox International. Lennox Industries is a Delaware corporation headquartered in Richardson, Texas. Lennox Industries manufactures and markets HVAC Equipment under the Lennox brand and several product lines.

40.    Defendant Allied Air Enterprises LLC ("Allied Air") is a wholly owned subsidiary of Lennox Industries, Inc. Allied Air is a Delaware limited liability company headquartered in West Columbia, South Carolina. Allied Air manufactures

---

[2] While not named as a Defendant, Advanced Distributor Products LLC ("ADP") is a wholly owned subsidiary of Heatcraft Inc., which is itself a subsidiary of Lennox International, Inc. ADP is a Delaware limited liability company headquartered in Stone Mountain, Georgia. ADP manufactures and markets HVAC Equipment under the ADP brand and several product lines.

and markets HVAC Equipment under several different brands and product lines, including Allied, Allied Commercial, Armstrong Air, AirEase, Ducane, and Concord.

41. Defendants Lennox International, Lennox Industries, and Allied Air are referred to collectively as "Lennox" or the "Lennox Defendants" in this Complaint. The Lennox Defendants are manufacturers of HVAC Equipment in the United States, including, both residential and commercial HVAC Equipment. During the Class Period, Lennox and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Lennox supplied HVAC Equipment to distributors, including in the State of Michigan and in this District.

### 6.    The Rheem Defendants.

42. Defendant Rheem Manufacturing Co. is a privately-owned manufacturer headquartered in Atlanta, Georgia. Rheem contracts with HVAC Equipment services in the Detroit, Michigan area. Rheem Manufacturing Co. entered commercial markets for HVAC Equipment in the 1970s when it acquired Acme Industries, which was headquartered in Jackson, Michigan. Rheem Manufacturing Co. is a subsidiary of Paloma Industries, Ltd., a privately held company based in Nagoya, Japan, which acquired Rheem Manufacturing Co. in

1988. Rheem Manufacturing Co. manufactures and markets HVAC Equipment under several different brands and product lines, including Rheem, Ruud, WeatherKing, Sure Comfort, and others. In October 2024, Rheem Manufacturing Co. acquired Nortek Global HVAC from Madison Industries.

43. Defendant Heat Transfer Products Group, LLC is a manufacturer of commercial HVAC Equipment sold under brands such as Russell, Witt, Kramer, and ColdZone. HTPG is a division of Rheem Manufacturing Co., and is headquartered in Lawrenceville, Georgia.

44. Defendants Rheem Manufacturing Co. and Heat Transfer Products Group, LLC are referred to collectively as "Rheem" or the "Rheem Defendants" in this Complaint. The Rheem Defendants are manufacturers of HVAC Equipment in the United States, including, both residential and commercial HVAC Equipment. During the Class Period, Rheem and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Rheem supplied HVAC Equipment to distributors, including in the State of Michigan and in this District.

**7.     The AAON Defendants.**

45. Defendant AAON, Inc. ("AAON, Inc. (Nevada)") is a publicly traded Nevada corporation headquartered in Tulsa, Oklahoma. AAON's common stock is

listed and traded on NASDAQ under the ticker symbol "AAON." AAON manufactures and markets primarily commercial HVAC Equipment, including rooftop units, air handling units, chillers, and condensing units. Airtech Equipment is the primary authorized representative for AAON HVAC Equipment in Michigan, with offices both in this District in Detroit, as well as in Grand Rapids. During the Class Period, AAON and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

46. Defendant AAON, Inc. ("AAON, Inc. (Oklahoma)") is a subsidiary of the AAON Inc. entity referenced above in the immediate prior paragraph. AAON, Inc. (Oklahoma) is incorporated in Oklahoma and AAON, Inc. Oklahoma engineers, manufactures, and sells highly configurable HVAC systems.

47. Defendant AAON Coil Products, Inc. is a Texas corporation and subsidiary of AAON, Inc. AAON Coil Products, Inc. engineers and manufactures semi-custom and custom HVAC systems, as well as heating and cooling coils for use in HVAC Equipment.

48. Defendant BASX, Inc. is an Oregon corporation and subsidiary of AAON, Inc. BASX engineers, manufactures, and sells a wide-range of custom, high-performance cooling solutions and highly customized air handlers and modular solutions for a variety of markets.

49.     Defendants AAON, Inc. (Nevada), AAON, Inc. (Oklahoma), AAON Coil Products, Inc., and BASX, Inc. are referred to collectively as "AAON" or the "AAON Defendants" in this Complaint. The AAON Defendants are manufacturers of HVAC Equipment in the United States, including both residential and commercial HVAC Equipment. During the Class Period, AAON and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, AAON supplied HVAC Equipment to distributors, including in the State of Michigan and this District.

## IV.   AGENTS AND CO-CONSPIRATORS

50.     Co-Conspirator Air-Conditioning, Heating, and Refrigeration Institute is the trade association that represents manufacturers of heating, ventilation, air conditioning, commercial refrigeration, and water heating equipment in North America. AHRI is based in Arlington, Virginia. As alleged elsewhere herein, AHRI, at a minimum, facilitated the conspiracy alleged herein, and moreover, AHRI's Board of Directors is comprised of, in substantial part, executives of several Defendants, as detailed *infra*. Further investigation and access to discovery will provide more clarity on the full scope of AHRI's role in the conspiracy.

51.     Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. The Defendants are jointly and severally liable for the acts of their co-conspirators whether or not the co-conspirators are named as Defendants in this Complaint.

52.     The acts alleged herein that were done by each of the Co-Conspirators were fully authorized by each of those Co-Conspirators, or ordered, or done by duly authorized officers, managers, agents, employees, or representatives of each Co-Conspirator while actively engaged in the management direction or control of its affairs. The acts charged in this Class Action Complaint as having been done by Defendants were authorized, ordered, and/or done by their officers, agents, employees, and/or representatives, while actively engaged in the management of their business and affairs.

*     *     *

53.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

54. Each Defendant named herein acted as the agent or joint venturer of, or on behalf of, the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

55. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## V.    FACTUAL ALLEGATIONS

56. Plaintiff alleges that Defendants entered into an agreement from at least as early as January 1, 2020, through the present to exchange price signaling statements and competitively sensitive information with the purpose of coordinating supracompetitive prices for HVAC Equipment and effect of generating historic profit margins.

### A.    A Description of HVAC Equipment

#### 1.    Residential HVAC Equipment.

57. Residential HVAC Equipment is just that: HVAC Equipment designed for residential use. Such systems tend to be smaller and simpler than their commercial counterparts. They often feature a "split" system, that is, one indoor unit and one outdoor condenser.

58. Residential HVAC Equipment includes systems that regulate indoor temperature, humidity, and air quality in homes. Key components of residential HVAC systems include furnaces, heat pumps, air conditioners, and air handlers.

These work, often together, to move heated or cooled air throughout the home via ductwork.

59.     Residential heating equipment includes furnaces (which use gas, oil, or electricity) and heat pumps, which provide heat by transferring warmth from the air. Residential cooling equipment, as well as heat pumps, remove heat and humidity from indoor air, releasing it outside.

60.     Air handlers, with blower motors, push conditioned air through ducts. Ductwork and venting distribute air throughout the home. Residential HVAC systems often include air quality components, such as filters that remove particulates, and systems like dehumidifiers or humidifiers to balance moisture levels.

61.     There are three primary types of residential HVAC systems: (1) split systems, which have separate indoor (furnace/air handler) and outdoor (condenser) components; (2) packaged units, where all components are combined into one outdoor unit (often used in homes without basements); and (3) ductless "mini-splits," which are individual units for cooling/heating specific rooms without needing ductwork. Ductless "mini-splits" are not included in the product definition in this case.

-23-

### 2.   Commercial HVAC Equipment.

62.   Commercial HVAC Equipment usually involve more complex requirements than their residential counterparts, such as controlling different temperatures in different rooms, zones, or offices within a building. Commercial HVAC Equipment are designed for high-capacity heating and cooling, and are often modular, rooftop units that combine heating and cooling, allowing for multiple units to be used in one building (*e.g.*, in applications such as apartments, hotels, office buildings, and data centers).

63.   Most companies offer rooftop HVAC units (also known as RTUs), which are commercial only systems. They are typically used on shops, restaurants, mini-malls, and the like. These are "all-in-one" systems that sit on the roof and handle heating, cooling, and ventilation for smaller commercial buildings. For example, Lennox offers "Rooftop Units" for commercial buildings, as do Daikin and Bosch (through its acquisition of Johnson Controls and its York brand).

64.   A typical commercial rooftop system is a self-contained system that bundles all the main refrigeration, air-moving, heating, and control components in one cabinet. The parts consist of refrigeration (compressor, condenser coil, condenser fan, expansion device, and evaporator coil). There is also an air-handling section (fan, return-air path, outdoor-air intake hood, and air filters) as well as a

heating unit. There are also controls and safety devices such as thermostats, sensors, and control boards.

65. As an alternative to a rooftop unit, Defendants also offer ducted and split systems. These are separate indoor and outdoor units connected by ducts that can be built into ceilings, boiler rooms, or utility closets in offices and other commercial buildings. These combine an outdoor condensing unit with an indoor air handler, running through ducts rather than as a single rooftop box. These include Bosch's commercial "split systems," Daikin's commercial split heat pumps, Carrier's "Split Systems and Air-Cooled Condensers," Lennox's commercial mini-split systems, and Rheem's "Split Air Conditioners."

66. A typical commercial split system has two main pieces: an outdoor condensing unit and an indoor air handler, connected by refrigerant lines. The outdoor unit houses the compressor, condenser coil, and outdoor fan, while the indoor unit contains the evaporator coil, supply fan/blower, and air filter.

67. For larger buildings, Defendants offer some form of multi-zone heat pump system. This includes variable refrigerant flow ("VRF") systems for offices, hotels, and other large commercial buildings. These systems offer room-by-room control and are refrigerant-only, connecting many indoor units to one or more outdoor devices to modulate refrigerant flow to each zone. They use a network of refrigerant piping to connect the outdoor systems to the indoor ones and then use

-25-

compressors to vary how much refrigerant each indoor unit gets so each zone can be heated or cooled independently. Examples include Daikin's air-cooled and water-cooled VRV systems,[3] Trane's air-source, water-source, and hybrid VRF systems, Carrier's air-source and heat recovery VRF systems, and Bosch's air-source and water-source VRF systems.

68.     A VRF has several groups of parts. The outdoor unit has the main compressor (the part that pumps the refrigerant) and a fan to expel heat to the outdoors. In many buildings, there are several connected outdoor units to get more capacity. The indoor unit has a fan coil to heat or cool the air, a fan to blow air into the ducts, and a filter to clean the air. Thin refrigerant pipes run from the outdoor unit to all the indoor units.

69.     For the largest commercial and institutional structures, Defendants sell chillers. These are for buildings like office towers, hospitals, and college campuses. Chillers make cold water for entire buildings. The VRF systems and chillers feed air-handling units inside the building, which do the work of moving, filtering, and heating or cooling the air.

---

[3] Daikin trademarked the variable refrigerant volume ("VRV") term, but VRF and VRV systems are technologically the same. *See* Daikin, *VRV and VRF Systems (Variable Refrigerant Volume/Flow)*, available at https://www.daikin.co.uk/en_gb/about/daikin-innovations/variable-refrigerant-volume.html (last accessed Mar. 19, 2026).

70. A typical commercial chiller contains all the main refrigeration components in one package: a compressor, evaporator, condenser, expansion device, and associated controls, valves, and power gear.

**B.     Market Distribution and Size for HVAC Equipment**

71. An approximation of market size distribution for each HVAC Equipment application is shown below.

**Figure 3**



2020 Market Share Percentage

72. The market for HVAC Equipment in the United States was approximately $31.26 billion in 2024.

## C.  Pricing Basics in the HVAC Equipment Industry

73.    Pricing of residential HVAC Equipment is generally consistent across the Defendants' brands, with ranges between $4,000–$13,000 depending on the model customers select. Model prices vary based on efficiency ratings, speed varieties, size/capacity, noise-reduction, and other factors. Residential HVAC Equipment installation factors such as labor costs, home sizes and duct-work, and the complexity of the systems being installed lead to significant variabilities in overall consumer cost.

74.    Pricing of commercial HVAC Equipment is also generally consistent across the Defendants' brands, with ranges between $5,000 to over $100,000 depending on the commercial application. For instance, a small retail shop is going to require a much smaller system than a warehouse. Commercial HVAC Equipment prices also vary based on efficiency ratings, size/capacity, and type of system. Commercial HVAC Equipment installation factors such as labor and equipment costs, permit and inspection fees, and design and engineering costs, and duct-work also lead to variabilities in overall cost.

## D.  Overview of Which HVAC Equipment Each Defendant Manufactures

75.    Bosch produces inverter ducted split ("IDS") heat pumps, geothermal water pumps, residential and commercial heat pump systems, commercial packaged rooftop and split units, air handling units, various furnaces, and air purifiers, among

others. Bosch offers a range of products within each of these categories of HVAC Equipment, including through other brand names.

76. Trane produces residential products such as air conditioners, furnaces, and heat pumps. Trane's line of commercial products includes airside equipment, chillers, commercial heat pumps, cooler distribution units, packaged units and split systems, VRF heating and cooling systems; and geothermal pumps. Trane offers a range of products within each of these categories of HVAC Equipment, including through other brand names.

77. Carrier produces residential products such as air conditioners, furnaces, heat pumps, crossover solutions, evaporator coils, geothermal pumps, and fan coils. Carrier's line of commercial products includes airside equipment, chillers, packaged indoor and outdoor units, split systems and condensers, and VRF systems. Carrier offers a range of products within each of these categories of HVAC Equipment, including through other brand names.

78. Daikin produces a range of residential and commercial products such as split/multi-split type air conditioners, unitary (ducted split) systems, air to water heat pump systems, air purifiers, heating systems, packaged air conditioners, medium/low temperature refrigeration, ventilation products, rooftop systems, air cooled chillers, water cooled chillers, airside equipment, and VRV systems. Daikin

-29-

offers a range of products within each of these categories of HVAC Equipment, including under other brand names.

79. Lennox produces a range of residential and commercial products such as air conditioners heat pumps, furnaces, air handlers, packaged units, indoor air quality units, water heaters, unit heaters, and duct furnaces. Lennox offers a range of products within each of these categories of HVAC Equipment, including under other brand names.

80. Rheem produces a range of residential products such as air conditioners, air handlers, furnaces, heat pumps, and water heaters. Rheem also produces a range of commercial products such as air handlers, packaged air conditioners, packaged gas electric units, packaged heat pumps, split air conditioners, split heat pumps, electric water heaters, gas water heaters, heat pump water heaters, storage tanks, tankless electric water heaters, and tankless gas water heaters. Lennox offers a range of products within each of these categories of HVAC Equipment, including under other brand names.

81. AAON manufactures a range of primarily commercial products such as packaged rooftop units, split systems, air handling units, and condensing units, among others. AAON offers a range of products within each of these categories of HVAC Equipment, including under other brand names.

## E.       The Air-Conditioning, Heating, and Refrigeration Institute

82.       Participants in a conspiracy often rely on a closely controlled industry trade association to facilitate information sharing, provide opportunities to meet in person, and otherwise monitor and enforce their conspiracy. In the HVAC Equipment conspiracy, AHRI played this role.

83.       AHRI is the trade association that represents manufacturers of heating, ventilation, air conditioning, commercial refrigeration, and water heating equipment in North America. It is largely controlled by Defendants and their senior executives. The AHRI Board of Directors is comprised of multiple senior HVAC executives and board members. For example, the 2026 AHRI Board includes: (1) Trane's President of HVAC Americas, Holly Paeper; (2) Carrier's President of Climate Solutions Americas, Gaurang Pandya; (3) Lennox's CEO, Alok Maskara; (4) Daikin's senior executive, Yogi Uemura; (5) Rheem's President of Global Air, Mike Branson; and (6) Bosch's Regional President Americas, David Budzinski.

84.       AHRI purports to "act[] as an impartial central agency for gathering individual company data and distributing it in summaries covering bookings, unit shipments, sales volume, manufacturer inventories, exports, efficiencies, and market information on trading area sales."

85.       AHRI follows a give-to-get model for information sharing. In order for members to receive industry data, they must provide that same data for their own

company. AHRI states that "AHRI statistical data is not for sale," and instead is only available to HVAC Equipment companies that also provide AHRI (and their competitors) their own confidential data.

86.  AHRI's HVAC Equipment information "is compiled in various reporting formulas and distributed in aggregate form to participants in monthly, quarterly, semi-annual, or annual reports." Indeed, AHRI boasts that they turn participants' data into "an industry report that they get so they can really get an idea of exactly where they stand in the market for [each] product" they manufacture for the AHRI "statistics program that consists of over 150 reports covering over 30 different product types." The reports are "based on what the members would like to buy in the reports, what data they'd like to provide."

87.  At the start of the conspiracy in 2020, AHRI launched a new "Analytics App and Executive Dashboard," which it describes as follows:

> In 2020 AHRI launched the Executive Dashboard to provide certification program participants with real-time program performance data, industry statistics, and the predictive analytics needed to drive results. As part of our commitment to further develop our suite of data analytics services, we are proud to introduce the AHRI Analytics App. This exciting new tool is designed to enhance the user's experience by providing access to data related to individual product performance, which can then be compared to the data of other AHRI certification program participants, along with predictive analysis.

-32-

88.     AHRI has a Standards Policy Committee (StdC) that "defines the policies and procedures related to development and approval of AHRI *standards, guidelines,* and *stand-alone appendices*." In 2024, for example, AHRI's StdC was Chaired by Darcy Lee of Trane. Voting members of the StdC in 2024 also included: Dominique Taudin of Carrier, Bruce Perkins of Lennox, Sachin Nehete of Rheem, and Patrick Marks of Johnson Controls (now Bosch).

89.     AHRI also has a chat platform called "AHRI Connect," a portal where "members and invited guests interact with other air conditioning, heating, and refrigeration industry leaders and technical experts" and which allows its users "to join communities where they can take part in vibrant discussions and work collaboratively with colleagues across the globe, access documentation instantaneously, and stay abreast of critical news updates."

90.     An example of the information available in just one of AHRI's reports, a monthly report called "Air Conditioning Today", includes the following information:

### Notes and FAQs

*A shipment is defined as when a unit transfers ownership; a consignment is not a transfer of ownership. Industry data is aggregated from the information supplied by AHRI member companies that participate in the statistics program and can be subject to revision. Published year-to-date data is inclusive of all revisions. No other AHRI data (e.g., by state or region) is available to the public other than that published. AHRI does not conduct any*

*market forecasting and is not qualified to discuss market trends. BTUHs of 64.9 and below are for residential units; 65.0 and above for commercial. For previous monthly shipment releases and historical data, please see http://www.ahrinet.org/statistics.*

91. **How do my colleagues subscribe to the report?** Go to http://www.ahrinet.org/statistics and click on Subscribe.

92. Does this data represent shipments to the United States only or are shipments outside of the United States included? *This data represents shipments to customers in the United States only.*

93. **Do you provide U.S. data by state?** That data is not available publicly.

94. **Is historical data available in Excel?** It is available monthly reflecting exactly the data presented in the monthly public release.

95. **Is data available in a different format?** The only format available is provided on the website.

*96.* Does the December YTD data equal full calendar year? *Yes, it does.*

97. Can I purchase additional industry data from AHRI? *No, AHRI statistical data is not for sale.*

98. **Does AHRI provide information for academic research purposes?** AHRI is not authorized by our members to provide information other than what is listed on our website.

99. **How much of the industry does the data represent?** Although we cannot get into specifics about how much of the industry the data represents, in general, AHRI is one of the largest trade associations in the nation, representing more than 300 heating, water heating, ventilation, air conditioning and commercial refrigeration manufacturers within the global HVACR industry. AHRI's 300+ member companies account for more than 90 percent of the residential and commercial air conditioning, space heating, water heating, and commercial refrigeration equipment manufactured and sold in North America.

100. **Is it accurate to use the number for year-to-date U.S. shipments as a measure of sales?** AHRI reports track shipments, which are defined as when a unit transfers ownership. While some people use the terms shipments and sales interchangeably, they may not be the same.

101. AHRI has at least two in-person board meetings each year. In 2026, those meetings are scheduled for June in Arlington, Virginia (where AHRI is based) and for November in Puerto Rico.

**F.      Pre-2020: Relatively Stable Pricing That Tracked the CPI and Household Appliance PPI**

102. Prior to the commencement of Defendants' conspiracy in or about January 2020, HVAC Equipment generally experienced stable and small price increases, consistent with both what one would expect in a normal market and with general consumer price trends.

103.   As reflected in Figure 1, *supra*, through the end of 2019, the HVAC PPI consistently tracked the CPI and the Household Appliance PPI. That all began to change in January 2020, when Defendants launched their conspiracy. The fruit of their efforts became increasingly apparent as the spread between the HVAC PPI and the CPI grew exponentially.

104.   In early 2019, some HVAC companies sought to increase prices, but they were not successful or as large of increases in the margin between costs and price because not enough HVAC companies announced prices together. For instance, on February 13, 2019, Nortek Air (now part of Rheem) announced a 6% increase for the first quarter of 2019. But other companies did not make similar announcements, so following through on and making the price increase stick was more difficult. Defendants needed a better boogeyman to blame, and they found it in early 2020 with the onset of COVID-19, which end users accepted as a legitimate reason for price increases, even though it was not.

**G.     2020: The Onset of the COVID-19 Pandemic and the Phasedown of HFCs Under the AIM Act Provided the Perfect Opportunity and Pretext for the Conspiracy to Succeed**

105.   Defendants launched their conspiracy on or around January 1, 2020. They began relying on publicly announced price increases, most often made through ACHR News. ACHR News is billed as the "the weekly newsmagazine of the HVACR contractor covering residential and commercial contracting," and its

website appears to have centralized reporting on the specifics of each price increase announcement. Almost all of the price increases that follow in this section of the Complaint were announced through ACHR News.

106. In the lead up to the start of the conspiracy on or around January 1, 2020—and before Defendants had the convenient excuse of widely spreading COVID-19 to blame for price increases—some companies announced prices increases. For instance, on November 15, 2019, Lennox announced a price increase of 3-6% effective January 1, 2020. On November 18, 2019, AAON announced a price increase of 5% effective December 5, 2019. On December 5, 2019, Amana (Daikin) and Goodman (Daikin) announced a price increase of 6% effective February 1, 2020. On December 13, 2019, Allied Air announced 4-6% increase effective February 1, 2020. The fact so many of these increases were publicly announced, primarily through ACHR News, was notable.

107. In early February 2020, AHRI held its annual meetings in Orlando, Florida. At the time, AHRI's Vice Chairman was Mike Schartz, CEO of Daikin Applied. AHRI's Board of Directors then included Gary Bedard, EVP, President, and COO Worldwide Refrigeration at Lennox, Mike Branson, President at Rheem, Elizabeth Haggerty, VP and GM Global Ducted Systems at Johnson Controls, Chris Nelson, President Residential and Commercial Systems at Carrier, and Donny Simmons, President Commercial HVACR at Ingersoll Rand (which at the time, was

Trane's parent). Upon information and belief, ACHR News staff were present at and attended the AHRI conference and provided coverage of all AHRI and other industry conferences.

108. Then came the COVID-19 pandemic in early 2020, which presented a golden opportunity. No customer could question that the pandemic had the potential to disrupt supply chains, so coordinated price increases suddenly became a bonanza for Defendants, eventually driving the prices of some HVAC Equipment to record highs, at levels that vastly exceeded the Consumer Price Index, as alleged herein.

109. Johnson Controls announced, through ACHR News, in August 2020 it was "implement[ing] a price increase of up to six percent on residential and commercial heating and cooling products," effective October 1, 2020. Johnson Controls attributed the increase to challenges related to the COVID-19 pandemic and the "escalating frontline manufacturing costs" that resulted.

110. Trane was the next to announce a price increase of up to 6% on September 30, 2020 for select commercial "Trane unitary, applied, and controls equipment," effective November 7, 2020. Again, Trane made its price increase announcements through ACHR News.

111. On October 30, 2020, AAON announced a 4% price increase on select commercial HVAC Equipment, effective January 11, 2021. Like the others, AAON announced its price increase through ACHR News.

112.   Trane tested the waters again on November 2, 2020, announcing price increases of up to 8%. It was reported that "[t]he increase, effective January 1, 2021, applies to Trane, American Standard Heating & Air Conditioning, RunTru by Trane and Ameristar equipment, and all parts and supply brands."

113.   Lennox soon followed Trane's lead, announcing on November 9, 2020 that it would increase prices by 4–6% on all residential and commercial equipment, effective January 18, 2021.

114.   The next month, on December 9, 2020, Nortek Air Solutions, another HVAC manufacturer and now part of Rheem, announced a price increase ranging from 3–9% on all its products. The company blamed the increase on "recent rises in labor rates, third-party component vendor prices, and a cost escalation on steel, copper, aluminum, and other commodities."

115.   Later that month, Nortek separately announced a 6% price increase on residential and commercial products, effective March 1, 2021.

116.   Like its parent company, Lennox, did the month prior, Allied Air announced an identical price increase of 4–6% on December 21, 2020, effective February 1, 2021, "due to inflationary pressures to due to transportation and input costs."

117.   At the end of the year, on December 27, 2020, Congress enacted the AIM Act, which mandated the phasedown of HFCs. This prohibition covered R-

410A, the primary refrigerant used in air conditioning condensers and heat pumps at the time. Beginning on January 1, 2025, the AIM Act prohibited Defendants from manufacturing or importing new R-410A systems. This provided further cover and pretext for Defendants' conspiratorial price increases.

## H.  2021: The Conspiracy Gathers Steam

118.  On March 8, 2021, Trane announced a price increase of up to 7.5% on for its commercial HVAC Equipment, effective April 9, 2021.

119.  AAON followed with a price increase on commercial HVAC Equipment the next day, raising prices by 4% on all HVAC Equipment, effective June 1, 2021. The company blamed the impact of rising raw material prices on component costs.

120.  Later that month, on March 31, 2021, Trane announced an additional price increase specific to residential HVAC Equipment of up to 6%, effective April 1, 2021.

121.  Less than two weeks later, on April 12, 2021, Lennox announced a similar price increase of 6–9% on all residential and commercial HVAC Equipment. Elliot Zimmer, President and CEO of Lennox Commercial, blamed "inflationary pressures on raw material costs." Quan Nguyen, VP and General Manager of Lennox Residential, explained, "These increases on steel, copper, plastics, and integrated components require us to pass these costs through the value chain." However, as

discussed in this Complaint, such pretextual excuses for price increases do not explain the magnitude and level of price increases seen during the Class Period.

122. Three days later, on April 15, 2021, Daikin announced a price increase of 6% on all commercial heating and cooling HVAC Equipment, effective April 26, 2021.

123. Four days after Daikin's announcement, on April 19, 2021, Lennox subsidiary Allied Air announced a price increase of between 5–7% beginning June 1, 2021 "[d]ue to inflationary commodity and operational costs."

124. Effective June 1, 2021, Carrier increased prices by up to 7% on North American residential, light commercial, and commercial HVAC Equipment.

125. On June 17, 2021, AAON announced it would be raising prices for the third time in under a year, this time by 5%. Effective September 1, 2021, AAON blamed the price increases on "inflationary pressures."

126. Johnson Controls (now part of Bosch) implemented a price increase of 3.5% on HVAC Equipment, effective July 1, 2021.

127. On July 2, 2021, Trane announced price increases of up to 7% on select commercial HVAC Equipment, effective August 7, 2021.

128. Then, on July 9, 2021, Trane announced a price increase of up to 7% on select residential HVAC Equipment that shipped on or after August 9, 2021.

-41-

129. Five days later, Carrier followed suit, announcing price increases of up to 8% on all "North America residential, light commercial, and commercial applied products effective September 1, 2021."

130. Less than two weeks later, on July 23, 2021, Lennox announced an identical 8% price increase on residential and commercial HVAC Equipment "due to further rise in inflationary costs," effective September 1, 2021.

131. Lennox subsidiary Allied Air also announced an 8% price increase that same day, effective October 1, 2021, "due to inflationary pressures from transportation and input costs."

132. Nortek Air Solutions (now part of Rheem) showed its support for its competitors' price increases when on August 10, 2021, it announced increases of its own from 8–12% on all HVAC Equipment, effective August 16, 2021. The company pretextually explained, "The increase is a result of surging commodity prices and continued availability shortages on materials such as steel, copper, aluminum, and resin, along with third-party component vendor price increases."

133. Daikin announced an identical 8% price increase on September 3, 2021, taking effect on select commercial HVAC Equipment that shipped after January 1, 2022.

134. On September 21, 2021, AAON announced its fourth price increase over the prior 12 months. The company implemented another 5% price increase, effective January 1, 2022, citing "inflationary pressures" once again.

135. Blaming "persistent cost inflation," Lennox announced an additional 13% price increase for commercial HVAC Equipment on October 18, 2021.

136. Carrier announced on October 26, 2021, a price increase effective January 10, 2022 of up to 12% on North American commercial HVAC Equipment and up to 10% on residential HVAC Equipment.

137. On November 3, 2021, Lennox announced a further price increase of up to 13% on residential HVAC Equipment, effective January 1, 2022.

138. On November 5, 2021, Rheem subsidiary HTPG announced a price increase of 11% on commercial HVAC Equipment orders received on or after December 6, 2021. The company blamed the price increase on the pandemic, claiming that it had impacted the supply chain and led to rising prices for freight, raw materials, and component costs.

139. On November 12, 2021, Allied Air (Lennox) announced a comparable price increase of up to 12% effective January 1, 2022, again pointing to "persistent inflationary costs."

140. Trane followed three days later, announcing an identical price increase of up to 12% on residential and commercial HVAC Equipment. Like Carrier,

Lennox, and Allied Air, Trane made its residential price increases effective January 1, 2022, and its commercial price increases effective January 15, 2022. Such a series of closely timed rounds of large price increases was unprecedented in the HVAC Equipment industry.

## I.     2022: The Conspiracy Takes Off

141.   On March 2, 2022, AAON announced a further 7% price increase on all commercial HVAC Equipment as "a result of inflationary pressures," effective March 29, 2022.

142.   One week later, on March 9, 2022, Carrier announced a price increase of up to 9% on North American residential, light commercial, and commercial HVAC Equipment, effective April 11, 2022.

143.   Less than three weeks after Carrier's announcement, Lennox announced on March 28, 2022 a matching price increase of up to 9% on residential and commercial HVAC Equipment, effective May 2, 2022.

144.   On April 4, 2022, Trane announced a price increase of up to 9%—identical to the price increases announced by Carrier and Trane less than one month prior—on residential and commercial HVAC Equipment, effective May 1, 2022.

145.   On April 18, 2022, Lennox subsidiary Allied Air announced a price increase of up to 9%, effective June 1, 2022, again pointing to "persistent inflationary costs."

146. A slew of commercial-specific increases on HVAC Equipment occurred throughout the duration of 2022. Daikin was first with its May 10, 2022 announcement of price increases of up to 12% on commercial HVAC Equipment, effective May 25, 2022. One week later, on May 17, 2022, Trane announced a price increase of up to 18% on select commercial HVAC Equipment, effective one day prior.  Hot on the heels of the announcements from Daikin and Trane, on May 26, 2022, Carrier announced a price increase of up to 12% on North American light commercial and commercial HVAC Equipment, effective July 11, 2022.

147. Beginning June 1, 2022, AAON "implemented a 1% per month price increase." This rolling price increase allowed AAON "to realize more pricing each month," with the company reporting on May 4, 2023 that "pricing compris[ed] 22.0% of growth."

148. The next month, on June 28, 2022, Lennox announced a price increase of up to 14% on commercial HVAC Equipment, effective August 1, 2022, due to "persistent cost inflation and regulatory transition."

149. Lennox's subsidiary, Allied Air, also announced a price increase of up to 14% on commercial HVAC Equipment on July 25, 2022 because of "inflationary pressures to due to transportation and input costs," effective August 1, 2022.

-45-

150.   A mere four days later, on July 29, 2022, Daikin announced an increase of up to 5% on commercial HVAC Equipment for all orders beginning on August 31, 2022.

151.   Trane very nearly matched Daikin's price increase, announcing on September 9, 2022 a further 3–6% increase of its own on commercial HVAC Equipment, effective September 10, 2022.

152.   On November 14, 2022, Carrier announced a further price increase of up to 8% on North American commercial HVAC Equipment, effective December 5, 2022.

153.   "Due to persistent cost increases," Lennox announced on December 5, 2022 that it would be increasing residential and commercial HVAC Equipment prices by as much as 8%, effective January 1, 2023.

154.   Similarly, "due to inflationary pressures to due to transportation and input costs," Lennox subsidiary Allied Air announced a price increase on December 9, 2022 of up to 8% on residential and commercial HVAC Equipment, effective January 1, 2023.

155.   The very same day, Trane announced a price increase of up to 10% on residential HVAC Equipment, effective January 9, 2023.

-46-

**J.    2023: The Conspiracy Hits Its Stride**

156.    Defendants' goal in 2023 was to maintain the supracompetitive price levels they had achieved from 2020 to 2022, often by announcing price increase that did not actually raise prices but rather stabilized them and avoided significant decreases from the record price levels.

157.    Trane announced its commercial HVAC Equipment price increases on January 9, 2023, about a month after its residential price increases, raising prices by 4–7.5%, effective January 14, 2023.

158.    Not long after, on February 2, 2023, Trane publicly reported, "Strong volume growth, positive price realization and productivity more than offset material and other inflation related to supply chain challenges and higher costs to serve customers."

159.    A mere five days later, Carrier issued a press release that almost mirrored Trane's announcement: "Strong price realization more than offset unprecedented inflation and productivity savings more than offset strategic incremental investments."

160.    From April 2–5, 2023, executives from Carrier, Daikin, Johnson Controls, Mitsubishi, and Rheem would all meet again in New Orleans for the Air Conditioning Contractors of America ("ACCA") 2023 Conference & Expo.

161. On May 1, 2023, Trane announced another increase of 4–6% on commercial HVAC Equipment, effective May 5, 2023.

162. In July 2023, Lennox's CEO, Alok Maskara, stated, "Regarding price versus inflation, we are pleased to report that the industry pricing remains disciplined and our own mid-year price increase has been broadly successful." He continued, "Our outlook on both components and commodity cost inflation remains stable and unchanged, and we expect the second half of the year to deliver a positive price versus inflation spread."

163. On August 9, 2023, Bosch raised prices on heat pumps, citing "adjustments to market conditions and supply chain challenges."

164. On September 18, 2023, Trane announced price increases on commercial HVAC Equipment, ranging from 2% to 6%, effective October 7, 2023.

165. Lennox announced similar price increases on October 24, 2023, raising prices by up to 8% on commercial HVAC Equipment, effective January 1, 2024.

166. On November 14, 2023, Carrier announced a price increase of 8% on North American commercial HVAC Equipment, effective the following month.

167. Three days later, on November 17, 2023, Trane announced one final HVAC Equipment price increase for the year, raising prices by up to 5% on some residential products, effective January 1, 2024.

168. Lennox followed with price increases of its own less than two weeks later on November 30, 2023, increasing residential HVAC Equipment prices by up to 10% because of "expected increases in the cost of R-410A refrigerant as well as other inflationary pressures." The price increases were effective February 5, 2024.

169. On December 5, 2023, Lennox's Allied Air subsidiary announced price increases of up to 10% on residential and 12% on commercial HVAC Equipment. The company claimed the increases, effective January 2, 2024, were a "response to inflationary cost pressures."

## K.  2024: Defendants Maintain Their Conspiracy

170. Carrier announced the first price increase of the year on January 5, 2024, raising prices by 6–10% on all products. Effective March 4, 2024, "The increase on residential products will be by a blended average of 6%, the increase on light commercial products will be by a blended average of 8%, and the increase on commercial applied products will be by a blended average of 10%."

171. Effective January 12, 2024, Bosch raised prices on heat pumps by 6%. The company attributed the higher prices to "increased costs in raw materials and logistics."

172. On January 18, 2024, Nortek Global HVAC (now part of Rheem) announced price increases of up to 8% on all residential HVAC Equipment, effective February 26, 2024.

-49-

173. Trane also announced price increases that month—six days after Nortek, on January 24, 2024. Trane raised prices on commercial HVAC Equipment by 2–6%, on average, effective February 10, 2024.

174. Effective February 1, 2024, Daikin increased prices of residential HVAC Equipment by up to 7%.

175. In September 2024 Lennox's CFO, Michael Quenzer spoke about the remarkable shifts that had happened over the prior years in the HVAC Equipment industry, noting "Yeah, shares don't shift a lot in our industry." Market share stability is a sign of collusion because it suggests that competitors have ceased competing for business on price.

176. On December 10, 2024, Trane raised prices of select commercial HVAC Equipment, effective January 12, 2025, with most increases falling in the range of 2–5%.

177. Over the course of 2024, Rheem—a private company—increased its HVAC Equipment prices by 8–15% through public price announcements.

**L.    2025: Defendants Keep the Price Increases Coming and Publicly Embrace "Price Discipline"**

178. Lennox subsidiary Allied Air kicked off the new year with a price increase announcement on January 2, 2025. The company raised residential parts and commercial HVAC Equipment prices by 5%, effective January 13, 2025.

179. Effective February 1, 2025, Trane announced a 10% price increase on residential HVAC Equipment.

180. On February 1, 2025, Daikin announced a price increase on all residential and commercial HVAC Equipment by 8–10%, effective April 1, 2025.

181. Also on February 1, 2025, Daikin subsidiary Goodman announced a price increase on residential HVAC Equipment by 8–10%, effective April 1, 2025.

182. Finally, on February 1, 2025, Daikin subsidiary Amana announced a price increase of 8–10% on all residential HVAC Equipment, effective April 1, 2025.

183. Effective March 1, 2025, Carrier increases prices on residential HVAC Equipment by 6%, light commercial HVAC Equipment by 8%, and commercial HVAC Equipment by 10%.

184. In April 2025, Rheem announced price increases on HVAC Equipment of approximately 6%. Also in April 2025, Lennox increased HVAC Equipment prices by another 6%. Effective May 1, 2025, Bosch increased heat pump prices by 2%.

185. On September 10, 2025, during the 13th Annual Morgan Stanley Laguna Conference, David Gitlin, Chairman and CEO of Carrier, and Patrick Goris, Senior Vice President and CFO of Carrier, delivered prepared remarks and responded to an analyst's questions. One question asked, in light of the challenging

market conditions, whether "there's price risk or price competition that could come to the resi market?" Carrier's Senior Vice President and CFO, Patrick Goris, dismissed the idea of price competition by refusing to directly address it, remarking instead, "What we've seen so far this quarter is that the combination of the price and the mix up is still double-digit positive. And so that is -- obviously, that's really good."

186.  Speaking at the same conference the next day, Michael Quenzer, CFO of Lennox, detailed Defendants' collective discipline and signaled Lennox's forthcoming price increases:

> Yeah, I think so far we've seen very rational pricing from all the OEMs. A lot of these OEMs have the same input costs as we do. They're seeing the same tariff pressures. They're seeing the same investments they had to make to switch to the new refrigerant products. **Very disciplined on the industry right now pushing price.** I expect price and cost to continue to go up. I don't think inflation is going to stop here. **I think the next level will be early next year when we all come out and announce our next full round of price increases.** For the balance of the year, I think we're pretty well set from a price perspective. **Next year, we'll do our annual price increase, and just like we always do, we expect similar results by others.**

187.  Trane's CEO Dave Regnery and CFO Chris Kuehn also spoke that day, with Regnery revealing in a prepared remark that—in keeping with Lennox's call for discipline—Trane had reduced production to manage supply: "We have taken

some time out of our factory so that we can balance the inventory load within the channel."

188. On September 27, 2025, Trane increased commercial HVAC Equipment prices, with most increases ranging from 1–4%.

189. In November 2025, Patrick Goris, Carrier's Chief Financial Officer and Senior Vice President, was asked by an analyst to discuss "this type of kind of industry-wide volume correction" and how "people start to ask about price and mix and those types of things. It doesn't sound like you see any sort of pressure from the OE, kind of the other OEs in terms of taking price down. I mean, if anything, it can still go up. Just kind of talk about the pricing environment in [the] industry right now where volumes are so pressured." Goris responded:

> It certainly is a watch item. Because as you say, when volumes are down so much, it's the natural question that comes up. In Q3, our overall pricing was up double digits year over year. Now that's a combination of the mix-up with the new units with the new refrigerant, which are more costly than the prior units, and some price increase. Some of that, of course, relates to some of the input cost increases that we've seen. This quarter, the increase will probably be a little bit less year over year, but only because we're starting to lap quarters last year where we started selling the new refrigerant units. Our intention is still that we would announce a price increase in residential in the Americas for next year, likely in the mid-single-digit range. One of the reasons is we see continued increase in some of the input costs. If you look at what copper has done, what aluminum is doing, we see some increases there. We would expect to realize, call it low single-digit price increases in the Americas resi for that reason.

190.   During Carrier's earnings call on December 4, 2025, David Gitlin, Chairman and CEO, made it clear that it viewed its prioritization of margin over market share as an example for the company's competitors to follow: "And we believe, as market leaders, that we -- it's important for us to retain pricing discipline, and you should expect that out of us as we go into next year."

191.   December 2025 saw a number of additional parallel price increase announcements.  Effective December 31, 2025, Bosch increased the prices of its heat pumps. Also effective December 31, 2025, Bosch's Coleman brand increased HVAC Equipment prices by 6–8%. Bosch's Evcon brand also implemented a 3% price increase, effective December 31, 2025.

**M.   2026: Lennox's CFO: "The industry's generally been disciplined for the past several years … we're gonna continue to increase our pricing"**

192.   Effective on the first day of the new year, Lennox increased prices of commercial HVAC Equipment by up to 5%.

193.   During Trane's January 29, 2026 earnings call, Chris Kuhn, the company's Executive Vice President and CFO, revealed that Trane "reduced factory production days by one-third" in order "to normalize residential inventory." He later explained that prices had not decreased because of decisions by Trane and its competitors to keep supply short of demand: "[W]e've not seen pricing fade in the business. If I think about the fourth quarter, and pricing, it really is more due to volume being lower than anything else." Kuhn also assured Trane's competitors that

it would not decrease prices, explaining, "I don't want anyone to think that pricing is coming down in that market." In a competitive environment, the decision to reduce production by 1/3 would simply give away market share to one's competitors. However, due to the conspiracy, Trane could be sure that competitors would not compete for its market share but would instead also restrict its supply and maintain high pricing.

194. ACHR News reported on January 30, 2026 that Lennox CEO "[Alok] Maskara reinforced that pricing discipline remains consistent across the industry." In the article, Maskara affirmed Lennox's commitment to price increases that his company observed from its competitors, saying, "Based on everything we have seen so far, we see our competitors aiming at similar price increases."

195. Effective February 16, 2026, Lennox increased prices of residential HVAC Equipment by up to 10%.

196. Defendants' executives publicly discussed their very recent price increases while attending Barclays 43rd Annual Industrial Select Conference held from February 17–19, 2026 in Miami, Florida. During a presentation on February 17, in response to a question about price competition in the residential business segment, Lennox CFO Michael Quenzer once again commended the industry for its pricing discipline—increasing margins by raising prices and not competing for

market share— and explained that the industry learned its lesson when it comes to competing on price:

> But if you look at the replacement side, overall, the industry's generally been disciplined for the past several years. We've had cost inputs coming into our business. Others have as well, and we're gonna continue to increase our pricing to maintain our margins. I think others have generally been as well. You know, we, as an industry, have realized that, you know, pricing, you know, taking it away, does not win market share.

197. By complementing the industry for its discipline and saying that "pricing, you know, taking it away, does not win market share," Quenzer was acknowledging that Lennox and its competitors would no longer compete for market share by, for example, lowering prices to win customers from competitors, which is inconsistent with the behavior of competitors in a market free from an anticompetitive agreement.

198. Quenzer also announced that Lennox would follow Trane's lead in reducing production to manage supply, stating, "So what we've been trying to do is very disciplined, kind of reduce our inventory levels … . So what we're gonna do is reduce some production in the first quarter, keep our inventories flat."

199. Trane's executive presented at the conference that same day. Chris Kuehn, Trane's CFO, echoed the sentiment of Lennox's CFO, Michael Quenzer, announcing, "On price, the team announced a price increase just in the last 10 days. It's up to 5%, effective April 1, and so our plans are to make sure we continue to

capture price to offset inflation and still get a spread on that." And he explained that the company's price increase was possible because "the industry has been very disciplined in that regard over many years."

200. Two days later, Carrier's Chairman and CEO, David Gitlin, followed the lead of his company's competitors and announced an identical 5% increase at the conference: "If you look at our residential businesses in terms of realization rates, it's probably best as you go from west to east. In the Americas, we have 5% price that we've announced comes into place next month."

201. On March 2, 2026, Daikin raised light commercial and commercial HVAC Equipment prices by up to 7% and increased other HVAC Equipment prices by 3.5–5%. That same day, Daikin's Amana and Goodman brands both also separately announced price increases of up to 7%. Effective March 16, 2026, Allied Air (Lennox) matched Daikin's 7% increase. And finally, that same month, Carrier announced its intention to increase its HVAC Equipment prices in the Americas by the "mid-single digit[s]" in 2026.

## VI. OTHER ASPECTS OF THE CONSPIRACY SUPPORT ITS PLAUSIBILITY

### A. Defendants' Record Profits Demonstrate the Conspiracy's Success

202. Throughout the conspiracy, Defendants boasted about rising and record profit margins. For instance, in mid-2024, Morningstar resumed its coverage of Lennox and observed that the company's margins rose from "from about 8% during

the last sales peak in 2007 to nearly 18% in 2023." Similarly, Carrier experienced significant profit increases of around 20% from 2020 to 2021 and 2023 to 2024, which correspond closely to their price increase announcements.

203. In its 2025 Q1 Financial Report, Daikin highlighted how its "[o]perating [p]rofits achieved a new record high" despite inflation and high mortgage interest rates in the Americas.

204. During its earnings call on January 29, 2026, Trane boasted about its profit growth from 2020 to 2025, highlighting that its revenue nearly doubled from approximately $12 billion to $21 billion, representing a compound annual growth rate of approximately 11%, that its adjusted earnings per share grew at a compound annual growth rate of approximately 24% over the same period, while the company's adjusted EBITDA margin expanded by 470 basis points to reach 20% in 2025:



205. AAON similarly experienced substantial profit growth in the wake of multiple price increases and a monthly 1% price increase beginning in June 2022, with the company reporting in a May 4, 2023 press release: "Gross profit margin in the quarter increased to 29.0%, up 380 basis points from the comparable quarter in 2022. Price increases implemented over the last year combined with moderating cost inflation were the driving factors to the gross profit margin expansion."

206. Defendants' success is also visible through the Producer Price Index by Industry: Air-Conditioning, Refrigeration, and Forced Air Heating Equipment Manufacturing: Primary Products, which is published by the U.S. Bureau of Labor Statistics and made available on the Federal Reserve Economic Data database maintained by the Research division of the Federal Reserve Bank of St. Louis. The

index shows a marked rise that begins in 2020 and is more abrupt and significant than any other increase in the index over at least the past 22 years:

**Figure 4**



207. The economic impact of the COVID-19 pandemic alone does not explain the sharp increase in the HVAC PPI. Neither the Household Appliance PPI nor the CPI rose nearly as dramatically, and the Household Appliance PPI returned to the CPI while the HVAC PPI remained elevated:

**Figure 5**



**B.**     **A Preliminary Regression Analysis Supports Anticompetitive Harm to the Price of HVAC Equipment Caused by the Conspiracy**

208.  To analyze the overcharge of Defendants' price-fixing conspiracy, Plaintiff's experts have conducted a regression model based on the relationship between the price of HVAC Equipment and the various input costs and other factors affecting prices but that are unrelated to collusion (*e.g.*, cost and demand factors) to isolate the price effects, if any, of the alleged conspiracy. This preliminary regression analysis demonstrates that Defendants' price-fixing during the Class Period created higher prices than Plaintiff and the Classes would have paid absent the conspiracy.

209.  The determination of a price effect, if any, and the estimation of damages attributable to collusive behavior, if any, typically involves the comparison of prices during the period affected by the alleged unlawful conduct (referred to as the "damages" or "Class" period) to competitive prices during a "benchmark" period, *i.e.*, prices in a market or during a time period likely unaffected by the alleged unlawful conduct. The benchmark prices provide information that can be used to estimate counterfactual, "but-for" prices that would have prevailed during the damages period in the absence of the alleged unlawful conduct. Figure 6 compares actual HVAC Equipment (Air-Conditioning, Refrigeration, and Forced Air Heating Equipment) prices to prices buyers would have paid but for the existence of the alleged conspiracy (the but-for prices).

**Figure 6**
**Comparison of Actual and But-For HVAC System Prices**



210. As part of Plaintiff's experts analysis, it is common and proper to employ econometric methods to account for factors that affect prices but that are unrelated to collusion (*e.g.*, supply and demand factors) to isolate the price effects, if any, of the alleged conspiracy. Plaintiff's expert applied the well-known and widely accepted dummy variable multiple regression methodology to estimate the price effects of the alleged conspiracy.[4] The dummy variable multiple regression

---

[4] *See*, *e.g.*, ABA Section of Antitrust Law (2017), *Proving Antitrust Damages: Legal and Economic Issues*, 3d ed. Ch. 6, Section F; McCrary, J. and Rubinfeld, D.

methodology implements the comparison described above, in that it relies on comparing "prices in the impact period to available prices before and/or after the alleged period of impact,"[5] while controlling for other factors that affect prices.

211.  Specifically, the multiple regression analysis illustrated in Figure 6 controls for all major non-conspiratorial factors by including variables for (1) compressor price index, (2) copper tubing price index, (3) aluminum price index, (4) steel price index, (5) plastic and resin price index, (6) production and nonsupervisory employees labor cost index in manufacturing, (7) utility price index for producers, (8) disposable income, (9) total units of new privately-owned housing, (10) climate, (11) average electricity price, (12) natural gas price for consumers, (13) average importing prices of HVAC Equipment, (14) average exporting prices of HVAC Equipment, (15) penetration rate of A2L (R-32 and R-454B), (16) inflation, (17) an indicator for the COVID affected period, (18) an indicator for the Great Recession affected period, and (19) calendar month fixed effects, which accounts for seasonality in prices. Thus, the estimated but-for prices account for inflation, changes in major cost and demand factors, changes in U.S.

---

(2014), "Measuring Benchmark Damages in Antitrust Litigation," *Journal of Econometric Methods*, vol. 3, pp. 63-74; and ABA Section of Antitrust Law (2014), *Econometrics: Legal, Practical, and Technical Issues*, 2d ed., Ch. 12.

[5] McCrary, J. and Rubinfeld, D. (2014), "Measuring Benchmark Damages in Antitrust Litigation," *Journal of Econometric Methods*, vol. 3, pp. 63–74, at 63. The control period is also known as the "benchmark period."

tariff, the COVID-19 pandemic, and the effects of refrigerant change precipitated by the AIM Act, among other factors. As shown Figure 6, all these factors together predict price increases in 2020 and later (see predicted but-for prices in the figure), but they would not explain all of the substantial price increases. Actual prices are significantly higher than but-for prices in the period from January 2020 to the present even after accounting for all major non-conspiratorial factors. Specifically, the estimated overcharge is 8% and highly statistically significant. The overcharge regression results demonstrate that prices of HVAC systems were inflated above competitive levels during the Class Period, accounting for all major non-conspiratorial factors that affect HVAC Equipment prices.

212.  The overcharge regression results demonstrate that prices of HVAC Equipment were maintained at an inflated level above competitive levels during the damages period, accounting for major non-conspiracy factors that affect HVAC Equipment product prices.

### C. Plus Factors Support the Plausibility of Defendants' Conspiracy

213.  "Plus factors are economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." William E. Kovacic, Robert C. Marshall, Leslie M. Marx & Halbert L. White, *Plus Factors and Agreement in Antitrust Law*, 110 MICH. L. REV. 393, 393 (2011), available at

https://repository.law.umich.edu/mlr/vol110/iss3/1. Plus factors support the plausibility of Defendants' conspiracy and include:

### 1. There are no close substitutes for HVAC Equipment.

214. According to the U.S. Census Bureau's Survey of Construction, 95.4% of new single-family homes started in 2020 in the U.S. had central air conditioning, while the U.S. Energy Information Administration's 2020 Residential Energy Consumption Survey indicates that two-thirds of all U.S. homes have central air conditioning. Based on data collected by the U.S. Energy Information Administration for its 2020 Residential Energy Consumption Survey, over 73% of homes have central heating.

215. HVAC Equipment is equally prevalent in commercial buildings. A 2023 article by the U.S. Energy Information Administration states that 83% of commercial buildings had space heating in 2018, while 78% of commercial buildings had space cooling.

216. HVAC Equipment is vitally important to comfort and maintaining indoor air quality, and in many parts of the country it is crucial to remaining safe during periods of extreme winter cold and sweltering summer heat.

217. There are no significant substitutes for HVAC Equipment. As Lennox's CFO, Michael Quenzer, explicitly recognized, "It's not like there's a great substitute for HVAC unless people don't want to have heating and air conditioning."

### 2. The demand for HVAC Equipment is inelastic.

218. Price elasticity refers to the sensitivity of the quantity of a good demanded by a purchaser to changes in its price. If demand is elastic, a price increase causes demand for the good to decrease significantly. Conversely, if demand is inelastic, a price increase will have little or no effect on demand. Goods with reasonable substitutes have demand that is elastic. Goods that do not have demand that is inelastic. An example of a good with inelastic demand is gas; commuters, and the trucking and airline industries, will continue to purchase the gasoline they need regardless of price. Demand for electricity is also inelastic since it is necessary for lighting, heating, cooling, and refrigeration.

219. Inelastic demand allows a cartel to form and find success. If demand is inelastic, then cartel members can increase prices above competitive levels without the fear of consumers switching to a reasonable substitute, if there even is one. This is because the percentage decrease in the quantity demanded is smaller than the percentage increase in price.

220. Demand for HVAC Equipment is inelastic. When HVAC Equipment fails, owners rarely delay purchasing replacement equipment, even if prices are high, because of the importance of HVAC Equipment to temperature regulation, comfort, indoor air quality, and safety, especially during the winter and summer seasons.

### 3. The HVAC Equipment industry is highly concentrated and consolidated.

221. A concentrated market is more susceptible to collusion. It is easier for competitors to enter into an anticompetitive agreement and sustain it when a small number of firms control a sizable portion of the market. At the same time, this makes it difficult for smaller firms outside a conspiracy to undermine its potency. The U.S. DOJ recognizes, "Collusion is more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids, customers, or territories. Collusion may also occur when the number of firms is fairly large, but there is a small group of major sellers and the rest are 'fringe' sellers who control only a small fraction of the market." A high degree of concentration and a small number of conspirators also reduces concerns over cartel instability or cheating. For these reasons, market concentration is a plus factor in evaluating the plausibility of an antitrust conspiracy.

222. Here, the HVAC Equipment industry is highly concentrated, which benefits the formation and maintenance of a conspiracy. Seven companies dominate the market, owning dozens of brands of HVAC Equipment—giving purchasers the illusion of choice—and accounting for a collective market share of over 90% during the Class Period, as shown in Figure 3.

-67-

223.   Another measure of market concentration is the Herfindahl-Hirschman Index ("HHI").[6] The U.S. Department of Justice and Federal Trade Commission use the HHI when evaluating whether a merger substantially lessens competition. In a perfectly competitive market, the HHI approaches zero, and it reaches its maximum of 10,000 points in a market controlled by a single firm. The U.S. Department of Justice and Federal Trade Commission consider a market with a score between 1,000 and 1,800 points to be moderately concentrated, while the agencies consider a market where the HHI exceeds 1,800 points to be highly concentrated. Using data from 2020, the HHI score for HVAC Equipment was over 1,588.

224.   The HVAC Equipment market has also experienced consolidation, further increasing concentration and reducing competition. For example, in April 2023, Carrier announced the acquisition of heat pump manufacturer Viessmann Climate Solutions, which it completed in January 2024. In October 2024, Rheem Manufacturing completed its acquisition of Nortek Global HVAC, bringing the Frigidaire, Maytag, Miller, Broan, Gibson, Intertherm, and Partner's Choice brand lines under the Rheem umbrella. In August 2025, Bosch acquired Johnson Controls' residential and light commercial HVAC business for $8.1 billion, the largest acquisition in Bosch's history.

---

[6] https://www.justice.gov/atr/herfindahl-hirschman-index.

**4.      The HVAC Equipment industry has high barriers to entry.**

225.   Barriers to entry are obstacles that prevent new competitors from entering a market easily. They include steep startup costs, often in the form of capital expenditures to build manufacturing facilities and high research and development costs, patents, government regulations, acquiring and training a workforce, and brand loyalty or established brand names.

226.   An anticompetitive agreement that raises or sustains prices above competitive levels would ordinarily attract new entrants interested in competing for those increased profits. High barriers to entry, however, deter new competitors from entering the market, meaning they benefit entrenched participants. They also make it easier for existing market participants to collude since there is no concern about competition from new entrants who are not a party to the conspiratorial agreement.

227.   The HVAC Equipment industry has significant barriers to entry. It costs hundreds of millions of dollars and takes multiple years to construct a new manufacturing facility and bring it online. A new plant also means hiring and training thousands of workers to operate, maintain, and oversee the facility. For example, Daikin broke ground on the Daikin Texas Technology Park in 2015, which cost $417 million to build, took more than two years to complete, and employs approximately 5,000 people.

228.   In addition to the capital expenditure necessary to open a new plant, new entrants also have to overcome brand loyalty and strong name recognition of established brands, several of which like Lennox, Carrier, Trane, Rheem, and York and have histories of over 100 years.

### 5.   HVAC Equipment is largely commoditized.

229.   Economics defines a commodity as a basic good used in commerce that is interchangeable with other goods of the same type. When a product is characterized as a commodity, market participants primarily compete based on price. It is easier to implement and monitor an anticompetitive agreement when competition occurs primarily on price since price is more objectively measurable than non-price factors.

230.   In the United States, the technology and processes for manufacturing HVAC Equipment are well established, as is the technology for the equipment itself. As a result, there is limited HVAC Equipment product differentiation. In fact, a residential furnace manufactured by one Defendant is designed to replace another manufactured by a different Defendant. The same is true for heat pumps and air conditioning condensers.

231.   Furnaces come in standard cabinet widths, have ratings measured in British Thermal Units per hour ("BTUh") to quantify the heating capacity (*e.g.*, 60,000 BTUh, 70,000 BTUh, and 80,000 BTUh), and have standardized Annual

Fuel Utilization Efficiency ("AFUE") ratings expressed as a percentage (*e.g.*, 80%, 90%, and 95%).

232.   Heat pumps have ratings measured in British Thermal Units per hour ("BTUh") to quantify the heating capacity (*e.g.*, 60,000 BTUh, 70,000 BTUh, and 80,000 BTUh), have Heating Seasonal Performance Factor 2 ("HSPF2"), have ratings to indicate energy efficiency for heating (*e.g.*, 7.5 HSPF2, 9.5 HSPF2, and 10.5 HSPF2), have ratings measured in BTUh to quantify the cooling capacity (*e.g.*, 24,000 BTUh, 36,000 BTUh, and 48,000 BTUh), and have Seasonal Energy Efficiency Ratio 2 ("SEER2") ratings to indicate energy efficiency for cooling (*e.g.*, 13 SEER2, 16 SEER2, and 19 SEER2). A heat pump with a given heating and cooling capacity will have a similar footprint to a heat pump with the same heating and cooling capacity produced by a different manufacturer.

233.   Air conditioning condensers likewise have similar footprints based on cooling capacity, have ratings measured in BTUh to quantify the cooling capacity (*e.g.*, 24,000 BTUh, 36,000 BTUh, and 48,000 BTUh), and have Seasonal Energy Efficiency Ratio 2 ("SEER2") ratings to indicate energy efficiency (*e.g.*, 13 SEER2, 16 SEER2, and 19 SEER2). An air conditioning condenser with a given cooling capacity will have a similar footprint to an air conditioning condenser with the same cooling capacity produced by a different manufacturer.

**6.      Defendants had numerous opportunities to collude.**

234.   Defendants' high-ranking executives had frequent and regular opportunities to meet and collude, including through their membership in trade organizations.

**a.      The Air-Conditioning, Heating, and Refrigeration Institute.**

235.   The Air-Conditioning, Heating, and Refrigeration Institute ("AHRI") is the primary U.S. trade association for HVAC Equipment manufacturers. Trane, Lennox, Carrier, Rheem, Daikin, AAON, and Bosch are members of AHRI. AHRI hosts several events each year, including what it refers to as four premiere events.

236.   Defendants' senior executives currently hold and have held leadership roles on the AHRI Board of Directors during the Class Period.

237.   In 2026, Mike Branson (President of Global Air Division, Rheem) serves as Chairman and Holly Paeper (President of Commercial HVAC, Trane) serves as Vice Chairman, while David Budzinski (Deputy CEO and President Americas, Bosch), Alok Maskara (CEO, Lennox), Gaurang Pandya (President of Climate Solutions Americas, Carrier), and Yogi Uemura (President, Daikin) serve on the Board.

238.   In 2025, Mike Branson (President of Global Air Division, Rheem) served as Vice Chairman, while David Budzinski (President and CEO of Global Residential and Light Commercial, Johnson Controls), Gaurang Pandya (President

of Climate Solutions Americas, Carrier), Holly Paeper (President of Commercial HVAC, Trane), and Yogi Uemura (President, Daikin) served on the Board.

239.   In 2024, Gary Bedard (Executive Vice President and President of Residential, Lennox) served as Chairman, while Mike Branson (President of Global Air Division, Rheem), David Budzinski (President and CEO of Global Residential and Light Commercial, Johnson Controls), Donny Simmons (Group President of the Americas, Trane), and Yogi Uemura (President, Daikin) served on the Board.

240.   In 2023, Chris Nelson (President of HVAC, Carrier) served as Vice Chairman, while Gary Bedard (Executive Vice President and President of Residential, Lennox), Mike Branson (President of Global Air Division, Rheem), Doug Schuster (President of Global Air Distribution, Johnson Controls), Donny Simmons (Group President of the Americas, Trane), Yogi Uemura (President, Daikin), and Philip Windham (President and CEO, Nortek Global HVAC, now part of Rheem) served on the Board.

241.   From January 31 through February 2, 2022, executives from Carrier, Trane, LG, Daikin, Rheem, and Mitsubishi were all present at the AHR Expo in Las Vegas. Later, from March 28–30, 2022, executives from Carrier, Goodman Manufacturing (Daikin), Johnson Controls, and Rheem would all meet at the ACCA Annual Conference and Expo in St. Louis. At the ACCA conference, Casey Yates

(Johnson Controls), Mike Branson (Rheem) and Justin Keppy (Carrier) participated in a HVAC manufacturers' panel discussion.

242.   The AHRI Expo was held on February 2–6, 2023 in Atlanta, at which in attendance were executives from Daikin, Johnson Controls, and Rheem. On April 2-5, 2023, executives from Carrier, Daikin, Johnson Controls, Mitsubishi, and Rheem attended the ACCA Annual Conference and Expo in New Orleans, Louisiana. At this conference, Braden Cook (Carrier), Nathan Walker (Daikin), Brandon Franks (Johnson Controls), and Randy Roberts (Rheem) participated in a panel discussion about the state of the HVAC industry.

243.   The AHRI Expo for 2024 was held in Chicago, Illinois on January 22–24 and attended by executives from Carrier, LG, Mitsubishi, and Rheem. The ACCA Annual Conference and Expo followed on March 11–14 in Orlando, Florida attended by Carrier, Daikin, Johnson Controls, Mitsubishi, and Rheem. During this conference Chris Forth (JCI), Braden Cook (Carrier), John Schneider (Copeland), Doug Widenmann (Daikin), Randy Roberts (Rheem/Ruud), and Heather Buchicchio (Mitsubishi) all participated in a panel discussion about the current state of the HVAC industry.

244.   The AHRI Expo was held on February 10-12, 2025 in Orlando, attended by executives from Daikin, Johnson Controls, LG, Mitsubishi, and Rheem.

-74-

On March 23–27, 2025 in Austin, Texas, executives from Carrier, Daikin, Johnson Controls, Mitsubishi, and Rheem attended the ACCA Annual Conference and Expo.

### b. Other industry conferences.

245. Other opportunities to collude existed outside of trade organizations. One such example was the 13th Annual Morgan Stanley Laguna Conference, which took place from September 10–12, 2025, and was attended by senior executives from Carrier, Trane, and Lennox. At this conference, Carrier's Senior Vice President and CFO brushed aside the concept of price competition, Lennox's CFO commended the industry's price discipline and discussed his company's forthcoming price increases, and Trane's CEO talked about the company's efforts to reduce supply, consistent with Lennox's call for discipline.

246. Defendants' executives were also present and spoke at the Barclays 43rd Annual Industrial Select Conference held from February 17–19, 2026 in Miami, Florida. It was there that Lennox's CFO spoke of the industry's discipline and mentioned price increases, while Trane's CFO announced a 5% price increase, while Carrier's CEO publicly matched two days later.

### c. ACHR News.

247. As noted above, ACHR News is billed as the "the weekly newsmagazine of the HVACR contractor covering residential and commercial contracting." Defendants used ACHR News to signal to one another to perpetuate

the conspiracy and communicate their adherence to it. Defendants extensively and nearly exclusively relied on ACHR News to immediate publish and disseminate their price increase announcements throughout the Class Period.

### d.      HARDI.

248.    Heating, Air-conditioning, and Refrigeration Distributors International ("HARDI") is another organization through which Defendants had numerous opportunities to collude. HARDI bills itself as the leading professional trade association for HVACR wholesale distributors, manufacturers, and representatives that "serves its members through government affairs and advocacy efforts, **market intelligence and benchmarking**, training programs, and world class events." (Emphasis added).

249.    While ostensibly setup to support HVAC *distributors*, it is clear that HARDI provided the Defendant-manufacturers with further opportunities to collude. For example, at the 2025 HARDI Annual Conference, a "Supplier Town Hall" was held, "dedicated to Supplier Manufacturers!" At that same Annual Conference, a roundtable discussion was held for "Manufacturer Reps Only," and was detailed as being "[e]xclusively for manufacturer representative members, these roundtable sessions offer an engaging space to exchange ideas, share experiences, and refine your professional skills. Guided by the Manufacturer Rep Council, each table-led

discussion is designed to provide practical insights, foster collaboration, and help you strengthen your expertise."

250. During the Class Period, the HARDI annual conference, which takes place early each December featured speakers from Defendants (such as from Trane and Bosch at the 2025 HARDI conference) and was also sponsored by at least certain Defendants (such as Bosch, Daikin, and Rheem).

## VII. DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONSPIRACY, DIVERTING ATTENTION FROM AND PREVENTING DISCOVERY OF THE CONSPIRACY

251. Plaintiff and members of the Classes did not have actual or constructive knowledge of their claims because of Defendants' affirmative acts to fraudulently conceal their conspiracy. Defendants' means of effectuating the conspiracy—including, but not limited to, price signaling, information sharing, production signaling, and in-person meetings—show that Defendants actively sought to prevent Plaintiff and members of the Classes from discovering the conspiracy. It also means that Plaintiff and members of the Classes lacked information that would have placed them on inquiry notice of the existence of an agreement to raise HVAC Equipment prices above competitive levels. Thus, Plaintiff and members of the Classes did not discover and, through the exercise of reasonable diligence, could not have discovered, the alleged conspiracy until shortly before this filing.

252. Defendants used terms like "discipline" and "price realization," and spoke of maintaining margins as a priority over competing for market share, to hide the conspiracy's existence and accomplish the conspiracy's goals, while also providing reassurance to co-conspirators of their continued commitment to the anticompetitive agreement. Examples of Defendants' use of coded language to conceal the conspiracy and maintain the information flow among co-conspirators include Lennox's CEO, Alok Maskara, stating that "industry pricing remains disciplined," Lennox's CFO, Michael Quenzer, stating that "the industry's generally been disciplined for the past several years [and] we're gonna continue to increase our pricing to maintain our margins" because lowering prices and sacrificing margins "does not win market share," Carrier's Chairman and CEO, David Gitlin, stating that "we believe, as market leaders, that we -- it's important for us to retain pricing discipline, and you should expect that out of us as we go into next year," Johnson Controls' Chairman and CEO, George Oliver, crediting the "further expanding [of] our margin profile," in part, on the company's "disciplined pricing approach," and Daikin's talk of avoiding "falling into price wars with our competitors."

253. Not only did Defendants take affirmative steps to keep their agreement secret and conduct the activities of the conspiracy in private, but they also gave alternative, non-conspiratorial explanations for HVAC Equipment price increases.

These pretextual explanations were always public and intended to mislead Plaintiff and members of the Classes—to divert attention away from the conspiracy.

254. Like in most industries, Defendants initially said supply chain disruptions following the onset of the COVID-19 pandemic in March 2020 were responsible for price increases on HVAC Equipment during the Class Period. For example, Rheem subsidiary HTPG sent a price increase letter that read, "The pandemic continues to impact our supply chain, our industry and the overall economy. Freight, raw materials (steel, aluminum, copper, wood and plastics) and critical component costs (compressors, valves and motors) have continued to rise significantly. As a result, HTPG will be implementing a general list price adjustment of 11% on equipment, parts, options and warranties." Defendants' price increases due to COVID-19 pandemic were often couched as price adjustments due to rises in "inflationary costs" and "cost inflation." Beginning in 2025, Defendants shifted the blame to tariffs. For example, Rheem's Senior VP and General Manager was reported as saying that "tariffs and overall economic conditions have increased the cost of raw materials."

255. Defendants also blamed two federal initiatives for price increases on HVAC Equipment during the Class Period: the updated SEER2 energy efficiency standards and the phasedown of HFCs under the AIM Act.

256.    On January 6, 2017, the U.S. Department of Energy published the direct final rule establishing the new SEER2 energy conservation standards in the Federal Register, which set minimum efficiency requirements for new HVAC Equipment sold beginning on January 1, 2023.[7] Defendants therefore had at least six years to develop HVAC Equipment that complied with the SEER2 standards. Defendants still blamed the new SEER2 standards for equipment price increases. For example, on its website for HVAC professionals, Lennox claimed, "The new air conditioners will be approximately 10–15% more than [outgoing models]. The new heat pumps will be approximately 20–25% more than [outgoing models]. This price increase is due to a more efficient compressor, a more efficient fan motor, a larger coil and cabinet size, and a higher refrigerant charge to achieve the higher efficiency."

257.    Under the AIM Act, which was enacted on December 27, 2020, the U.S. Environmental Protection Agency required a phase-out of the R-410A refrigerant, prohibiting the manufacture and import of new air conditioning condensers and heat pumps that use R-410A beginning on January 1, 2025.[8] On its

---

[7]    https://www.federalregister.gov/documents/2017/01/06/2016-29992/energy-conservation-program-energy-conservation-standards-for-residential-central-air-conditioners.

[8] https://www.epa.gov/climate-hfcs-reduction/frequent-questions-phasedown-hydrofluorocarbons.

website that catered toward residential customers, Lennox pinned HVAC Equipment price increases on the refrigerant transition.

258. With any regulatory change, new technology and components are needed to meet the updated standards and requirements. The transition to more environmentally friendly refrigerants is no different. Refrigerants will remain market priced based on supply and demand while the updated line of 2025 complaint [*sic*] systems will see a rise in price due to the new technology incorporated to maintain efficiency, reliability and overall system performance.

259. Yet, it was the HVAC Equipment industry that spearheaded efforts to transition away from HFC refrigerants like R-410A by investing billions of dollars and more than a decade advocating for a transition away from HFCs. In fact, they claimed they had "invested the most and [were] the best prepared" for the transition, as shown by the 2019 congressional testimony of Stephen Yurek, President and CEO of AHRI:

> More than 15 years ago, the U.S. HVACR industry began investing billions of dollars in R&D to be the first to bring to market next generation refrigerant technologies. More than a decade ago, the U.S. HVACR industry began working with the George W. Bush Administration to initiate discussions under the Montreal Protocol for a global phase down of HFCs. After nearly a decade of advocacy by the U.S. HVACR industry, these discussions culminated in the Kigali Amendment to the Montreal Protocol in 2016. The Kigali Amendment intensified the global competition over next generation refrigerant technologies in the fast-growing international HVACR

market. American-based companies have invested the most and are the best prepared to benefit from a global transition out of HFCs and into American-made next generation refrigerant technologies.

260. Plaintiff and members of the Classes had no ability to determine the accuracy of these pretextual explanations for price increases that Defendants communicated to the public.

261. Defendants' fraudulent concealment tolls the applicable statutes of limitations on the claims of Plaintiff and the Classes. It also acts to equitably estops Defendants from asserting any statute of limitations defense.

## VIII. CLASS ACTION ALLEGATIONS

262. Plaintiff brings this action on behalf of herself and under Federal Rule of Civil Procedure 23(a), (b)(1), and (b)(2) as a representative of a Class of purchasers seeking, under federal law, injunctive and equitable relief for indirect claims (the "Nationwide Class") defined as:

> All entities and persons who purchased HVAC Equipment in the United States at least as early as January 1, 2020 through the present manufactured by a Defendant for end use in a residential or commercial building.

263. Plaintiff also brings this action on behalf of herself and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages as well as equitable relief, on behalf of the following classes (the "State Law Classes"):

264. All entities and persons who purchased HVAC Equipment in the United States between January 1, 2020 through the present manufactured by a Defendant for end use in a residential or commercial building sold in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and/or Wisconsin.

265. Specifically excluded from the Nationwide Class and State Law Classes are (1) Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant, (2) any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, any business majority-owned by any such person, (3) any Co-Conspirator identified in this Action, and (4) any federal governmental entities.

266. The Classes are so numerous as to make joinder impracticable. Plaintiff does not know the exact number of Class members but the above-defined Classes are readily identifiable and are ones for which records should exist. Plaintiff believes

-83-

that due to the nature of the HVAC Equipment industry there are at least hundreds of thousands of members of the Classes in the United States.

267. Common questions of law and fact exist as to all members of the Classes. Plaintiff and the Classes were injured by the same unlawful price-fixing conspiracy, and Defendants' anticompetitive conduct was generally applicable to all the members of the Classes. Relief to the Classes as a whole is appropriate. Common issues of fact and law include, but are not limited to, the following:

a. Whether Defendants engaged in a conspiracy to artificially inflate, increase, and stabilize HVAC Equipment prices;

b. The identity of the participants in the conspiracy;

c. The duration of the conspiracy and the acts performed by Defendants in furtherance of the conspiracy;

d. Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business or property of Plaintiff and other members of the Classes;

e. The effect of Defendants' conspiracy on the price of HVAC Equipment sold in the United States during the Class Period; and

f. The amount of class-wide damages.

268. These and other questions of law or fact, which are common to the members of the Classes, predominate over any questions affecting only individual members of the Classes.

269. Plaintiff's claims are typical of the claims of members of the Classes, and Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff

and all members of the Classes are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated, increased, and stabilized prices of HVAC Equipment sold in the United States, resulting from price-fixing in the HVAC Equipment industry by Defendants.

270. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiff's interests are coincident with and typical of, and not antagonistic to, those of the other members of the Classes.

271. Plaintiff has retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

272. As described herein, Defendants acted or refused to act on grounds that apply generally to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Classes as a whole.

273. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims

that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

274. Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## IX. ANTITRUST INJURY

275. Defendants' anticompetitive conduct had the following effects, among others:

a. Price competition has been restrained or eliminated with respect to HVAC Equipment;

b. HVAC Equipment prices have been fixed, raised, stabilized, or maintained at artificially inflated levels;

c. Plaintiff and the Classes have been deprived of free and open competition; and

d. Plaintiff and the Classes paid artificially inflated HVAC Equipment prices.

276. The HVAC Equipment that Plaintiff and members of the Classes purchased was in substantially the same form as when they were initially sold by Defendants. As a result, HVAC Equipment follows a traceable physical chain from

Defendants to Plaintiff and members of the Classes, and the overcharges on HVAC Equipment can be traced from Defendants to Plaintiff and members of the Classes.

277. As discussed in detail, as a matter of economic principle, firms must recover the short-run variable costs of production when they price their products for the market, which ultimately get passed to purchasers here, to Plaintiff and members of the Classes, in the form of higher prices. When demand is inelastic, as it is for HVAC Equipment, the pass-through rate to purchasers from non-converter HVAC Equipment sellers is at or near 100%.

278. Consequently, while direct purchasers were the first to pay supra-competitive prices, the overcharge was passed along the distribution chain and absorbed by Plaintiff and members of the Classes when they purchased HVAC Equipment through a non-converter HVAC Equipment seller.

279. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive price paid by Plaintiff and the members of the Classes. Thus, the economic harm to Plaintiff and the members of the Classes can be quantified.

280. The purpose of the collusive conduct of Defendants is to raise, fix, stabilize, or maintain the price of HVAC Equipment and, as a direct and foreseeable result, Plaintiff and the members of the Classes paid supra-competitive HVAC Equipment prices during the Class Period.

281. By reason of the alleged violations of the antitrust laws, Plaintiff and the members of the Classes have sustained injury to their businesses or property, having paid higher HVAC Equipment prices than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, have suffered damages.

282. This is an antitrust injury of the type that federal and state antitrust laws were meant to punish and prevent.

## X.     CLAIMS FOR RELIEF

### COUNT 1:  VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1) FOR RESTRAINT OF TRADE
### (On Behalf of Nationwide Class for Injunctive and Equitable Relief)

283. Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

284. Beginning on or around January 1, 2020, the exact date being unknown to Plaintiff and the Nationwide Class and exclusively within the knowledge of Defendants, and continuing through the present, Defendants entered into a continuing agreement to unlawfully and unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating price competition for HVAC Equipment.

-88-

285. In particular, Defendants have combined and conspired to raise, fix, maintain, or stabilize the price of HVAC Equipment sold to United Sates purchasers during the Class Period.

286. As a result of Defendants' unlawful and unreasonable conduct and acts taken in furtherance of their conspiracy, the price of HVAC Equipment sold to purchasers in the United States during the Class Period was raised, fixed, maintained, or stabilized at artificially inflated levels.

287. The combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action between and among Defendants.

288. For purposes of formulating and effectuating their combination or conspiracy, Defendants did those things they combined or conspired to do, including:

     a. Participating in meetings and conversations at regular industry events and meetings;

     b. Communicating in writing and orally to raise, fix, maintain, and stabilize price of HVAC Equipment;

     c. Agreeing to coordinate and manipulate the price of HVAC Equipment sold to United States purchasers in a manner that deprived those purchasers of free and open price competition;

     d. Issuing or signaling to each other price announcements and price quotations for HVAC Equipment in accordance with the agreement Defendants reached among themselves;

e.    Selling HVAC Equipment to United States purchasers at non-competitive and artificial prices that Defendants collusively determined; and

f.    Providing pretextual justifications to purchasers and the public to explain any rises, maintenance, or stabilization of the prices for the Defendants' HVAC Equipment.

289.    As a result of Defendants' anticompetitive conduct, Plaintiff and the Nationwide Class have been injured in their business and property in that they have paid more for HVAC Equipment they purchased during the Class Period than they otherwise would have paid but for Defendants' conduct.

290.    Plaintiff and the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein, and equitable relief.

## XI.    VIOLATIONS OF STATE ANTITRUST LAWS FOR INDIRECT PURCHASES

291.    Plaintiff repeats and realleges, as if fully set forth herein, each allegation, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

292.    During the Class Period, Defendants entered and engaged in a contract, combination, or conspiracy to fix, raise, maintain, and stabilize the price of HVAC Equipment in various states to unreasonably restrain trade and commerce and harm consumers in violation of the various state antitrust and consumer protection laws set forth below.

293. In formulating and effectuating this conspiracy, Defendants performed acts in furtherance of the combination and conspiracy, including: agreeing to fix, raise, maintain, and stabilize the price of HVAC Equipment which injured Plaintiff and members of the Classes; exchange of competitively sensitive information between and among Defendants; and participating in meetings conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

294. Defendants engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize HVAC Equipment prices at artificially high levels. As a direct and proximate result of Defendants' conduct, Plaintiff and members of the Classes were deprived of free and open competition and paid more to purchase HVAC Equipment than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type that the antitrust and consumer protection laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

295. In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of and to the detriment of Plaintiff and members of the Classes.

296. Accordingly, Plaintiff and the members of the State Law Damages Class in each of the following jurisdictions seek damages (including statutory

damages where applicable), to be trebled or otherwise increased as permitted by each particular jurisdiction's law, injunction (where applicable), and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

297. Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following state antitrust and consumer protection statutes. Plaintiff has also sent the applicable notices required under these state antitrust and consumer protection statutes.

298. In the Claims for Relief that follow, a reference to the "Class" is a reference to the State Law Class unless otherwise specified.

### COUNT 2:  ALABAMA
### (On Behalf of Class Members that Purchased HVAC Equipment in Alabama)

299. Defendants' agreement was an unlawful agreement to restrain trade in the State of Alabama in violation of ALA. CODE §6-5-60 *et seq.* Defendants' unlawful conduct caused (1) competition for HVAC Equipment was restrained, suppressed, and eliminated within Alabama; (2) HVAC Equipment prices in the State of Alabama were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals in Alabama have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Alabama commerce and caused Class members in Alabama to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and the

members of the Class in Alabama seek all forms of relief available under ALA. CODE §6-5-60 *et seq.*

### COUNT 3:  ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION
### (On Behalf of Class Members that Purchased HVAC Equipment in Alaska)

300.   Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Alaska Unfair Trade Practices and Consumer Protection Act, ALASKA STATUTE § 45.50.471, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Alaska, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HVAC Equipment were sold, distributed, or obtained in Alaska. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for HVAC Equipment. Defendants misrepresented to all purchasers during the Class Period that Defendants' HVAC Equipment prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Alaska; (2) HVAC Equipment prices in the State of Alaska were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Alaska commerce and consumers. As a direct and proximate result of

Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of HVAC Equipment, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing HVAC Equipment at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of HVAC Equipment they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ALASKA STATUTE § 45.50.471 *et seq.*, and, accordingly, Plaintiff and Class members in Alaska seek all relief available under that statute.

### COUNT 4:  ARKANSAS DECEPTIVE TRADE PRACTICES ACT
**(On Behalf of Class Members that Purchased HVAC Equipment in Arkansas)**

301.  Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Arkansas Deceptive Trade Practices Act, ARKANSAS CODE ANN., §4-88-101, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Arkansas, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HVAC Equipment were sold, distributed, or obtained in Arkansas. Defendants deliberately

failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for HVAC Equipment. Defendants misrepresented to all purchasers during the Class Period that Defendants' HVAC Equipment prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Arkansas; (2) HVAC Equipment prices in the State of Arkansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of HVAC Equipment, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing HVAC Equipment at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of HVAC Equipment they purchased. Defendants have engaged

-95-

in unfair competition or unfair or deceptive acts or practices in violation of ARKANSAS CODE ANN., §4-88-101, *et seq.*, and, accordingly, Plaintiff and Class members in Arkansas seek all relief available under that statute.

## COUNT 5:  ARIZONA ANTITRUST ACT
**(On Behalf of Class Members that Purchased HVAC Equipment in Arizona)**

302.   Defendants' agreement was an unlawful agreement to restrain trade in the State of Arizona in violation of ARIZ. REV. STAT. §44-1401 *et seq.* Defendants' unlawful conduct caused: (1) competition for HVAC Equipment to be restrained, suppressed, and eliminated throughout Arizona; (2) HVAC Equipment prices in the State of Arizona to be raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals in Arizona to have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Arizona commerce and caused Class members in Arizona to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in Arizona seek all forms of relief available under ARIZ. REV. STAT. §44-1401 *et seq.*

## COUNT 6:  ARIZONA CONSUMER FRAUD ACT
**(On Behalf of Class Members that Purchased HVAC Equipment in Arizona)**

303.   Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Arizona Consumer Fraud Act, ARIZ. REV. STAT. §44-1521 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or

commerce in Arizona, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HVAC Equipment distributed or obtained in Arizona. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for HVAC Equipment. Defendants misrepresented to all purchasers during the Class Period that Defendants' HVAC Equipment prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Arizona; (2) HVAC Equipment prices in the State of Arizona were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Arizona commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of HVAC Equipment, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing HVAC Equipment at prices set by a free and fair market.

Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of HVAC Equipment they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ARIZ. REV. STAT. §44-1521 *et seq.*, and, accordingly, Plaintiff and Class members in Arizona seek all relief available under that statute.

## COUNT 7:  CALIFORNIA CARTWRIGHT ACT
### (On Behalf of Class Members that Purchased HVAC Equipment in California)

304.  Defendants have entered into an unlawful agreement in restraint of trade in violation of CAL. BUS. & PROF. CODE §16700 *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout California; (2) HVAC Equipment prices in the State of California were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected California commerce and caused Class members in California to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in California seek all forms of relief available under CAL. BUS. & PROF. CODE §16700 *et seq.*

## COUNT 8:  CALIFORNIA UNFAIR COMPETITION LAW
### (On Behalf of Class Members that Purchased HVAC Equipment in California)

305.    Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the California Unfair Competition Law, CAL. BUS. & PROF. CODE §17200 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in California, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HVAC Equipment were sold, distributed, or obtained in California. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for HVAC Equipment. Defendants misrepresented to all purchasers during the Class Period that Defendants' HVAC Equipment prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of California; (2) HVAC Equipment prices in the State of California were raised, fixed, maintained, and stabilized at artificially high levels in violation of both the Sherman and Clayton Acts and California's Cartwright Act; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected California commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable

loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of HVAC Equipment, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing HVAC Equipment at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of HVAC Equipment they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of CAL. BUS. & PROF. CODE §17200 *et seq.*, and, accordingly, Plaintiff and Class members in California seek all relief available under that statute.

## COUNT 9:  COLORADO ANTITRUST ACT
**(On Behalf of Class Members that Purchased HVAC Equipment in Colorado)**

306.  Defendants have entered into an unlawful agreement in restraint of trade in violation of COLO. REV. STAT. §6-4-101 *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout Colorado; (2) HVAC Equipment prices in the State of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially

-100-

affected Colorado commerce and caused Class members in Colorado to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in Colorado seek all forms of relief available under COLO. REV. STAT. §6-4- 101, *et seq.*

### COUNT 10:  COLORADO CONSUMER PROTECTION ACT
**(On Behalf of Class Members that Purchased HVAC Equipment in Colorado)**

307.   Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Colorado Consumer Protection Act, COLO. REV. STAT. §6-1-101 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Colorado, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HVAC Equipment were sold, distributed, or obtained in Colorado. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for HVAC Equipment. Defendants misrepresented to all purchasers during the Class Period that Defendants' HVAC Equipment prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Colorado; (2) HVAC Equipment prices in the State of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Colorado commerce

and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of HVAC Equipment, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing HVAC Equipment at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of HVAC Equipment they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of COLO. REV. STAT. §6-1-101 *et seq.*, and, accordingly, Plaintiff and Class members seek all relief available under that statute.

### COUNT 11:  CONNECTICUT ANTITRUST ACT
**(On Behalf of Class Members that Purchased HVAC Equipment in Connecticut)**

308.   Defendants have entered into an unlawful agreement in restraint of trade in violation of CONN. GEN. STAT. §35-24 *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout Connecticut, and (2) HVAC

Equipment prices in the State of Connecticut were fixed, controlled, and maintained at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Connecticut commerce and caused Class members in Connecticut to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in Connecticut seek all forms of relief available under Conn. Gen. Stat. §35-24 *et seq.*

## COUNT 12:  DISTRICT OF COLUMBIA ANTITRUST ACT
### (On Behalf of Class Members that Purchased HVAC Equipment in the District of Columbia)

309.   Defendants have entered into an unlawful agreement in restraint of trade in violation of D.C. CODE §28-4501, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the District of Columbia; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; and (3) Plaintiff and members of the Class, including those who resided in the District of Columbia and Purchased HVAC Equipment in the District of Columbia, paid supra-competitive, artificially inflated prices for HVAC Equipment. During the Class Period, Defendants' unlawful conduct substantially affected the District of Columbia's commerce and caused Class members in the District of Columbia to pay

-103-

supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in the District of Columbia seek all forms of relief available under D.C. CODE §28-4501, *et seq.*

### COUNT 13:  DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT
### (On Behalf of Class Members that Purchased HVAC Equipment in the District of Columbia)

310.   Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the District of Columbia Consumer Protection Procedures Act, D.C. CODE, §28-3901 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in the District of Columbia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HVAC Equipment were sold, distributed, or obtained in the District of Columbia. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for HVAC Equipment. Defendants misrepresented to all purchasers during the Class Period that Defendants' HVAC Equipment prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the District of Columbia; (2) HVAC Equipment prices in the District of Columbia were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct

substantially affected the District of Columbia's commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of HVAC Equipment, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing HVAC Equipment at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of HVAC Equipment they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. CODE §28-3901, *et seq.*, and, accordingly, Plaintiff and Class members seek all relief available under that statute.

### COUNT 14:  FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
**(On Behalf of Class Members that Purchased HVAC Equipment in Florida)**

311.   Defendants' unfair competition or unfair, and unconscionable acts or practices violated the Florida Deceptive and Unfair Trade Practices Act, FLA. STAT. §501.201 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Florida, by affecting, fixing, controlling, and/or maintaining, at

artificial and non-competitive levels, the prices at which HVAC Equipment were sold, distributed, or obtained in Florida. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Florida; (2) HVAC Equipment prices in the State of Florida were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of FLA. STAT. §501.201 *et seq.*, and, accordingly, Plaintiff and Class members seek all relief available under that statute.

### COUNT 15:  HAWAII
### (On Behalf of Class Members that Purchased HVAC Equipment in Hawaii)

*312.* Defendants have entered into an unlawful agreement in restraint of trade in violation of HAW. REV. STAT. ANN. §480-1 *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout Hawaii; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; and (3) Plaintiff and members of the Class, including those who

resided in the Hawaii and Purchased HVAC Equipment in Hawaii, paid supra-competitive, artificially inflated prices for HVAC Equipment. During the Class Period, Defendants' unlawful conduct substantially affected Hawaii commerce and caused Class members in Hawaii to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in Hawaii seek all forms of relief available under HAW. REV. STAT. ANN. §480-1 *et seq.*

## COUNT 16:  ILLINOIS ANTITRUST ACT
### (On Behalf of Class Members that Purchased HVAC Equipment in Illinois)

313. Defendants have entered into an unlawful agreement in restraint of trade in violation of 740 Ill. Comp. Stat. 10/1, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the Illinois; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; and (3) Plaintiff and members of the Class, including those who resided in the Illinois and Purchased HVAC Equipment in Illinois, paid supra-competitive, artificially inflated prices for HVAC Equipment. During the Class Period, Defendants' unlawful conduct substantially affected Illinois commerce and caused Class members in Illinois to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in Illinois seek all forms of relief available under 740 Ill. Comp. Stat. 10/1 *et seq.*

## COUNT 17:  ILLINOIS CONSUMER FRAUD &
## DECEPTIVE BUSINESS PRACTICES ACT
### (On Behalf of Class Members that Purchased HVAC Equipment in Illinois)

314.   Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Illinois, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HVAC Equipment were sold, distributed, or obtained in Illinois. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for HVAC Equipment. Defendants misrepresented to all purchasers during the Class Period that Defendants' HVAC Equipment prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Illinois; (2) HVAC Equipment prices in the State of Illinois were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Illinois commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and

deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of HVAC Equipment, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing HVAC Equipment at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of HVAC Equipment they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. 505/1, *et seq.*, and, accordingly, Plaintiff and Class members seek all relief available under that statute.

## COUNT 18: IOWA
### (On Behalf of Class Members that Purchased HVAC Equipment in Iowa)

315. Defendants have entered into an unlawful agreement in restraint of trade in violation of IOWA CODE §553.1, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Iowa, and (2) HVAC Equipment prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Iowa. During the Class Period, Defendants' unlawful conduct substantially affected Iowa commerce and caused Class members in Iowa to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and

Class members in Iowa seek all forms of relief available under IOWA CODE §553.1, *et seq.*

## COUNT 19:  KANSAS RESTRAINT OF TRADE ACT
### (On Behalf of Class Members that Purchased HVAC Equipment in Kansas)

316.  Defendants have entered into an unlawful agreement in restraint of trade in violation of KAN. STAT. ANN. §50-101, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Kansas; (2) HVAC Equipment prices in the State of Kansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Kansas commerce and caused Class members in Kansas to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in Kansas seek all forms of relief available under KAN. STAT. ANN. §50-101, *et seq.*

## COUNT 20:  MAINE ANTITRUST LAW
### (On Behalf of Class Members that Purchased HVAC Equipment in Maine)

317.  Defendants have entered into an unlawful agreement in restraint of trade in violation of ME. STAT. TIT. 10, §1101, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Maine; and (2) HVAC

Equipment prices in the State of Maine were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Maine commerce and caused Class members in Maine to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in Maine seek all forms of relief available under ME. STAT. TIT. 10, §1101, *et seq.*

### COUNT 21: MARYLAND ANTITRUST ACT
**(On Behalf of Class Members that Purchased HVAC Equipment in Maryland)**

318. Defendants have entered into an unlawful agreement in restraint of trade in violation of MD. CODE ANN., COM. LAW §11-201 *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Maryland; and (2) HVAC Equipment prices in the State of Maryland were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Maryland commerce and caused Class members in Maryland to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in Maryland seek all forms of relief available under MD. CODE ANN., COM. LAW §11-201 *et seq.*

**COUNT 22:  MARYLAND CONSUMER PROTECTION ACT**
**(On Behalf of Class Members that Purchased HVAC Equipment in Maryland)**

319.    Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §13-101 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Maryland, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HVAC Equipment were sold, distributed, or obtained in Maryland. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for HVAC Equipment. Defendants misrepresented to all purchasers during the Class Period that Defendants' HVAC Equipment prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Maryland; (2) HVAC Equipment prices in the State of Maryland were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Maryland commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by

Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of HVAC Equipment, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing HVAC Equipment at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of HVAC Equipment they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Code Ann., Com. Law §13-101, *et seq.*, and, accordingly, Plaintiff and Class members seek all relief available under that statute.

### COUNT 23: MASSACHUSETTS CONSUMER PROTECTION ACT
**(On Behalf of Class Members that Purchased HVAC Equipment in Massachusetts)**

320. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ann. ch. 93A §1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Massachusetts, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HVAC Equipment were sold, distributed, or obtained in Massachusetts. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for HVAC

Equipment. Defendants misrepresented to all purchasers during the Class Period that Defendants' HVAC Equipment prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the Commonwealth of Massachusetts; (2) HVAC Equipment prices in the Commonwealth of Massachusetts were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of HVAC Equipment, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing HVAC Equipment at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of HVAC Equipment they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. Laws Ann. ch. 93A

-114-

§1, *et seq.*, and, accordingly, Plaintiff and Class members seek all relief available under that statute.

## COUNT 24:  MICHIGAN ANTITRUST REFORM ACT
### (On Behalf of Class Members that Purchased HVAC Equipment in Michigan)

321.   Defendants have entered into an unlawful agreement in restraint of trade in violation of MICH.COMP. LAWS §445.771 *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Michigan; and (2) HVAC Equipment prices in the State of Michigan were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Michigan commerce and caused Class members in Michigan to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in Michigan seek all forms of relief available under MICH.COMP. LAWS §445.771 *et seq.*

## COUNT 25:  MICHIGAN CONSUMER PROTECTION ACT
### (On Behalf of Class Members that Purchased HVAC Equipment in Michigan)

322.   Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Michigan Consumer Protection Act, MICH. COMP. LAWS §445.903, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HVAC Equipment were

sold, distributed, or obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for HVAC Equipment. Defendants misrepresented to all purchasers during the Class Period that Defendants' HVAC Equipment prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Michigan; (2) HVAC Equipment prices in the State of Michigan were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Michigan commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of HVAC Equipment, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing HVAC Equipment at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of HVAC

-116-

Equipment they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MICH. COMP. LAWS §445.903 et seq, and, accordingly, Plaintiff and Class members seek all relief available under that statute.

## COUNT 26:  MINNESOTA ANTITRUST LAW
### (On Behalf of Class Members that Purchased HVAC Equipment in Minnesota)

323.   Defendants have entered into an unlawful agreement in restraint of trade in violation of MINN. STAT. §325D.49 *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Minnesota; and (2) HVAC Equipment prices in the State of Minnesota were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Minnesota commerce and caused Class members in Minnesota to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in Minnesota seek all forms of relief available under MINN. STAT. §325D.49 *et seq.*

324.   Defendants have violated the MINN. STAT. §325D.49 *et seq.*, through their anticompetitive actions. Accordingly, Plaintiff and members of the Class seek all forms of relief available under MINN. STAT. §325D.49 *et seq.*

-117-

**COUNT 27:  MINNESOTA UNIFORM DECEPTIVE TRADE
PRACTICES ACT
(On Behalf of Class Members that Purchased HVAC Equipment in
Minnesota)**

325.   Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Minnesota Uniform Deceptive Trade Practices Act, MINN. STAT. §325d.43-48, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Minnesota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HVAC Equipment were sold, distributed, or obtained in Minnesota. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for HVAC Equipment. Defendants misrepresented to all purchasers during the Class Period that Defendants' HVAC Equipment prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Minnesota; (2) HVAC Equipment prices in the State of Minnesota were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Minnesota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of

unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of HVAC Equipment, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing HVAC Equipment at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of HVAC Equipment they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MINN. STAT. §325d.43-48 et seq, and, accordingly, Plaintiff and Class members seek all relief available under that statute.

## COUNT 28: MISSISSIPPI
### (On Behalf of Class Members that Purchased HVAC Equipment in Mississippi)

326. Defendants have entered into an unlawful agreement in restraint of trade in violation of MISS. CODE ANN. §75-21-1 *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Mississippi; and (2) HVAC Equipment prices in the State of Mississippi were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Mississippi commerce and

caused Class members in Mississippi to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in Mississippi seek all forms of relief available under MISS. CODE ANN. §75-21-1 *et seq.*

**COUNT 29:  MISSOURI MERCHANDISING PRACTICES ACT**
**(On Behalf of Class Members that Purchased HVAC Equipment in Missouri)**

327.   Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Missouri Merchandising Practices Act, MO. REV. STAT. §407.020, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Missouri, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HVAC Equipment were sold, distributed, or obtained in Missouri. Plaintiff and members of the Damages Class purchased HVAC Equipment for personal or household purposes. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for HVAC Equipment. Defendants misrepresented to all purchasers during the Class Period that Defendants' HVAC Equipment prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Missouri; (2) HVAC Equipment prices in the State of Missouri were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially

affected Missouri commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' conduct, as described herein. Upon information and belief, Defendants also directed advertising and marketing efforts for HVAC Equipment in the State of Missouri. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of HVAC Equipment, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing HVAC Equipment at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of HVAC Equipment they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MO. REV. STAT. §407.020 et seq, and, accordingly, Plaintiff and Class members seek all relief available under that statute.

### COUNT 30:  MONTANA UNFAIR TRADE PRACTICES & CONSUMER PROTECTION ACT
**(On Behalf of Class Members that Purchased HVAC Equipment in Montana)**

328.  Defendants' unfair, unconscionable, or deceptive acts or practices violated the Montana Unfair Trade Practices and Consumer Protection Act, MONT. CODE, §§30-14-101 *et seq.*, and §30-14-201, *et seq.* Defendants agreed to, and did

in fact, act in restraint of trade or commerce in Montana, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HVAC Equipment were sold, distributed, or obtained in Montana. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Montana; (2) HVAC Equipment prices in the State of Montana were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MONT. CODE, §§30-14-101 *et seq.* §30-14-201, *et seq.*, and, accordingly, Plaintiff and Class members seek all relief available under that statute.

### COUNT 31:  NEBRASKA JUNKIN ACT
**(On Behalf of Class Members that Purchased HVAC Equipment in Nebraska)**

329.   Defendants have entered into an unlawful agreement in restraint of trade in violation of NEB. REV. STAT. §59-801 *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Nebraska; and

-122-

(2) HVAC Equipment prices in the State of Nebraska were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Nebraska commerce and caused Class members in Nebraska to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in Nebraska seek all forms of relief available under NEB. REV. STAT. §59-801 *et seq.*

## COUNT 32:  NEBRASKA CONSUMER PROTECTION ACT
### (On Behalf of Class Members that Purchased HVAC Equipment in Nebraska)

330.  Defendants' unfair competition or unfair, and unconscionable acts or practices violated the Nebraska Consumer Protection Act, NEB. REV. STAT. §59-1601 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nebraska, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HVAC Equipment were sold, distributed, or obtained in Nebraska. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Nebraska; (2) HVAC Equipment prices in the State of Nebraska were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Nebraska commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property

-123-

because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of NEB. REV. STAT. §59-1601 *et seq.*, and, accordingly, Plaintiff and Class members seek all relief available under that statute.

## COUNT 33: NEVADA ANTITRUST ACT
**(On Behalf of Class Members that Purchased HVAC Equipment in Nevada)**

331. Defendants have entered into an unlawful agreement in restraint of trade in violation of NEV. REV. STAT. ANN. §598A.210 *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Nevada; and (2) HVAC Equipment prices in the State of Nevada were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Nevada commerce and caused Class members in Nevada to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in Nevada seek all forms of relief available under NEV. REV. STAT. ANN. §598A.210 *et seq.*

## COUNT 34: NEVADA DECEPTIVE TRADE PRACTICES ACT
**(On Behalf of Class Members that Purchased HVAC Equipment in Nevada)**

332. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Nevada Deceptive Trade Practices Act, NEV. REV. STAT. § 598.0903, *et seq.* Defendants agreed to, and did in fact, act in restraint of

trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HVAC Equipment were sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for HVAC Equipment. Defendants misrepresented to all purchasers during the Class Period that Defendants' HVAC Equipment prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Nevada; (2) HVAC Equipment prices in the State of Nevada were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of HVAC Equipment, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing HVAC Equipment at prices set by a free and fair market.

Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of HVAC Equipment they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of NEV. REV. STAT. § 598.0903, *et seq.*, and, accordingly, Plaintiff and Class members seek all relief available under that statute.

**COUNT 35: NEW HAMPSHIRE ANTITRUST LAW**
**(On Behalf of Class Members that Purchased HVAC Equipment in**
**New Hampshire)**

333. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.H. REV. STAT. ANN. §356:1 *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of New Hampshire; and (2) HVAC Equipment prices in the State of New Hampshire were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected New Hampshire commerce and caused Class members in New Hampshire to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in New Hampshire seek all forms of relief available under N.H. REV. STAT. ANN. §356:1 *et seq.*

**COUNT 36:  NEW HAMPSHIRE CONSUMER PROTECTION ACT**
**(On Behalf of Class Members that Purchased HVAC Equipment in**
**New Hampshire)**

334.   Defendants' unfair competition or unfair, and unconscionable acts or practices violated the New Hampshire Consumer Protection Act, N.H. REV. STAT. ANN. §358-A:1 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nebraska, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HVAC Equipment were sold, distributed, or obtained in New Hampshire. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of New Hampshire; (2) HVAC Equipment prices in the State of New Hampshire were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. REV. STAT. ANN. §358-A:1 *et seq.*, and, accordingly, Plaintiff and Class members seek all relief available under that statute.

## COUNT 37:  NEW JERSEY ANTITRUST ACT
### (On Behalf of Class Members that Purchased HVAC Equipment in New Jersey)

335.  Defendants have entered into an unlawful agreement in restraint of trade in violation of N.J. STAT. ANN. §56:9-1 *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of New Jersey; (2) HVAC Equipment prices in the State of New Jersey were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected New Jersey commerce and caused Class members in New Jersey to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in New Jersey seek all forms of relief available under N.J. STAT. ANN. §56:9-1 *et seq.*

## COUNT 38:  NEW MEXICO ANTITRUST ACT
### (On Behalf of Class Members that Purchased HVAC Equipment in New Mexico)

336.  Defendants have entered into an unlawful agreement in restraint of trade in violation of N.M. STAT.ANN. §57-1-1 *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of New Mexico; (2) HVAC Equipment prices in the State of New Mexico were raised, fixed,

maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected New Mexico commerce and caused Class members in New Mexico to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in New Mexico seek all forms of relief available under N.M. STAT.ANN. §57-1-1 *et seq.*

## COUNT 39: NEW MEXICO UNFAIR PRACTICES ACT
### (On Behalf of Class Members that Purchased HVAC Equipment in New Mexico)

337. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the N.M. STAT. §57-12-1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which HVAC Equipment were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiff and New Mexico Class members. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M. STAT. §57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiff and members of the Damages Class and the prices paid by them for generic HVAC Equipment as set forth in N.M. STAT. §57-12-2E. Plaintiff and members of the Damages Class were not aware of Defendants'

price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiff and New Mexico Class members had no power to negotiate a lower price. Moreover, Plaintiff and New Mexico Class members lacked any meaningful choice in purchasing HVAC Equipment because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiff and New Mexico Class members could avoid the overcharges. Defendants' conduct with regard to sales of HVAC Equipment, including their illegal conspiracy to secretly fix the price of HVAC Equipment at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and New Mexico Class members. Defendants took grossly unfair advantage of Plaintiff and New Mexico Class members. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for HVAC Equipment. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of New Mexico; (2) HVAC Equipment prices in the State of New Mexico were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

-130-

During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff and New Mexico Class members have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. STAT. § 57-12-1, *et seq.*, and, accordingly, Plaintiff and New Mexico Class members seek all relief available under that statute.

### COUNT 40:  NEW YORK DONNELLY ACT
### (On Behalf of Class Members that Purchased HVAC Equipment in New York)

338.   Defendants have entered into an unlawful agreement in restraint of trade in violation of N.Y. GEN. BUS. LAW §340 *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of New York; (2) HVAC Equipment prices in the State of New York were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected New York commerce and caused Class members in New York to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in New York seek all forms of relief available under N.Y. GEN. BUS. LAW §340 *et seq.*

## COUNT 41:  NORTH CAROLINA ANTITRUST LAW
### (On Behalf of Class Members that Purchased HVAC Equipment in North Carolina)

339.   Defendants have entered into an unlawful agreement in restraint of trade in violation of N.C. GEN. STAT. §75-1 *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of North Carolina; (2) HVAC Equipment prices in the State of North Carolina were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected North Carolina commerce and caused Class members in North Carolina to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in North Carolina seek all forms of relief available under N.C. GEN. STAT. §75-1 *et seq.*

## COUNT 42:  NORTH DAKOTA UNIFORM STATE ANTITRUST ACT
### (On Behalf of Class Members that Purchased HVAC Equipment in North Dakota)

340.   Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. CENT. CODE §51-08.1-01 *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of North Dakota; (2) HVAC Equipment prices in the State of North Dakota were raised, fixed,

maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected North Dakota commerce and caused Class members in North Dakota to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in North Dakota seek all forms of relief available under N.D. CENT. CODE §51-08.1-01 *et seq.*

## COUNT 43: OREGON ANTITRUST LAW
**(On Behalf of Class Members that Purchased HVAC Equipment in Oregon)**

341. Defendants have entered into an unlawful agreement in restraint of trade in violation of OR. REV. STAT. §646.725 *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Oregon; (2) HVAC Equipment prices in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Oregon commerce and caused Class members in Oregon to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in Oregon seek all forms of relief available under OR. REV. STAT. §646.725 *et seq.*

## COUNT 44:  OREGON UNFAIR TRADE PRACTICES ACT
### (On Behalf of Class Members that Purchased HVAC Equipment in Oregon)

342.   Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Oregon Unfair Trade Practices Act, OR. REV. STAT. §646.605, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Oregon, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HVAC Equipment were sold, distributed, or obtained in Oregon. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for HVAC Equipment. Defendants misrepresented to all purchasers during the Class Period that Defendants' HVAC Equipment prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Oregon; (2) HVAC Equipment prices in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Oregon commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive

conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of HVAC Equipment, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing HVAC Equipment at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of HVAC Equipment they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of OR. REV. STAT. §646.605, *et seq.*, and, accordingly, Plaintiff and Class members seek all relief available under that statute.

### COUNT 45:  PENNSYLVANIA UNFAIR TRADE PRACTICES & CONSUMER PROTECTION LAW
### (On Behalf of Class Members that Purchased HVAC Equipment in Pennsylvania)

343.   Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("PUTPCPL"), 73 P.S. §201-1, *et seq.* The PUTPCPL prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 Pa. Stat. Ann. § 201-3. Among other things, the PUTPCPL prohibits "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 Pa. Stat. Ann. § 201-2(4)(xxi). Plaintiff and Pennsylvania Class members purchased HVAC

Equipment primarily for personal or household use. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Pennsylvania, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HVAC Equipment were sold, distributed, or obtained in Pennsylvania. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for HVAC Equipment. Defendants misrepresented to all purchasers during the Class Period that Defendants' HVAC Equipment prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the Commonwealth of Pennsylvania; (2) HVAC Equipment prices in the Commonwealth of Pennsylvania were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Pennsylvania commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of HVAC

-136-

Equipment, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing HVAC Equipment at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of HVAC Equipment they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 P.S. §201-1, *et seq.,* and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNT 46:  RHODE ISLAND ANTITRUST ACT
### (On Behalf of Class Members that Purchased HVAC Equipment in Rhode Island)

344.   Defendants have entered into an unlawful agreement in restraint of trade in violation of R.I. GEN. LAWS §6-36-7 *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Rhode Island; (2) HVAC Equipment prices in the State of Rhode Island were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Rhode Island commerce and caused Class members in Rhode Island to pay supracompetitive prices for HVAC Equipment.

Accordingly, Plaintiff and Class members in Rhode Island seek all forms of relief available under R.I. GEN. LAWS §6-36-7 *et seq.*

## COUNT 47:  RHODE ISLAND UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION ACT
### (On Behalf of Class Members that Purchased HVAC Equipment in Rhode Island)

345.   Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. GEN. LAWS §6-13.1-1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HVAC Equipment were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for HVAC Equipment. Defendants misrepresented to all purchasers during the Class Period that Defendants' HVAC Equipment prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Rhode Island; (2) HVAC Equipment prices in the State of Rhode Island were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers. As a direct and

-138-

proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of HVAC Equipment, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing HVAC Equipment at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of HVAC Equipment they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. GEN. LAWS §6-13.1-1, *et seq.*, and, accordingly, Plaintiff and Class members seek all relief available under that statute.

## COUNT 48:  SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
### (On Behalf of Class Members that Purchased HVAC Equipment in South Carolina)

346. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. CODE ANN. §39-5-10, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of South Carolina;

(2) HVAC Equipment prices in the State of South Carolina were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and South Carolina Class members have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. CODE ANN. §39-5-10, *et seq.*, and, accordingly, Plaintiff and the South Carolina Class members seek all relief available under that statute.

### COUNT 49:  SOUTH DAKOTA ANTITRUST LAW
### (On Behalf of Class Members that Purchased HVAC Equipment in South Dakota)

347.  Defendants have entered into an unlawful agreement in restraint of trade in violation of S.D. CODIFIED LAWS §37-1-3.1 *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of South Dakota; (2) HVAC Equipment prices in the State of South Dakota d were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected South Dakota commerce and caused Class

-140-

members in South Dakota to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in South Dakota seek all forms of relief available under S.D. CODIFIED LAWS §37-1-3.1 *et seq.*

**COUNT 50:  SOUTH DAKOTA DECEPTIVE TRADE PRACTICES
AND CONSUMER PROTECTION STATUTE
(On Behalf of Class Members that Purchased HVAC Equipment in
South Dakota)**

348.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. CODIFIED LAWS §37-24-1 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HVAC Equipment were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for HVAC Equipment. Defendants misrepresented to all purchasers during the Class Period that Defendants' HVAC Equipment prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of South Dakota; (2) HVAC Equipment prices in the State of South Dakota were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants'

illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of HVAC Equipment, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing HVAC Equipment at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of HVAC Equipment they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. CODIFIED LAWS §37-24-1, *et seq.*, and, accordingly, Plaintiff and Class members seek all relief available under that statute.

### COUNT 51:  TENNESSEE FAIR TRADE PRACTICE ACT
**(On Behalf of Class Members that Purchased HVAC Equipment in Tennessee)**

349.  Defendants have entered into an unlawful agreement in restraint of trade in violation of TENN. CODE ANN. §47-25-101 *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for the sale of HVAC Equipment was restrained, suppressed, and eliminated throughout the State of

Tennessee; (2) prices for HVAC Equipment, tangible goods, in the State of Tennessee were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Tennessee commerce and caused Class members in Tennessee to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in Tennessee seek all forms of relief available under TENN. CODE ANN. §47-25-101 *et seq.*

**COUNT 52:  UTAH ANTITRUST ACT**
**(On Behalf of Class Members that Purchased HVAC Equipment in Utah)**

350.   Defendants have entered into an unlawful agreement in restraint of trade in violation of UTAH CODE ANN. §76-10-3101 *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for the sale of HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Utah; (2) prices for HVAC Equipment, tangible goods, in the State of Utah were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Utah commerce and caused Class members in Utah to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in Utah seek all forms of relief available under UTAH CODE ANN. §76-10-3101 *et seq.*

## COUNT 53:  VERMONT ANTITRUST LAW
### (On Behalf of Class Members that Purchased HVAC Equipment in Vermont)

351.   Defendants have entered into an unlawful agreement in restraint of trade in violation of VT. STAT. ANN. TIT. 9, §2453 *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Vermont; (2) HVAC Equipment prices in the State of Vermont were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' Defendants' unlawful conduct substantially affected Vermont commerce and caused Class members in Vermont to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in Vermont seek all forms of relief available under VT. STAT. ANN. TIT. 9, §2465 *et seq.*

## COUNT 54:  WEST VIRGINA ANTITRUST ACT
### (On Behalf of Class Members that Purchased HVAC Equipment in West Virginia)

352.   Defendants have entered into an unlawful agreement in restraint of trade in violation of W. VA. CODE §47-18-1 *et seq.* Defendants' conspiracy had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of West Virginia; (2) HVAC Equipment prices in the State of West Virginia were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free

and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of West Virginia and caused Class members in West Virginia to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and West Virginia members of the Class seek all forms of relief available under W. VA. CODE §47-18-1 *et seq.*

### COUNT 55:  WISCONSIN ANTITRUST ACT
### (On Behalf of Class Members that Purchased HVAC Equipment in Wisconsin)

353.   Defendants have entered into an unlawful contract and conspiracy in restraint of trade in violation of WIS. STAT. §133.03(1). Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Wisconsin; (2) HVAC Equipment prices in the State of Wisconsin were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Wisconsin and caused Class members in Wisconsin to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Wisconsin members of the Class seek all forms of relief available under WIS. STAT. §133.03.

## XII.   PRAYER FOR RELIEF

354.   WHEREFORE, Plaintiff, on behalf of herself and the Classes of all others so similarly situated, respectfully requests that:

A.      The Court determine that this action may be maintained as a class action under Fed. R. Civ. P. 23(a) and (b)(3), appoint Plaintiff as Class Representative and the law firms of Lockridge Grindal Nauen PLLP and Hagens Berman Sobol Shapiro LLP as Co-Lead Class Counsel, and direct that notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the Classes, once certified;

B.      The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants be adjudged to have been a *per se* violation (or alternatively illegal as a quick look or full-fledged rule of reason violation) of various state antitrust and competition laws as alleged above;

C.      The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.    The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiff and members of the Classes for treble the amount of damages sustained by Plaintiff and the Classes as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

E.    The Court award Plaintiff and members of the Classes such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## XIII. JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

-147-

Dated: March 20, 2026            Respectfully submitted,

s/ Steve W. Berman

Steve W. Berman (Admitted, E.D. Mich.)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
455 North Cityfront Plaza Drive
Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile:  (708) 628-4950
steve@hbsslaw.com

Shana E. Scarlett
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
shanas@hbsslaw.com

Breanna Van Engelen
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
breannav@hbsslaw.com

s/ Brian D. Clark

Brian D. Clark
Laura M. Matson
Olivia T. Levinson
Madison J. Gaffney
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue South,
Suite 2200
Minneapolis, Minnesota 55401
Telephone: (612) 339-6900
Facsimile:  (612) 339-0981
bdclark@locklaw.com
lmmatson@locklaw.com
otlevinson@locklaw.com
mjgaffney@locklaw.com

Kyle Pozan
Consuela Abotsi-Kowu
**LOCKRIDGE GRINDAL NAUEN PLLP**
1165 North Clark Street, Suite 700
Chicago, Illinois 60610
Telephone: (312) 470-4333
kjpozan@locklaw.com
cmabotsi-kowu@locklaw.com

Stephen J. Teti
**LOCKRIDGE GRINDAL NAUEN PLLP**
265 Franklin Street, Suite 1702
Boston, Massachusetts 02110
Telephone: (617) 456-7701
sjteti@locklaw.com

*Counsel for Plaintiff and the Proposed Classes*