**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| IN RE HVAC EQUIPMENT ANTITRUST LITIGATION | No. 2:26-cv-10949-SKD-APP |
| | Hon. Susan K. DeClercq |
| *This document relates to*: All Actions | *Oral Argument Requested* |

**DEFENDANTS' JOINT MOTION TO DISMISS**

Defendants Carrier Global Corporation, Viessmann Manufacturing Co. (U.S.), Inc., Daikin Industries, Ltd., Daikin Applied Americas Inc., Daikin Comfort Technologies North America, Inc., ThermalNetics, LLC, Daikin Comfort Technologies Distribution, Inc. f/k/a Goodman Distribution Inc., Rheem Manufacturing Company, Rheem Sales Co., Inc., Lennox International Inc., Allied Air Enterprises LLC, Lennox Industries Inc., Robert Bosch LLC, BHC Residential & Light Commercial LLC f/k/a JC Residential and Light Commercial LLC, Bosch Home Comfort LLC f/k/a Johnson Controls-Hitachi Air Conditioning North America LLC, Bosch Thermotechnology Corp., AAON, Inc. (Nevada), AAON, Inc. (Oklahoma), AAON Coil Products, Inc., BASX, Inc., Trane Technologies plc, Trane U.S. Inc., and Mitsubishi Electric Trane HVAC US ("Defendants"), by and through

counsel, hereby move this Court for an order pursuant to Fed. R. Civ. P. 12(b)(6) dismissing all of the claims contained in Direct Purchaser Plaintiffs' Consolidated Class Action Complaint (PageID.1330-1452), End-User Indirect Purchaser Plaintiffs' Amended Class Action Complaint (PageID.1453-1643), and Commercial Indirect Purchaser Plaintiffs' Consolidated Amended Class Action Complaint (PageID.1769-1872).

The factual and legal bases supporting this Motion are included in the accompanying Brief and Exhibits.

Pursuant to LR 7.1(a), counsel for Defendants and counsel for Plaintiffs met and conferred via videoconference to discuss the basis for Defendants' motion on August 12, 2026, and did not reach agreement.

***

Dated: October 9, 2026

Respectfully submitted,

*<u>/s/ David Marriott</u>*
David Marriott (admitted, E.D. Mich.)
Lawrence E. Buterman
**LATHAM & WATKINS LLP**
1271 Ave. of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
david.marriott@lw.com
lawrence.buterman@lw.com

Belinda S Lee
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
belinda.lee@lw.com

Anna M. Rathbun
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
anna.rathbun@lw.com

Kimberly L. Scott (P69706)
**MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.**
101 North Main, 7th Floor
Ann Arbor, MI 48104
(734) 668-7696
Scott@millercanfield.com

A. Michael Palizzi (P47262)
**MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.**
150 W. Jefferson Ave., Suite 2500
Detroit, MI 48226
(313) 496-7645
Palizzi@millercanfield.com

*Counsel for Trane U.S. Inc. and Trane Technologies plc*

*s/ with consent of Michael W. Scarborough*
Michael W. Scarborough
Dylan I. Ballard
**VINSON & ELKINS LLP**
555 Mission St., Ste. 2000
San Francisco, CA 94105
Tel.: (415) 979-6900
mscarborough@velaw.com
dballard@velaw.com

Craig P. Seebald
**VINSON & ELKINS LLP**
2000 Pennsylvania Ave., Ste. 500 W.
Washington, DC 20037
Tel.: (202) 639-6500
cseebald@velaw.com

*Counsel for AAON, Inc. (Nevada), AAON, Inc. (Oklahoma), AAON Coil Products, Inc., and BASX, Inc.*

*s/ with consent of K. Winn Allen*
K. Winn Allen
Leah A. Hamlin
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Ave., N.W.
Washington, DC 20004
Tel: (202) 389-5000
winn.allen@kirkland.com
leah.hamlin@kirkland.com

Devin S. Anderson
Chris Mack
**KIRKLAND & ELLIS LLP**
95 State St.
Salt Lake City, UT 84111
Tel: (801) 877-8100
devin.anderson@kirkland.com
chris.mack@kirkland.com

Andrew C. Goetz (P71410)
**MILLER JOHNSON**
500 Woodward Ave., Ste. 3600
Detroit, MI 48226
Tel: (313) 435-2292
goetza@millerjohnson.com

*Counsel for Carrier Global Corp. and Viessmann Manufacturing Co. (U.S.), Inc.*

*s/ with consent of Mark H. Hamer*
Mark H. Hamer
Mark G. Weiss
Baker Mckenzie LLP
815 Connecticut Ave. N.W.
Washington, DC 20006
Tel: (202) 452-7000
mark.hamer@bakermckenzie.com
mark.weiss@bakermckenzie.com

Howard B. Iwrey (P39635)
**DYKEMA GOSSETT PLLC**
39577 Woodward Ave.
Bloomfield Hills, MI 48304
Tel: (248) 203-0700
hiwrey@dykema.com

Cody D. Rockey (P78653)
**DYKEMA GOSSETT PLLC**
2723 S. State St., Ste. 400
Ann Arbor, MI 48104
Tel: (734) 214-7660
crockey@dykema.com

*Counsel for Robert Bosch LLC; BHC Residential & Light Commercial LLC; Bosch Home Comfort LLC, and Bosch Thermotechnology Corp.*

*s/ with consent of James H. Weingarten*
James H. Weingarten
Anastasia Pastan
**Milbank LLP**
1101 New York Ave. N.W.
Washington, DC 20005
Tel.: (202) 835-7500
jweingarten@milbank.com
apastan@milbank.com

*s/ with consent of Brian Byrne*
Brian Byrne
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
151 University Avenue
Palo Alto, CA 94301
Tel: (650) 815-4110
bbyrne@cgsh.com

C. Lawrence Malm
Elsbeth Bennett
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
2112 Pennsylvania Ave., N.W.
Washington, DC 20037
Tel: (202) 974-1500
lmalm@cgsh.com
ebennett@cgsh.com

Perrin Rynders (P38221)
**VARNUM LLP**
Bridgewater Place, P.O. Box 352
Grand Rapids, MI 49501-0355
Tel.: (616) 336-6000
prynders@varnumlaw.com

Mark J. Chasteen (P81936)
**VARNUM LLP**
101 N. Main St., Ste. 525
Ann Arbor, MI 48104
Tel.: (734) 372-2900
mjchasteen@varnumlaw.com

*Counsel for Daikin Industries, Ltd., Daikin Comfort Technologies North America, Inc., Daikin Applied Americas Inc., Daikin Comfort Technologies Distribution, Inc. f/k/a Goodman Distribution Inc., and ThermalNetics, LLC*

David A. Ettinger
**HONIGMAN LLP**
660 Woodward Ave., Ste. 2290
Detroit, MI 48226
Tel: (313) 465-7368
dettinger@honigman.com

*Counsel for Lennox International, Inc., Lennox Industries Inc., and Allied Air Enterprises LLC*

*s/ with consent of Michael E. Martínez*
Michael E. Martínez
Lauren Norris Donahue
**K&L Gates LLP**
70 W. Madison St., Ste. 3300
Chicago, IL 60602
Tel: (312) 372-1121
michael.martinez@klgates.com
lauren.donahue@klgates.com

Michael Brady
Warner Norcross + Judd LLP
2715 Woodward Ave., Ste. 300
Detroit, MI 48201
Tel: (313) 546-6000
mbrady@wnj.com

*Counsel for Rheem Manufacturing Company and Rheem Sales Co., Inc.*

*s/ with consent of Colleen M. Lauerman*
Colleen M. Lauerman
Jeffrey T. Green
**Green Lauerman Chartered PLLC**
1050 30th St NW
Washington, DC 20007
Tel: (202) 213-9795
colleen@glclaw.net

Mitchell Zajac
Butzel Long
150 W. Jefferson Avenue Suite 100
Detroit, MI 48226
Tel: (313) 225-7000
zajac@butzel.com

*Counsel for Mitsubishi Electric Trane HVAC US*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| IN RE HVAC EQUIPMENT ANTITRUST LITIGATION<br><br>*This document relates to*: All Actions | No. 2:26-cv-10949-SKD-APP<br><br>Hon. Susan K. DeClercq<br><br>*Oral Argument Requested* |

**BRIEF IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

I. STATEMENT OF ISSUES PRESENTED .......... x

II. CONTROLLING OR MOST APPROPRIATE AUTHORITY FOR RELIEF SOUGHT .......... xi

III. INTRODUCTION .......... 1

IV. BACKGROUND .......... 4

A. Plaintiffs .......... 4
B. The HVAC Industry .......... 5
C. Defendants .......... 6
D. The Alleged Conduct .......... 7

V. LEGAL STANDARDS .......... 10

VI. ARGUMENT .......... 12

A. Plaintiffs Have Not Alleged Direct Evidence of an Agreement to Fix HVAC Equipment Prices .......... 12
B. Plaintiffs Have Not Alleged Circumstantial Evidence Plausibly Suggesting an Agreement to Fix HVAC Equipment Prices .......... 12

1. Plaintiffs Do Not Plead Parallel Conduct .......... 13
2. Plaintiffs Plead, At Most, Lawful Interdependent Conduct .......... 19
3. Plaintiffs Fail to Sufficiently Plead Plus Factors .......... 21

a. The Public Statements by Defendants' Executives Do Not Suggest an Unlawful Agreement .......... 22
b. Plaintiffs' Conclusory "Preliminary Regression Analysis" Carries No Weight .......... 28
c. The Alleged Data-Aggregating Products Do Not Plausibly Suggest an Unlawful Agreement .......... 30
d. Market Characteristics Are Insufficient to Suggest an Unlawful Agreement .......... 34
e. Motive and Opportunity to Conspire Do Not Suggest Agreement .......... 34

f. The Alleged Conduct Is Consistent with Defendants' Economic Self-Interest..............................35

4. Considered as a Whole, Plaintiffs' Allegations Do Not Suggest an Agreement ..........................................................37

5. Obvious Alternative Explanations Further Render an Agreement Implausible..........................................................37

C. Plaintiffs Fail to Allege Facts Tying Each Individual Defendant to the Alleged Conspiracy ..........................................................43

D. CIPPs and EUIPPs Fail to Plausibly Allege State Law Claims..........44

1. Indirect Purchasers Cannot Assert Antitrust Claims in Puerto Rico, Consumer-Protection Claims in Arkansas and Montana, and Unjust-Enrichment Claims in Seven States .......................................................................44

2. CIPPs' Unjust-Enrichment Claims Fail Pleading Standards..................................................................46

3. Two States' Antitrust Statutes and Four States' Consumer-Protection Statutes Bar Such Claims as Class Actions ..................................................................47

4. Price Fixing Is Not a Consumer-Protection Violation in 11 States ..................................................................48

5. Two State Consumer-Protection Statutes Bar Claims by Purchasers for Resale........................................................49

6. Consumer Protection Claims in Two States Must Be Dismissed for Failure to Plead All Essential Elements ............49

VII. CONCLUSION.......................................................................50

## TABLE OF ABBREVIATIONS

| **PARTIES & NAMES** | |
|---|---|
| Direct Purchaser Plaintiffs | "DPPs" |
| End-User Indirect Purchaser Plaintiffs | "EUIPPs" |
| Commercial Indirect Purchaser Plaintiffs | "CIPPs" |
| Commercial Indirect Purchaser Plaintiffs, Direct Purchaser Plaintiffs, and End-User Indirect Purchaser Plaintiffs | Collectively, "Plaintiffs" |

| **PLEADINGS** | | |
|---|---|---|
| Direct Purchaser Plaintiffs' Consolidated Class Action Complaint | PageID.1330-1452 | "DPP ¶ __" |
| End-User Indirect Purchaser Plaintiffs' Amended Class Action Complaint | PageID.1453-1643 | "EUIPP ¶ __" |
| Commercial Indirect Purchaser Plaintiffs' Consolidated Amended Class Action Complaint | PageID.1769-1872 | "CIPP ¶ __" |
| Direct Purchaser Plaintiffs' Consolidated Class Action Complaint, and End-User Indirect Purchaser Plaintiffs' Amended Class Action Complaint, and Commercial Indirect Purchaser Plaintiffs' Consolidated Amended Class Action Complaint | PageID.1330-1643, 1769-1872 | Collectively, "Complaints" |

| **DECLARATION** | |
|---|---|
| Declaration of Belinda S Lee in Support of Defendants' Joint Motion to Dismiss | "Lee Decl." |

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................*passim*

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)....................20

*Burtch v. Milberg Factors, Inc.*,
662 F.3d 212 (3d Cir. 2011)....................12

*California v. ARC Am. Corp.*,
490 U.S. 93 (1989)....................44

*Chapman v. Tristar Prods., Inc.*,
2016 WL 6216135 (N.D. Ohio Oct. 25, 2016)....................48

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*,
92 F.4th 381 (2d Cir. 2024)....................30, 37, 38

*Corrigan v. U.S. Steel Corp.*,
478 F.3d 718 (6th Cir. 2007)....................44

*Cortis v. City of Coleman*,
2011 WL 1518901 (E.D. Mich. Apr. 20, 2011)....................47

*D'Augusta v. Am. Petroleum Inst.*,
117 F.4th 1094 (9th Cir. 2024)....................4, 38

*David B. Turner Builders LLC v. Weyerhaeuser Co.*,
603 F. Supp. 3d 459 (S.D. Miss. 2022)....................39

*Davidson v. Microsoft Corp.*,
792 A.2d 336 (Md. Ct. App. 2002)....................48

*Emergency One, Inc. v. Waterous Co.*,
23 F. Supp. 2d 959 (E.D. Wis. 1998)....................49

*Erie County, Ohio v. Morton Salt, Inc.*,
702 F.3d 860 (6th Cir. 2012) ........................................................ *passim*

*Fin. Acquisition Partners LP v. Blackwell*,
440 F.3d 278 (5th Cir. 2006) ........................................................ 30

*First Magnus Fin. Corp. v. Dobrowski*,
387 F. Supp. 2d 786 (N.D. Ill. 2005) ................................................ 49

*Gibson v. Cendyn Grp., LLC*,
2024 WL 2060260 (D. Nev. May 8, 2024) ............................................ 34

*Hawes v. Macy's Inc.*,
2023 WL 8811499 (S.D. Ohio Dec. 20, 2023) ...................................... 47

*Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*,
48 F.4th 656 (6th Cir. 2022) ................................................ 10, 21, 34

*Humana Inc. v. Merck & Co.*,
2025 WL 2538859 (D.N.J. Sept. 4, 2025) ........................................... 45

*Hyland v. HomeServices of Am., Inc.*,
771 F.3d 310 (6th Cir. 2014) ........................................................ 12

*Ill. Brick Co. v. Illinois*,
431 U.S. 720 (1977) ................................................................... 44

*In re Auto. Parts Antitrust Litig.*,
29 F. Supp. 3d 982 (E.D. Mich. 2014) .............................................. 47

*In re Blood Reagents Antitrust Litig.*,
266 F. Supp. 3d 750 (E.D. Pa. 2017) ................................................ 42

*In re Broiler Chicken Antitrust Litig.*,
2020 WL 4032932 (N.D. Ill. July 15, 2020) ........................................ 45

*In re Concrete & Cement Additives Antitrust Litig.*,
2025 WL 1755193 (S.D.N.Y. June 25, 2025) ................................... *passim*

*In re Concrete & Cement Additives Antitrust Litig.*,
2026 WL 2594002 (S.D.N.Y. Sept. 2, 2026) ................................ 15, 16, 17

*In re Crop Prot. Prods. Loyalty Program Antitrust Litig.*,
779 F. Supp. 3d 624 (M.D.N.C. 2025) ....................................................48

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
2015 WL 3988488 (N.D. Ill. June 29, 2015)..............................................45

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
903 F. Supp. 2d 198 (S.D.N.Y. 2012) .....................................................45

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
516 F. Supp. 2d 1072 (N.D. Cal. 2007)....................................................48

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*,
28 F.4th 42 (9th Cir. 2022) ....................................................................27

*In re German Auto. Mfrs. Antitrust Litig.*,
612 F. Supp. 3d 967 (N.D. Cal. 2020).....................................................44

*In re Graphics Processing Units Antitrust Litig.*,
527 F. Supp. 2d 1011 (N.D. Cal. 2007)....................................................48

*In re Hawaiian & Guamanian Cabotage Antitrust Litig.*,
647 F. Supp. 2d 1250 (W.D. Wash. 2009) ...............................................37

*In re ICE LIBOR Antitrust Litig.*,
2020 WL 1467354 (S.D.N.Y. Mar. 26, 2020)......................................35, 42

*In re Lidoderm Antitrust Litig.*,
103 F. Supp. 3d 1155 (N.D. Cal. 2015)...............................................46, 48

*In re Mexican Gov't Bonds Antitrust Litig.*,
412 F. Supp. 3d 380 (S.D.N.Y. 2019) .....................................................29

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ........................................................19, 35

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
350 F. Supp. 2d 160 (D. Me. 2004) ..................................................45, 48

*In re Omnicare, Inc. Sec. Litig.*,
769 F.3d 455 (6th Cir. 2014) ..................................................................22

*In re Packaged Ice Antitrust Litig.*,
779 F. Supp. 2d 642 (E.D. Mich. 2011) ....................................................47

*In re Passenger Vehicle Replacement Tires Antitrust Litig*,
767 F. Supp. 3d 681 (N.D. Ohio 2025) ............................................*passim*

*In re Passenger Vehicle Replacement Tires Antitrust Litig.*,
2026 WL 879018 (N.D. Ohio Mar. 31, 2026)................................20, 28, 30, 38

*In re Photochromic Antitrust Litig.*,
2011 WL 13141933 (M.D. Fla. Oct. 26, 2011)..............................................48

*In re Refrigerant Compressors Antitrust Litig.*,
2013 WL 1431756 (E.D. Mich. Apr. 9, 2013) ...............................................49

*In re Seroquel XR (Extended Release Quetiapine Fumarate) Antitrust Litig.*,
2022 WL 2438934 (D. Del. July 5, 2022) ..............................................45, 46

*In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*,
150 F. Supp. 3d 593 (D.S.C. 2015) ..............................................................48

*In re Travel Agent Comm'n Antitrust Litig.*,
583 F.3d 896 (6th Cir. 2009) ...................................................................*passim*

*In re Treasury Sec. Auction Antitrust Litig.*,
2021 WL 1226670 (S.D.N.Y. Mar. 31, 2021).................................................29

*Jones v. Micron Tech. Inc.*,
400 F. Supp. 3d 897 (N.D. Cal. 2019)..........................................23, 24, 28, 31

*Kleen Prods. LLC v. Georgia-Pac. LLC*,
910 F.3d 927 (7th Cir. 2018) ........................................................................16

*Kleen Prods. LLC v. Int'l Paper*,
276 F. Supp. 3d 811 (N.D. Ill. 2017).............................................................20

*LaFlamme v. Societe Air France*,
702 F. Supp. 2d 136 (E.D.N.Y. 2010) .....................................................13, 16

*Laughlin v. Evanstan Hosp.*,
550 N.E.2d 986 (Ill. 1990)............................................................................48

*Litovich v. Bank of Am. Corp.*,
2025 WL 2521039 (S.D.N.Y. Sept. 2, 2025) ....................................................25

*Miami Prods. & Chem. Co. v. Olin Corp.*,
546 F. Supp. 3d 223 (W.D.N.Y. 2021)............................................................46

*Midwest Auto Auction, Inc. v. McNeal*,
2012 WL 3478647 (E.D. Mich. Aug. 14, 2012)................................................35

*Mitchell v. Roosen Varchetti &Oliver, PLLC*,
2014 WL 1775575 (E.D. Mich. May 2, 2014) ..................................................46

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
911 F.3d 505 (8th Cir. 2018) ...........................................................................17

*Prosterman v. Am. Airlines, Inc.*,
747 F. App'x 458 (9th Cir. 2018) .....................................................................34

*Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.*,
971 F.2d 37 (7th Cir. 1992) .........................................................................36, 37

*RSD Leasing, Inc. v. Navistar Int'l Corp.*,
319 A.3d 734 (Vt. 2024)...................................................................................49

*Segal v. Amadeus IT Grp., S.A.*,
2026 WL 879583 (N.D. Ill. Mar. 31, 2026) .....................................................32

*Sickles v. Cabot Corp.*,
877 A.2d 267 (N.J. Super. Ct. App. Div. 2005) ................................................48

*Smith v. Gidley*,
2020 WL 2573184 (E.D. Mich. May 21, 2020) ................................................43

*State ex rel. Wasden v. Daicel Chem. Indus., Ltd.*,
106 P.3d 428 (Idaho 2005) ...............................................................................46

*Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
552 F.3d 430 (6th Cir. 2008) .......................................................................11, 43

*Union Line Farms, Inc., v. The Mosaic Co. et al.*,
No. 1:26-cv-1043 ECF No. 1 ...........................................................................21

*United States v. Bestfoods*,
524 U.S. 51 (1998)....................................................................................44

*Valspar Corp. v. E.I. Du Pont de Nemours & Co.*,
873 F.3d 185 (3d Cir. 2017) ...........................................................19, 20

*Wade Park Land Holdings, LLC v. Kalikow*,
2023 WL 2614243 (S.D.N.Y. Mar. 23, 2023)...................................................30

**STATUTES**

740 Ill. Comp. Stat. 10/7(2) ..........................................................................47

Ark. Code Ann. § 4-88-113(f)(1)(B) ...................................................................48

Ill. Comp. Stat. Ann. § 815.505/1(e) ...................................................................49

Mont. Code Ann. § 30-14-133(1) .......................................................................48

Nev. Rev. Stat. Ann. § 598.0977 ........................................................................50

## I. STATEMENT OF ISSUES PRESENTED

1. Whether Plaintiffs properly state a claim for relief under Section 1 of the Sherman Act when they allege no direct evidence and instead seek to infer an anticompetitive agreement from indirect evidence such as (1) allegations of parallel pricing conduct that are disparate in timing, magnitude, and product type, and (2) allegations of "plus" factors that are consistent with normal market behavior and each Defendant's independent economic self-interest.

2. Whether Plaintiffs state a claim for relief against each Defendant when they lack sufficient allegations about each Defendant and, instead, rely on impermissible group pleading.

3. Whether CIPPs' and EUIPPs' state law claims should be dismissed for failure to plead a plausible conspiracy and for additional independent reasons.

## II. CONTROLLING OR MOST APPROPRIATE AUTHORITY FOR RELIEF SOUGHT

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)

*In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896 (6th Cir. 2009)

*Erie County, Ohio v. Morton Salt, Inc.*, 702 F.3d 860 (6th Cir. 2012)

*Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*, 48 F.4th 656 (6th Cir. 2022)

*In re Passenger Vehicle Replacement Tires Antitrust Litig.* ("*Tires I*"), 767 F. Supp. 3d 681 (N.D. Ohio 2025)

*In re Passenger Vehicle Replacement Tires Antitrust Litig.* ("*Tires II*"), 2026 WL 879018 (N.D. Ohio Mar. 31, 2026)

*In re Concrete & Cement Additives Antitrust Litig.* ("*Concrete I*"), 2025 WL 1755193 (S.D.N.Y. June 25, 2025)

*In re Concrete & Cement Additives Antitrust Litig.* ("*Concrete II*"), 2026 WL 2594002 (S.D.N.Y. Sept. 2, 2026)

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42 (9th Cir. 2022)

## III. INTRODUCTION

Plaintiffs try, but fail, to manufacture a price-fixing conspiracy out of unremarkable, independent responses to supply-chain challenges arising from the COVID-19 pandemic, regulatory requirements, and tariffs. Plaintiffs assert that 23 Defendants across four countries and six years agreed to fix the prices of residential and commercial ducted heating, ventilation, and air conditioning ("HVAC") equipment sold in the United States. Plaintiffs offer no direct evidence of this supposed price-fixing agreement.

Instead, Plaintiffs contrive a conspiracy from nothing more than ordinary business dealings: that Defendants each increased their own prices at different times and in different ways for different products during a six-year period of extraordinary cost shocks to the HVAC industry; that a trade publication reported those increases; and that certain executives from the publicly traded Defendants individually discussed pricing and other market trends on earnings calls and at investor conferences. These allegations of mundane business conduct do not plausibly suggest Defendants agreed to fix prices.

*First*, Plaintiffs do not allege that Defendants engaged in "parallel" conduct, which is required to plead an antitrust conspiracy through circumstantial allegations. Defendants' alleged price increases since 2020 vary widely in magnitude, timing, and product scope. The alleged increases often apply to different product

categories—sometimes to residential equipment and other times to commercial equipment, yet other times for subsets of one or the other. There are years in which some Defendants did not increase prices at all. Such disparate behavior does not plausibly suggest an antitrust conspiracy.

*Second*, even if Defendants' pricing behavior could be characterized as "parallel," it is entirely consistent with lawful interdependent conduct in what Plaintiffs describe as a "highly concentrated" oligopoly market. Antitrust law takes no issue with firms in oligopoly markets observing and following a competitor's publicly announced price increase. This, at most, constitutes "conscious parallelism," which is a common and lawful reaction of "firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007).

*Third*, Plaintiffs' claimed "plus factors" do not plausibly suggest conspiracy rather than lawful and ordinary market behavior. Plaintiffs point to: (1) public executive statements; (2) a "preliminary regression analysis"; (3) data-aggregating products; (4) market characteristics; and (5) motive and opportunity to conspire. But none of these raises a plausible inference of a price-fixing conspiracy among Defendants. The public statements are routine corporate disclosures by executives of a few publicly traded Defendants made on earnings calls and at investor

conferences, frequently in response to investor questions. The regression "analysis" identifies no methodology, data sources, or explanation behind it. The data-aggregating products are alleged to share only anonymized and aggregated industry data, not any individual firm's competitively sensitive data. And the market-structure, motive, and opportunity allegations merely describe conditions conducive to lawful interdependence. Individually and collectively, these allegations do not plausibly suggest Defendants agreed to fix prices.

*Fourth*, the Complaints themselves plead obvious alternative explanations that further confirm Plaintiffs' failure to plausibly suggest an unlawful agreement. Plaintiffs concede that the COVID-19 pandemic "disrupted supply chains across every sector of the economy" and that "customers expected some price increases as a result." They also acknowledge that the American Innovation and Manufacturing ("AIM") Act's mandated phasedown of hydrofluorocarbons ("HFCs") cost the industry "billions of dollars" in equipment redesigns, that new SEER2 energy-efficiency standards required product-line overhauls beginning in 2023, and that tariffs on steel, aluminum, and copper—key HVAC raw materials—further increased input costs beginning in 2025.

After stripping away the innuendo, what remains is the well-documented trend of rising prices spurred by the COVID-19 pandemic, environmental regulations, and

tariffs. Plaintiffs cannot use unsupported legal conclusions to transform lawful responses to similar market pressures into a price-fixing conspiracy.

The Supreme Court has long instructed courts to perform an important gate-keeping function in antitrust cases: District courts must "insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly*, 550 U.S. at 558. Claims that attempt to recast ordinary business conduct as a price-fixing agreement are routinely rejected. *See, e.g.*, *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 908 (6th Cir. 2009); *In re Passenger Vehicle Replacement Tires Antitrust Litig.* ("*Tires I*"), 767 F. Supp. 3d 681, 699–702 (N.D. Ohio 2025); *D'Augusta v. Am. Petroleum Inst.*, 117 F.4th 1094, 1104–05 (9th Cir. 2024); *In re Concrete & Cement Additives Antitrust Litig.* ("*Concrete I*"), 2025 WL 1755193, at *24 (S.D.N.Y. June 25, 2025). This Court should do the same.[1]

## IV. <u>BACKGROUND</u>

### A. <u>Plaintiffs</u>

Plaintiffs claim they are direct and indirect purchasers of "HVAC Equipment," a broad term they use to describe at least nine different types of heating,

---

[1] Defendants have separately moved to stay the EUIPP case pending arbitration. PageID.2131–2886. Similarly, Daikin Industries, Ltd., a Japanese company, has moved to dismiss including for lack of personal jurisdiction, PageID.1982–2016, and only joins this Motion, as well as the arbitration motions, to the extent that the Court finds it has jurisdiction. Depending on the outcomes of the different motions, the Court may not need to decide all of the pending motions, as some may become moot or otherwise be held in abeyance.

ventilation, and air conditioning systems across residential, commercial, and industrial applications. DPP n.1, ¶ 91; EUIPP n.1, ¶ 127; CIPP ¶¶ 1 n.1, 5, 30.[2]

Three groups of Plaintiffs purport to represent putative classes of purchasers of HVAC Equipment from January 1, 2020 through the present: (1) DPPs allege a claim under Section 1 of the Sherman Act on behalf of those who "directly purchased HVAC Equipment from one or more of the Defendants," DPP ¶ 244; (2) CIPPs allege federal antitrust and state-law claims on behalf of commercial indirect purchasers who bought HVAC Equipment "for the purpose of resale," CIPP ¶¶ 181–82; and (3) EUIPPs allege federal antitrust and state-law claims on behalf of "persons and entities who purchased HVAC Equipment indirectly from a Defendant for end use in the United States . . . ," EUIPP ¶ 11.

### B. <u>The HVAC Industry</u>

The HVAC industry is complex and includes a broad range of products that span residential, light commercial, commercial, and industrial applications. *See, e.g.*, DPP ¶¶ 86–88, 92; EUIPP ¶¶ 102–115; CIPP ¶¶ 69–76. Residential HVAC products include familiar home products like air conditioners and furnaces. DPP ¶ 87; EUIPP ¶¶ 102–104. Commercial HVAC products have a far wider range of

---

[2] For purposes of this motion only, Defendants accept as true the factual allegations in the Complaints, without admitting their truth and while expressly reserving the right to contest them in any further proceedings.

applications—such as in restaurants, hospitals, and data centers. DPP ¶ 88; EUIPP ¶ 107; *see also* CIPP ¶¶ 76–77.

Some manufacturers sell to large distributors, who act as the supply-chain bridge to dealers and contractors, who in turn sell, install, and service HVAC systems for end users. *See* DPP ¶ 4; CIPP ¶¶ 77–79. Other manufacturers sell HVAC equipment directly to dealers and contractors. *See, e.g.*, DPP ¶ 48.

Given the diversity of product and distribution channels, pricing varies widely and can be bespoke to the individual customer, depending on the type of product and application involved. EUIPP ¶¶ 118–119; DPP ¶ 89; CIPP ¶¶ 80–81. Plaintiffs allege residential equipment can range from $2,000 to $15,000, whereas commercial equipment may range from $5,000 to over $100,000. CIPP ¶¶ 81–82.

### C. **Defendants**

Defendants are 23 separate entities that Plaintiffs group into seven "Defendant Families": "Bosch," "Trane," "Carrier," "Daikin," "Lennox," "Rheem," and "AAON," a shorthand that obscures the distinct legal entities Plaintiffs have actually sued. DPP ¶¶ 27–62; EUIPP ¶¶ 58–94; CIPP ¶¶ 24–58. Plaintiffs allege each "Defendant family" sells HVAC Equipment across nine product categories, ranging from residential air conditioners and furnaces to commercial rooftop units, chillers, and variable refrigerant flow ("VRF") systems, each of which spans dramatically different price points. DPP ¶ 91; EUIPP ¶ 127; CIPP ¶¶ 5, 30. The Complaints

admit Defendants do not all compete in the same product categories.[3] For instance, AAON does not sell residential air conditioners, heat pumps, furnaces, VRF systems, or geothermal heat pumps. DPP ¶ 91; EUIPP ¶ 127; CIPP ¶¶ 53, 58. According to DPPs, Lennox and Rheem do not sell chillers, VRF systems, or geothermal heat pumps. DPP ¶ 91. Only four of the seven Defendant groups sell both VRF/VRV systems and chillers. *Id.* ¶¶ 91–92.

### D. The Alleged Conduct

According to Plaintiffs, Defendants carried out the alleged "conspiracy" through three "mechanisms": (1) "the exchange of non-public competitive data," (2) "the public signaling of price increases" through public statements and an industry news site, and (3) "coordinated restrictions on manufacturing output." DPP ¶¶ 5, 83; EUIPP ¶¶ 229, 233, 235; CIPP ¶¶ 85, 89, 112–16.

**AHRI and data exchange.** The Complaints allege Defendants are members of a trade association called the Air-Conditioning, Heating, and Refrigeration Institute ("AHRI"). DPP ¶ 5; EUIPP ¶ 4; CIPP ¶ 90. AHRI allegedly operates a "give-to-get data exchange" through which "300+ members" (not just Defendants)

[3] Although Plaintiffs acknowledge that Mitsubishi Electric Trane HVAC US ("METUS") is an entity established as a 50/50 joint venture between Mitsubishi Electric US, Inc. and Trane Technologies plc, Plaintiffs nevertheless inappropriately attempt to group METUS with Trane Technologies plc and Trane U.S. Inc. into a corporate "family." In so doing, Plaintiffs ignore that METUS is a distinct entity that distributes "ductless mini-splits," which are expressly excluded from Plaintiffs' definition of "HVAC Equipment." *See generally* METUS' Motion to Dismiss.

receive non-price industry data in "aggregate form," covering metrics such as "bookings, unit shipments, sales volume, manufacturer inventories, exports, efficiencies, and market information on trading area sales." CIPP ¶ 91; DPP ¶¶ 96, 100; EUIPP ¶¶ 131–32, 138. The Complaints do not allege AHRI shares any individual Defendant's prices or that Defendants receive competitor-specific (as opposed to aggregated) information.

**Price announcements.** Plaintiffs allege Air Conditioning Heating Refrigeration ("ACHR") News reports on price increases for HVAC Equipment. DPP ¶ 219; EUIPP ¶ 143; CIPP ¶ 97. Plaintiffs identify ACHR's target readership as Defendants' *customers*—HVAC contractors—not their competitors. *See id.* Plaintiffs do not allege Defendants communicated privately about price increases.

**Public statements.** Plaintiffs allege that executives of some (but not all) of the publicly traded Defendants made statements on earnings calls and at investor conferences over a six-year period, which Plaintiffs characterize as "signaling." *See, e.g.*, DPP ¶¶ 5, 116–18, 125–27, 130; EUIPP ¶¶ 155, 159, 200, 231, 246; CIPP ¶¶ 104, 106, 111, 113–14. These statements fall into two categories. *First*, Plaintiffs selectively quote statements about pricing and other market trends, which were often responses to questions from securities analysts and investment conference panelists. *See, e.g.*, DPP ¶¶ 117–18, 126, 149; EUIPP ¶¶ 199, 269; CIPP ¶ 103.

*Second*, DPPs and EUIPPs allege that, between May 2025 and February 2026,

three Defendants made public statements about managing their inventory in response to softening demand for residential HVAC equipment. DPP ¶¶ 134, 137, 139, 154; EUIPP ¶¶ 229, 233, 235, 242, 248. CIPPs allege such statements by only two Defendants. CIPP ¶¶ 112, 115–16. Plaintiffs acknowledge these inventory-related statements were made on earnings calls and at investor conferences, often in response to analyst questions, and spread across 10 months. DPP ¶¶ 134, 137, 139, 154; EUIPP ¶¶ 229, 233, 235, 242, 248; CIPP ¶¶ 112, 115–16. The Complaints do not allege that AAON, Bosch, Daikin, METUS, or Rheem made any statements about inventory management.

**The Complaints Identify Alternative Explanations for Defendants' Price Increases.** The Complaints all acknowledge the alleged conspiracy period coincided with extraordinary economic disruptions. First, the COVID-19 pandemic "drove costs up across every manufacturing sector." DPP ¶¶ 7, 110; *see also* EUIPP ¶ 1; CIPP ¶ 11. Second, Defendants faced significant regulatory changes, with the AIM Act's 2020 mandate to phasedown HFCs by January 1, 2025, followed by updated energy efficiency standards effective January 2023. DPP ¶¶ 7, 113; EUIPP ¶¶ 333–36; CIPP ¶ 11. Together, these regulatory changes cost the industry "billions of dollars." EUIPP ¶ 337. Third, Defendants faced significant cost pressures from new tariffs on "raw materials" used in HVAC Equipment. DPP ¶ 226; EUIPP ¶ 329.

## V. LEGAL STANDARDS

**Motion to Dismiss Standard.** "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). This "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. While courts accept a complaint's well-pleaded factual allegations as true, courts "need not accept as true legal conclusions or unwarranted factual inferences, and conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Travel Agent*, 583 F.3d at 903.

**Standard for Pleading a Sherman Act Section 1 Claim.** Section 1 of the Sherman Act prohibits conspiracies "in restraint of trade or commerce[.]" 15 U.S.C. § 1. As the Sixth Circuit explained, "a plaintiff must demonstrate that there is: 1) an agreement, which may be in the form of a contract, combination, or conspiracy; 2) affecting interstate commerce; 3) that imposes an unreasonable restraint on trade." *Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*, 48 F.4th 656, 663 (6th Cir. 2022).

The "crucial question" in any Section 1 case is "whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553. Plaintiffs may plead agreement through

direct evidence or "circumstantial evidence of conduct that, in the context, negates the likelihood of independent action and raises an inference of coordination." *Erie County, Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 868 (6th Cir. 2012). Either way, the allegations must establish the relevant "who, what, where, when, how or why" as to each named defendant. *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008).

The seminal case on "what a plaintiff must plead" to state a Section 1 claim based on circumstantial evidence is the Supreme Court's 2007 *Twombly* decision. *See* 550 U.S. at 554–55. In *Twombly*, a putative class of telephone and internet subscribers alleged that four incumbent service providers conspired to block competitors from entering their respective service areas and to refrain from competing with each other. *Id.* at 550–51. The plaintiffs based their conspiracy claim on an "absence of any meaningful competition," a "parallel course of conduct," and "other facts and market circumstances." *Id.* at 564–65. The Supreme Court found that allegations of parallel conduct and market characteristics were insufficient "to suggest that an agreement was made" because, "[w]ithout more, parallel conduct does not suggest conspiracy." *Id*. at 556–57.

When evaluating whether plaintiffs have pleaded facts "plausibly suggesting (not merely consistent with) agreement," a court should consider "common economic experience" and "obvious alternative explanation[s]." *Id.* at 557, 565,

567. *Twombly* also encouraged trial courts to be mindful of "the costs of modern federal antitrust litigation" when ruling on motions to dismiss. *Id*. at 558.

# VI. ARGUMENT

## A. Plaintiffs Have Not Alleged Direct Evidence of an Agreement to Fix HVAC Equipment Prices

Direct allegations of an agreement are "explicit and require[] no inferences to establish the proposition or conclusion being asserted." *Tires I*, 767 F. Supp. 3d at 696 (quoting *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 318 (6th Cir. 2014) ("[D]irect evidence is 'tantamount to an acknowledgment of guilt'")).

None of the three Complaints alleges any direct communication—oral, written, electronic, or otherwise—showing two or more Defendants agreed to fix HVAC Equipment prices. *See, e.g.*, *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011) (plaintiffs failed to plead direct evidence of an agreement because they did not "specify a time or place that any actual agreement" was reached or "indicate that any particular individuals or [defendants] made such an agreement").

## B. Plaintiffs Have Not Alleged Circumstantial Evidence Plausibly Suggesting an Agreement to Fix HVAC Equipment Prices

Without direct factual allegations of an agreement, Plaintiffs bear the burden of pleading facts that plausibly suggest the existence of a preceding agreement to fix prices. *Twombly*, 550 U.S. at 556. A plaintiff relying on circumstantial evidence of an agreement must plead both parallel conduct and additional facts (known as "plus

factors") that place the parallel conduct "in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557. Plaintiffs do not come close.

### 1. <u>Plaintiffs Do Not Plead Parallel Conduct</u>

Plaintiffs fail to allege "parallel" conduct. *Twombly*, 550 U.S. at 557. Plaintiffs' theory hinges on Defendants' alleged price increases between 2020 and the present. *See* DPP ¶¶ 102–07, 111–24, 157–58; EUIPP ¶¶ 3, 141–43, 267–68; CIPP ¶¶ 83–84, 96–107. But pricing behavior that varies in magnitude, timing, and the very product at issue—as alleged here—does not constitute parallel conduct for purposes of a Section 1 claim; indeed, such variations are "fatal" to Plaintiffs' claim. *See Concrete I*, 2025 WL 1755193, at *13; *see also LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 151 (E.D.N.Y. 2010) (finding parallel conduct allegations "dubious" where price increases were imposed weeks apart).

Here, the alleged price increases vary widely in terms of: (1) magnitude; (2) timing; and (3) products. *Concrete I*, 2025 WL 1755193, at *13.

***(1) There is wide variation in the alleged magnitude of the increases.*** To plead that price increases were "parallel," Plaintiffs must allege either that "price increases were generally commensurate with one another in either percentage or amount," or "that the result of the increases was to bring" the Defendants' prices for the same HVAC equipment closer together. *Id.* at *15. Plaintiffs allege neither.

Nor do they allege what any Defendant charged for any product at the outset of the alleged conspiracy, so the percentages they recite reveal nothing about whether Defendants' prices for comparable equipment were ever aligned or converged.

What Plaintiffs do allege are wide disparities between the alleged cumulative price increases by each Defendant. For instance, for residential products, Bosch[4] allegedly announced six increases across the alleged six-year conspiracy for a sum total increase of 39%. DPP ¶¶ 129, 131, 133, 143; EUIPP ¶ 227. By contrast, Lennox allegedly announced 10 residential increases for a total increase of 87%. DPP ¶¶ 111, 114, 115, 118, 120, 123, 129, 133, 151, 162. For commercial products, Bosch allegedly announced six increases for a total of 39%, while Trane allegedly announced 15 commercial increases for a total of 115%. *Id.* ¶¶ 111, 114, 115, 118, 120, 121, 125, 126, 129, 131, 133, 141, 143, 162; EUIPP ¶ 227.

Plaintiffs also lump together fundamentally different *types* of price changes without showing that they amount to the same thing. Some Defendants are alleged to have announced price changes at fixed percentages, others announced increases "up to" certain levels, while still others announced "blended average" increases, and one Defendant (AAON) announced a rolling monthly increase (which, as DPPs concede, was a "novel approach" that no other defendant followed). *See, e.g.*, DPP

---

[4] This does not include the two alleged price increases by Johnson Controls prior to its acquisition by Bosch, which are cumulatively 9.5%. EUIPP ¶¶ 147, 164.

¶ 121; EUIPP ¶¶ 147–48, 150, 152, 160, 213. Further demonstrating divergent—not parallel—conduct, in 2025, rather than raising prices, AAON imposed a temporary surcharge in response to tariffs. DPP ¶ 133. Plaintiffs never allege that an "up to 6%" announcement, a "blended average" increase, a rolling monthly surcharge, and a temporary tariff surcharge produced comparable price movements on comparable products. There is nothing "parallel" about these different pricing strategies at different points in time.

Indeed, measuring price increases by percentage—and not by dollars—is a transparent attempt to avoid the disparity. The "vastly dissimilar" magnitudes of the price increases do not support parallel conduct. *In re Concrete & Cement Additives Antitrust Litig.* ("*Concrete II*"), 2026 WL 2594002, at *18 (S.D.N.Y. Sept. 2, 2026) (finding no parallel conduct where plaintiffs alleged price increases "spanning from 2.7% to 13.83%").

***(2) The alleged price increases are disparate in timing***. "[U]nseasonably long delays between the allegedly parallel acts will refute rather than support allegations of conspiracy." *Concrete I*, 2025 WL 1755193, at *13. A price increase that is not promptly followed by competitors "tend[s] to be competitive, as customers will be incentivized to switch providers." *Id.* Courts have rejected the characterization of price increases as "parallel" where they occurred "weeks or

months apart." *Concrete II*, 2026 WL 2594002, at *17; *see Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 936 (7th Cir. 2018).

Here, there are *years* during the alleged conspiracy in which some Defendant groups did not announce price increases at all. For instance, Plaintiffs do not allege that Bosch, Carrier, Daikin, Rheem, or METUS announced any increases in 2020. Likewise, according to Plaintiffs, Bosch did not announce any increases for a 2-year period (2020–2022), AAON did not announce new increases for a different 2-year period (2023–2024), and Rheem did not announce increases in 2023. This matters because parallel conduct allegations are "dubious" where price increases involved "action by only some defendants and no action by other defendants, or action by a solitary defendant." *LaFlamme*, 702 F. Supp. 2d at 151; *see also Concrete I*, 2025 WL 1755193, at *13.

Additionally, there are lags of up to eight months between the alleged price increase announcements. For example, although the conspiracy allegedly began by January 1, 2020, no Defendant announced a price increase for *eight months* until Johnson Controls—amidst an unprecedented global pandemic that initiated havoc on markets, operations, and supply chains—announced a 6% increase in August. DPP ¶ 111; EUIPP ¶ 147; CIPP ¶ 101. Additionally, after Lennox allegedly announced a price increase in December 2022, DPP ¶ 123; EUIPP ¶ 190; CIPP ¶ 102, no Defendant other than Trane is alleged to have announced a price increase

for eight months, DPP ¶¶ 125–26; EUIPP ¶¶ 194, 198; CIPP ¶ 105. A delay of eight months is "a long time, [and] Plaintiffs do nothing to establish how a price increase in the last month or two of that period has any relation to a price increase at the beginning of the period." *Concrete I*, 2025 WL 1755193, at *16; *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 517 (8th Cir. 2018) (holding that actions "executed under dissimilar circumstances and separated by six months, did not constitute parallel conduct").[5] Moreover, Plaintiffs provide no announcement date for some alleged price increases, *see, e.g.*, EUIPP ¶ 162, and therefore "giv[e] no measure by which to assess the relative timing of the supposedly parallel conduct," *Concrete II*, 2026 WL 2594002, at *17.

***(3) The products at issue vary materially***. Price increases affecting only one subset of products are not "parallel" to increases affecting a different subset. *Concrete I*, 2025 WL 1755193, at *14. Plaintiffs attempt to equate increases across fundamentally different HVAC product categories—commercial, residential, light

---

[5] Plaintiffs suggest certain Defendants publicly discussed their respective approaches to managing residential inventory between 2025 and 2026 as part of the alleged conspiracy. *See, e.g.,* DPP ¶¶ 134, 137, 139; EUIPP ¶¶ 229, 233–35; CIPP ¶¶ 112, 115–16. But only three of seven Defendant groups (Carrier, Lennox, and Trane—all publicly traded companies) allegedly made those statements, which were separated by at least four months. DPP ¶¶ 134, 139, 173; EUIPP ¶¶ 229, 233, 242, 248; CIPP ¶¶ 112, 115–16. The timing disparities between these statements by less than half the Defendant "families" preclude any claim that these statements were "parallel."

commercial, heat pumps, parts, and specific brands—as if they form a single pattern. *See, e.g.,* DPP ¶¶ 121, 123, 129. They do not, and Plaintiffs' own allegations concede the difference. Residential systems are "small[] and simple[]," EUIPP ¶ 102, priced between $2,000 and $15,000, CIPP ¶ 81, while commercial systems are "more complex," may use "modular" or rooftop configurations, EUIPP ¶ 107, and can cost over $100,000, DPP ¶¶ 88–89. And individual products and parts like a water heater or air conditioner vary even more. These are categorically different products, serving different customers, at price points that differ by an order of magnitude. These differences do not allow for any reasonable inference of parallel conduct. *Concrete I*, 2025 WL 1755193, at *14.

The Complaints do not address these differences. For example, Plaintiffs do not explain how Trane's alleged 4-6% increase on commercial equipment in May 2023 is similar to the next-in-time alleged increase, when Daikin's Goodman subsidiary increased "parts prices" 5.2% two months later. DPP ¶¶ 126–27. Nor do Plaintiffs explain how Bosch's alleged increase on *residential heat pump* prices by an unspecified amount in August 2023 relates to Trane's 2-6% increase on a variety of *commercial equipment* in September 2023. DPP ¶ 129; EUIPP ¶¶ 203–04; CIPP ¶ 105. To make matters worse, in many instances, Plaintiffs do not specify any category of affected products at all. *See, e.g.*, DPP ¶ 115; EUIPP ¶ 226. "It is definitional that wher[e] [sic] a company increases prices for a product and its

competitor does not increase prices for that product, those companies have not engaged in parallel conduct with respect to that product." *Concrete I*, 2025 WL 1755193, at *14.

### 2. Plaintiffs Plead, At Most, Lawful Interdependent Conduct

Even if Plaintiffs had adequately pleaded parallel conduct, that would not be enough to plausibly infer a price-fixing conspiracy in what Plaintiffs allege is a "highly concentrated" market with "only a handful of dominant producers." DPP ¶ 186–87; EUIPP ¶ 281; CIPP ¶¶ 86, 132. In such an alleged oligopoly, "companies base their actions in part on the anticipated reactions of their competitors. And because of this mutual awareness, two firms may arrive at identical decisions independently . . . . In other words, competitors' behavior may be consciously parallel." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015). As the Sixth Circuit explained in *Travel Agent*, "[w]hen one oligopolist raises its price, each of its rivals must decide whether to follow," and "each rival asks itself whether it is better off at the lower price when it is charged by all or at the higher price when charged by all." 583 F.3d at 910. Because each will choose "the latter . . . the leader's price increase is likely to be followed." *Id.* As a result, firms "will naturally follow a competitor's price increase in the hopes that each firm's profits will increase." *Valspar Corp. v. E.I. Du Pont de Nemours & Co.*,

873 F.3d 185, 190 (3d Cir. 2017); *see also Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993).

*Twombly* rested on this principle. The Supreme Court held that parallel conduct among competitors is "in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 550 U.S. at 554. That is why a "statement of parallel conduct, even conduct consciously undertaken," is not enough to defeat a motion to dismiss. *Id.* at 557. As a recent decision in this circuit observed, "[f]ollowing the example set by a competitor, without agreeing to do so in advance, is textbook price leadership—a practice that has repeatedly been found to be insufficient to establish the existence of an agreement." *Tires I*, 767 F. Supp. 3d at 710–11; *see also In re Passenger Vehicle Replacement Tires Antitrust Litig.* ("*Tires II*"), 2026 WL 879018, at *21 (N.D. Ohio Mar. 31, 2026).

All Plaintiffs have alleged here is, at most, textbook price leadership. Firms cannot "set [their] prices *without regard* to the likely reactions of [their] competitors." *Valspar*, 873 F.3d at 192. Indeed, they are free to independently observe, respond to, and even copy their competitors' publicly announced pricing decisions, so long as the competitors do not reach a preceding *agreement* about those pricing decisions. *See, e.g.*, *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 817, 819 (N.D. Ill. 2017).

All told, Defendants' alleged pricing conduct does "not plausibly suggest an unlawful agreement." *Travel Agent*, 583 F.3d at 904 (citing *Twombly*, 550 U.S. at 570).

### 3. **Plaintiffs Fail to Sufficiently Plead Plus Factors**

Even if Plaintiffs had adequately pleaded parallel conduct, and they have not, that alone would not be enough to state a claim. *Twombly*, 550 U.S. at 553–54. The Complaints must also allege plus factors that "point[] toward a meeting of the minds," not just "an account of a defendant's commercial efforts." *Id.* at 557. This requires some further factual enhancement that "support[s] plaintiff's allegation that the actions of the Defendants are not independent." *Hobart-Mayfield*, 48 F.4th at 665. Plaintiffs allege five categories of purported plus factors: (1) public statements by certain Defendants' executives; (2) a "preliminary regression analysis"; (3) data-aggregating products; (4) market characteristics; and (5) Defendants' alleged motive and opportunities to conspire.[6] None of these, individually or collectively, suggests the existence of a preceding unlawful agreement.

---

[6] CIPPs inexplicably refer to allegations by the "U.S.D.A. . . . that Defendants were engaging in anticompetitive conduct" and a "DOJ[] antitrust investigation" in "early 2026." CIPP ¶ 176. This appears to be a cut-and-paste error. *See* Complaint, *Union Line Farms, Inc. v. The Mosaic Co. et al.*, No. 1:26-cv-1043 ECF No. 1, ¶ 118 (D. Colo. Mar. 13, 2026) (same language verbatim in case involving the fertilizer industry). In any event, it makes no sense that the U.S. Department of Agriculture would make such allegations about HVAC manufacturers. Neither the DPPs nor the EUIPPs allege such an investigation, and Defendants are not aware of one.

**a. The Public Statements by Defendants' Executives Do Not Suggest an Unlawful Agreement**

Plaintiffs selectively quote from different statements made by certain of the publicly traded Defendants' executives on earnings calls, at investor conferences, and at other public forums over a span of 6.5 years,[7] and characterize these out-of-context quotes as "price signaling." *See, e.g.*, DPP ¶¶ 5, 116–18, 125–27, 130; EUIPP ¶¶ 155, 200, 231, 246; CIPP ¶¶ 104, 106, 111, 113. By doing so, Plaintiffs incorporate those public statements by reference, such that the Court is permitted to, and should review those statements and the investor questions that prompted many of them in their full context. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 468–69 (6th Cir. 2014) (taking judicial notice of documents that the complaint referenced or quoted).

Plaintiffs focus on two types of public statements by certain Defendants' executives as part of routine corporate disclosures (none by Rheem, Bosch, and METUS), but neither plausibly suggest an unlawful agreement: (1) statements about pricing "discipline" and market trends; and (2) statements about three Defendants'

---

[7] The alleged public statements concern only a subset of the named Defendants that are publicly traded: Trane Technologies plc, Carrier Global Corp., Daikin Industries, Ltd., Lennox International, Inc., and AAON, Inc. AAON allegedly made a total of two statements over four years. DPP ¶¶ 159, 215. Daikin also allegedly made a total of two statements, in March 2025 and February 2026. DPP ¶¶ 149, 224. Neither Rheem, Bosch, nor METUS allegedly made any public statements; indeed, those entities are not publicly traded and have no obligation to do so, as explained below.

inventory-management decisions.

***"Discipline" and Market Trends*:** Plaintiffs seize on certain executives' references to "discipline," DPP ¶ 117; EUIPP ¶ 178; CIPP ¶ 104, but that word does not transform the statements into nefarious "signaling" suggesting a price-fixing conspiracy. As the context shows, the statements are "no more than descriptions of circumstances of their market"—routine corporate disclosures of the kind that "companies legitimately convey to their shareholders." *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 919–20 (N.D. Cal. 2019); *see also Tires I*, 767 F. Supp. 3d at 721–28 (similar). In almost every case, Plaintiffs critically omit the *unprompted questions* from third parties that precede the executives' quoted statements. This full context "undermines any inference of collusion." *Tires I*, 767 F. Supp. 3d at 724. For example:

- Plaintiffs allege Carrier's CFO stated in November 2021 that "it's our intention to capture pricing and retain that pricing" and that "we've seen discipline in the market." DPP ¶ 118. But he was responding to a question "about the level of stickiness to pricing" and in the same sentence, expressly disclaimed any forward-looking certainty: "who knows what will happen when inflation subsides."[8]

---

[8] Lee Decl., Ex. 1 at 7.

- Plaintiffs quote Trane CFO's May 2023 earnings call statement that the HVAC industry "typically retains price and is disciplined on price," DPP ¶ 126; EUIPP ¶ 199; but omit that he was specifically asked about competitors' pricing decisions, and declined to announce any pricing actions of Trane: "I won't necessarily talk about potential pricing actions we may do throughout the year."[9]
- Plaintiffs quote Daikin's Senior Executive Officer as declaring in 2026, "We are not increasing our market share by lowering our selling prices," and cast this as a "commitment" not to compete on price. DPP ¶ 149; EUIPP ¶ 269. But the full transcript shows he was answering a question about whether Daikin's focus on market share represented a strategic shift, and explained Daikin had *lost* share the prior year but was actively *winning it back* through "efforts to strengthen our sales capabilities."[10]

The executives' unprompted statements are no different. These statements, too, "stop short of giving rise to a reasonable inference of illegal collusion" because they are "individual Defendants' indications of their own future behavior and descriptions of their past behavior, predictions of industry trends, and observations about competitor behavior." *Jones*, 400 F. Supp. 3d at 918–19. Indeed, publicly

---

9 Lee Decl., Ex. 2 at 17.

10 Lee Decl., 3 at 27.

traded firms—like the ones alleged to have made public statements here—have public disclosure obligations about their financial position. "[T]o infer conspiracy from the public statements cited by plaintiffs here would be to create an antitrust minefield for publicly traded companies, chilling speech on issues of interest to investors, analysts, and the public." *Tires I*, 767 F. Supp. 3d at 724.

***Inventory Management*:** Plaintiffs also allege certain Defendants' executives made public statements signaling "coordinated restrictions on manufacturing output" as part of the purported conspiracy. DPP ¶ 83; *see also* EUIPP ¶ 4; CIPP ¶ 115. Those allegations likewise do not withstand scrutiny.

As a threshold matter, Plaintiffs do not allege that METUS or four named Defendant groups (AAON, Bosch, Daikin, and Rheem) made any statements about inventory management or adjusted their factory production at any point during the alleged conspiracy. A court cannot plausibly infer that Defendants "coordinated" to restrict the supply of HVAC Equipment when the allegations involve only a minority of Defendants. *See Litovich v. Bank of Am. Corp.*, 2025 WL 2521039, at *12 (S.D.N.Y. Sept. 2, 2025) (declining to infer a conspiracy "from three isolated incidents involving different subsets of Defendants").

Here too, Plaintiffs strip context from the statements they cite. Specifically, Plaintiffs allege that, on July 29, 2025, Carrier's CEO stated that the company was "going to consciously pull down inventory in the second half of the year." DPP

¶ 137; *see also* EUIPP ¶ 229. But Plaintiffs ignore the investor analyst's prior question, which specifically identified "*sluggish demand*" and asked whether Carrier will "*continue to pull down inventory* in the back half of the year . . . ." Lee Decl., Ex. 4 at 22 (emphasis added). And, Plaintiffs omit the CEO's further explanation that "movement was just much softer in June than we had forecast for a bunch of reasons," providing a reason why it was "only natural" to reduce inventory, *Twombly*, 550 U.S. at 566. Lee Decl., Ex. 4 at 23.

Plaintiffs suggest that Lennox made a similar statement in September 2025, but the quoted statement did not mention anything about Lennox's inventory. DPP ¶ 138; EUIPP ¶ 232. It was not until February 17, 2026 (five months later) when Lennox's CFO allegedly said it would "reduce some production in the first quarter" and "keep our inventories flat." DPP ¶ 154; EUIPP ¶ 248. But Plaintiffs ignore that he was explaining how Lennox—"both an OEM and the distributors"—"have to balance the production and demand" before market demand "rebounds," in direct response to an analyst's question about whether there is "much under absorption headwind given Q4 you weren't exactly running at full tilt to produce?" Lee Decl., Ex. 5 at 10.

Plaintiffs also point to a statement by Trane's CEO in September 2025 that Trane took "some time out of our factory so that we can balance the inventory load within the channel." DPP ¶ 139; EUIPP ¶ 233. But Plaintiffs again ignore the

preceding context that the "market was down approximately 30%," "the residential business [was] running into some tough times," and Trane therefore was "managing the business appropriately from a cost standpoint." Lee Decl., Ex. 6 at 3.[11]

A plain reading of the transcripts from which Plaintiffs cherry-pick shows that these publicly traded Defendants made these statements across a ten-month span, on public earnings calls and at investor conferences, often in response to analysts' questions, and as part of their respective discussions of how they were each rationally managing their inventory amid softening demand for residential HVAC equipment—hence the references to "tough times" and "softness in residential." Lee Decl., Exs. 1–7. "If no conspiracy existed, Defendants would likely make the same public statements about their observations, predictions, and strategies for the future, particularly in response to investor and analyst questions." *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 50 (9th Cir. 2022) (affirming dismissal). No plausible inference of conspiracy involving all Defendants can be drawn from the cherry-picked statements involving only a few Defendants. And, in any event, they are entirely consistent with each of their independent self-interest in avoiding a glut of unsold residential inventory while

---

[11] Plaintiffs also cite Trane CFO's statement that it "reduced factory production days by one-third," Lee Decl., Ex. 7 at 3; DPP ¶ 10; EUIPP ¶ 242, but ignore his preceding description of "softness in residential" business with declining revenues. Lee Decl., Ex. 7 at 1.

customer demand declined.

Finally, the fact that *all* these statements were made *publicly* further "weighs against their illegality." *Jones*, 400 F. Supp. 3d at 918–20. It is "common sense that a direct and secret price discussion between competitors is more probative of a conspiracy than are indirect and public communications." *Tires I*, 767 F. Supp. 3d at 723; *Jones*, 400 F. Supp. 3d at 920 (similar). As the Sixth Circuit observed: "Rational people, after all, do not conspire in the open[.]" *Erie County*, 702 F.3d at 869. None of the statements Plaintiffs cite support an inference of conspiracy.

#### b. Plaintiffs' Conclusory "Preliminary Regression Analysis" Carries No Weight

DPPs and EUIPPs' purported "regression analysis" likewise fails to show that HVAC prices can only be explained by unlawful conduct. DPP ¶¶ 167–70; EUIPP ¶¶ 261–65. This is not the first time antitrust plaintiffs have asked a court to credit an opaque regression as a substitute for well-pleaded facts. It did not work in *Tires*. *Tires I*, 767 F. Supp. 3d at 733 (giving "no credence to DPPs' preliminary regression analysis"); *Tires II*, 2026 WL 879018, at *28–33 (finding that plaintiffs' regression model did "not nudge the complaint toward plausibly stating a claim" for price-fixing). It did not work in *Concrete*. 2025 WL 1755193, at *17 ("A plaintiff may not disguise a conclusory statement by merely alleging that the conclusion derives from mathematical calculations done behind the scenes."). It does not work here.

Indeed, Plaintiffs' so-called "preliminary regression analysis" repeats the

same defects. As in *Tires* and *Concrete*, Plaintiffs allege no facts about their regression. All they offer is its purported conclusion, in the form of a chart with two lines that purport to show "Actual" and "But-For HVAC System Prices" over time. DPP ¶ 168, Figure 12; EUIPP ¶ 262, Figure 13. Plaintiffs' chart "does not offer any indication as to what companies' prices were analyzed, what type(s) of [products] were considered, or even what geographic area the 'analysis' is supposed to represent." *Tires I*, 767 F. Supp. 3d at 734.[12] It does not "reveal the source of the data, or the specifics of the methodology used." *Id.* at 735. And it does not explain "how the expert purportedly controlled for any of the identified factors." *Id.*; *Concrete I*, 2025 WL 1755193, at *17 (similar). In short, Plaintiffs' "regressions" obscure individual action and say nothing about the involvement of any individual Defendant.

The EUIPPs list 19 "independent variables" that the regression purportedly accounts for, EUIPP ¶ 264; *see also* DPP ¶ 169, but reciting a list of variable names is not the same as disclosing the model's data, the source of that data, the time periods analyzed, any indicia of statistical significance, or the methodology by

---

12 *See also In re Treasury Sec. Auction Antitrust Litig.*, 2021 WL 1226670, at *14 (S.D.N.Y. Mar. 31, 2021) (declining to rely on statistical analyses that did "not differentiate the Auction Defendants from each other, or from the rest of the market"); *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 389 (S.D.N.Y. 2019) (similar).

which the expert purportedly isolated the alleged "overcharge" from lawful conscious parallelism. And merely invoking unnamed "experts," *see* EUIPP ¶ 261, is not a substitute because undisclosed expert opinions "are not given a presumption of truthfulness" on a motion to dismiss. *Wade Park Land Holdings, LLC v. Kalikow*, 2023 WL 2614243, at *15 (S.D.N.Y. Mar. 23, 2023); *see also Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006) (similar).

In any event, Plaintiffs do not explain how the regression plausibly suggests conspiracy as opposed to "follow the leader" pricing. *See Tires II*, 2026 WL 879018, at *29 (granting a motion to dismiss, finding that even a regression with specified control variables could not distinguish between conspiracy and conscious parallelism because "both will correlate similarly with the dependent variable"); *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 399–400 (2d Cir. 2024) (affirming dismissal after rejecting regression that relied on "averages spread over a long span of time" that may "flatten or hide trends that might tell a different story"). Plaintiffs' regression is nothing but "an unsupported legal conclusion" that "has been converted into a graph." *Tires I*, 767 F. Supp. 3d at 735.

#### c. The Alleged Data-Aggregating Products Do Not Plausibly Suggest an Unlawful Agreement

Plaintiffs allege that Defendants' use of three sets of "data-aggregating" programs—AHRI, Pricefx, and Convergence Data—somehow suggests price-fixing, but those allegations fail. *See* DPP ¶¶ 96–100, 194–202; EUIPP ¶¶ 131–38,

295–307. Courts consistently recognize that "information-seeking [about competitors] is common in concentrated markets, and such behavior is consistent with conscious parallelism rather than collusion." *Tires I*, 767 F. Supp. 3d at 714–15; *Jones*, 400 F. Supp. 3d at 918 (same). None of the supposed data-aggregating products alleged here plausibly suggests a conspiracy.

***AHRI's Products.*** Plaintiffs concede that AHRI distributes data only in "*aggregate form*" and covers only *non-price* metrics: "bookings, unit shipments, sales volume, manufacturer inventories, exports, efficiencies, and market information on trading area sales." DPP ¶ 96; EUIPP ¶¶ 131, 133; CIPP ¶ 91. EUIPPs further concede that AHRI's monthly report, "Air Conditioning Today," tracks shipments (defined as "when a unit transfers ownership") and that "AHRI does not conduct any market forecasting." EUIPP ¶ 138. Additionally, AHRI's reports are shared not just with Defendants but also with AHRI's "300+ member companies." EUIPP ¶ 138; DPP ¶ 100. This kind of generalized and aggregated information sharing—divorced from any allegations of *how* Defendants use the products—does not render an alleged price-fixing conspiracy plausible. *See Concrete I*, 2025 WL 1755193, at *5 (holding that "benchmarking analysis" including "information on ready-mixed concrete production and the costs associated with the sales and support of concrete" did not support conspiracy allegations); *Tires I*, 767 F. Supp. 3d at 715–16 (similar).

Plaintiffs also allege that AHRI's 2020 "Analytics App and Executive Dashboard" allows Defendants to "monitor, in real time, whether [] competitors' pricing and output was consistent with the coordinated strategy." DPP ¶ 98. But the webpage that DPPs quote shows that the Executive Dashboard monitors certification and engineering metrics, such as SEER (seasonal energy-efficiency ratio), not pricing. Lee Decl., Ex. 8 (quoted at DPP ¶ 98); *see also* EUIPP ¶¶ 4, 134; CIPP ¶ 93 (acknowledging that the dashboard provides "real-time program performance data" and "data related to individual product performance").

Without allegations that AHRI transmitted competitor-specific pricing data in a form that could be used to reach or monitor (let alone enforce) a price-fixing agreement, the existence of a data program adds nothing. *See Tires I*, 767 F. Supp. 3d at 716 (rejecting similar allegations because "plaintiffs do not explain what non-public information was supposedly exchanged or how it was, or even how it could have been, used 'to make sure that each [defendant] acted in accordance with the agreement to increase prices'"); *Segal v. Amadeus IT Grp., S.A.*, 2026 WL 879583, at *4 (N.D. Ill. Mar. 31, 2026) (similar).

***Pricefx and Convergence Data.*** DPPs and EUIPPs separately allege that a subset of Defendants use Pricefx and/or Convergence Data. DPP ¶¶ 194–202; EUIPP ¶¶ 295–307. These allegations do not support their conspiracy claims for at least two independent reasons.

*First*, Plaintiffs do not allege that either platform shares Defendants' confidential, non-public pricing data with competitors. Rather, Plaintiffs concede that Pricefx and Convergence Data are "data aggregating tools" that provide market-level information, including "products, parts, and dealer network information," without disclosing any individual user's confidential data. DPP ¶¶ 194, 199; EUIPP ¶ 295. EUIPPs even describe Convergence Data as offering "competitive intelligence research" that "should include extensive qualitative research from *publicly* accessible sources." EUIPP ¶ 307 (emphasis added). "At most, plaintiffs have alleged that it was possible for defendants to use a licit tool for illicit means, a possibility which exists for any tool, used by any company, in any industry." *Tires I*, 767 F. Supp. 3d at 715. That does not *plausibly* suggest a price-fixing agreement.

*Second*, Plaintiffs do not allege Defendants conspired to fix prices through Pricefx or Convergence Data. Plaintiffs likewise do not allege when the subset of Defendants began using the software or that they did so in parallel. Instead, Plaintiffs allege in a conclusory fashion that "these tools enabled Defendants to police adherence to their agreement." DPP ¶ 194. More importantly, a firm's subscription to a market-intelligence tool is not an agreement to fix prices any more than a subscription to a trade publication is, and "consulting public sources" to determine how to price a product is a common and lawful business practice. *See*

*Gibson v. Cendyn Grp., LLC*, 2024 WL 2060260, at *4 (D. Nev. May 8, 2024); *Prosterman v. Am. Airlines, Inc.*, 747 F. App'x 458, 462 (9th Cir. 2018) (finding revenue management software comparable to a "trade organization," which is not "suggestive of collusion").

#### d. Market Characteristics Are Insufficient to Suggest an Unlawful Agreement

Plaintiffs devote several pages to describing the purported structural characteristics of the alleged HVAC Equipment market: high concentration, high barriers to entry, inelastic demand, lack of substitutes, and product standardization. *See, e.g.,* DPP ¶¶ 180–93; EUIPP ¶¶ 272–92; CIPP ¶¶ 129–42, 157–69, 163–66. Even if they were true, these allegations are all just different ways of saying that the alleged "concentrated" market is prone to *lawful* interdependent conduct, not conspiracy. The Sixth Circuit has held that "having a market where collusion is simply possible, is not evidence of collusion." *Hobart-Mayfield*, 48 F.4th at 668; *see also Erie County*, 702 F.3d at 869–71 (similar).

#### e. Motive and Opportunity to Conspire Do Not Suggest Agreement

Plaintiffs' allegation that Defendants had "opportunities" to collude—through AHRI membership, HARDI conferences, and other industry events—carries no weight. DPP ¶¶ 203–18; EUIPP ¶¶ 308–28; CIPP ¶¶ 143–56. Even "[n]umerous opportunities" to collude "are not sufficient" to support an inference of

conspiracy. *Midwest Auto Auction, Inc. v. McNeal*, 2012 WL 3478647, at *10 (E.D. Mich. Aug. 14, 2012). And courts recognize that "gather[ing] at industry trade association meetings" does not suggest "an illegal agreement," but is "more likely explained by [] lawful, free-market behavior." *Travel Agent*, 583 F.3d at 910–11; *accord Musical Instruments*, 798 F.3d at 1196; *Twombly*, 550 U.S. at 567 n.12.

The Complaints neither allege that every Defendant attended these industry events nor identify any specific communication at any industry conference in which any Defendant discussed pricing with any other Defendant, much less agreed to fix prices. *See Tires I*, 767 F. Supp. 3d at 712 (rejecting opportunity-to-conspire allegations where "at no point do plaintiffs even speculate, much less plausibly allege, that defendants actually conspired or exchanged confidential information at any of these events"). Plaintiffs' allegations here are "based wholly in speculation and wishful thinking as to what Defendants might have done." *In re ICE LIBOR Antitrust Litig.*, 2020 WL 1467354, at *4 (S.D.N.Y. Mar. 26, 2020).

**f. The Alleged Conduct Is Consistent with Defendants' Economic Self-Interest**

Plaintiffs' allegations that Defendants' pricing behavior was contrary to their economic self-interest, *see* CIPP ¶ 161, are conclusory and contradicted by well-settled antitrust law. Of course, Defendants' "interests are best served" when they increase profits, and "independent, self-interested failure to compete . . . does not violate Section One." *Erie County*, 702 F.3d at 871. As the Sixth Circuit has

explained, "the plausibility of plaintiffs' conspiracy claim is inversely correlated to the magnitude of defendants' economic self-interest in" the challenged conduct, and where that conduct served each defendant's independent interest, "there is no reason to infer that [defendants] had agreed among themselves to do what was only natural anyway." *Travel Agent*, 583 F.3d at 909 (quoting *Twombly*, 550 U.S. at 566).

"[T]he fact that [Defendants] informed their customers of price increases in advance hardly enhances [Plaintiffs'] case." *Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.*, 971 F.2d 37, 54 (7th Cir. 1992); *see* DPP ¶ 178. A price "leader is likely to retract an increase that is not followed," so it does not risk being undercut. *Travel Agent*, 583 F.3d at 910. For example, Plaintiffs allege that in November 2023, Trane announced an increase of "up to 5% on some residential products," DPP ¶ 129; EUIPP ¶ 208; CIPP ¶ 105, but ignore that their relied-upon ACHR report states Trane's "prices for other products will *decrease* or remain *unchanged*." Lee Decl., Ex. 9 at 1. Far from suggestive of a conspiracy, the alleged Trane announcement illustrates why advance price announcements are not against any Defendant's self-interest—they are provisional notices to customers, easily retracted or offset, as Trane's simultaneous price decreases on other products confirm.

Additionally, HVAC Equipment reaches many end users through intermediary distribution channels: manufacturers typically sell to distributors, who

sell to contractors, who sell to building owners and other end users. *See* DPP ¶ 4; CIPP ¶¶ 77–78. Notices of price changes thus serve "an important purpose in the industry" by allowing distributors and contractors to plan inventory, communicate pricing to their own customers, and make purchasing decisions. *Reserve Supply Corp.*, 971 F.2d at 53–54. Moreover, contractual obligations to certain customers may require advance notice of price changes. To that end, Plaintiffs concede the obvious reason that some price increases were published in ACHR News: it is "the weekly newsmagazine of the HVACR contractor covering residential and commercial contracting." DPP ¶ 219; EUIPP ¶ 143; CIPP ¶ 97.

#### 4. **Considered as a Whole, Plaintiffs' Allegations Do Not Suggest an Agreement**

Plaintiffs' allegations, when considered "together, not in isolation," point to nothing more than lawful, interdependent conduct. *Erie County*, 702 F.3d at 870. That is not enough to state a claim. *See Tires I*, 767 F. Supp. 3d at 742 (concluding that plus factors as a whole fell short of plausibly alleging a conspiracy); *In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F. Supp. 2d 1250, 1260–61 (W.D. Wash. 2009) (same); *BNP Paribas Sec. Corp.*, 92 F.4th at 415 (same).

#### 5. **Obvious Alternative Explanations Further Render an Agreement Implausible**

Under *Twombly*, allegations of parallel conduct are not "suggestive of conspiracy" when there exists "an obvious alternative explanation" for that

conduct. 550 U.S. at 567–68. Here, the Complaints supply *four* industry-wide cost shocks that provide the "natural explanation" for the increase in HVAC Equipment prices over the course of the purported conspiracy. *Id.*

***The COVID-19 pandemic disrupted supply chains.*** Plaintiffs concede "the pandemic disrupted supply chains across every sector of the economy, and customers expected some price increases as a result." DPP ¶ 110; *see also* EUIPP ¶ 1 (noting "supply chain disruptions, demand fluctuations, and price volatility"); CIPP ¶ 100. The Complaints are also replete with Defendants' contemporaneous explanations for how those disruptions were causing increased prices. *See, e.g.*, DPP ¶ 226; EUIPP ¶ 333 (Rheem's subsidiary HTPG cited the pandemic's impact on "our supply chain, our industry, and the overall economy," noting that "[f]reight, raw materials (steel, aluminum, copper, wood, and plastics) and critical component costs (compressors, valves, and motors) have continued to rise significantly"); DPP ¶ 111; EUIPP ¶ 147; CIPP ¶ 101 (similar for Johnson Controls); DPP ¶ 114; EUIPP ¶ 159 (similar for Lennox); EUIPP ¶¶ 153, 159, 163, 169, 171, 178, 186; DPP ¶¶ 73, 114 (similar for AAON and others).

Other courts considering claims of price-fixing amid COVID-era cost pressures have found those pressures are "obvious alternative explanation[s]" for defendants' pricing. *D'Augusta*, 117 F.4th at 1100, 1104; *Tires I*, 767 F. Supp. 3d at 730–39; *Tires II*, 2026 WL 879018 at *22 ("One plainly obvious market

consideration, even acknowledged by plaintiffs, is the sudden increase in input costs and other inflationary pressures beginning with the COVID-19 pandemic."); *David B. Turner Builders LLC v. Weyerhaeuser Co.*, 603 F. Supp. 3d 459, 464 (S.D. Miss. 2022) (dismissing price-fixing complaint where defendants raised prices during pandemic); *Concrete I*, 2025 WL 1755193, at *16 (finding increases in the COVID-19 context "just as indicative of inflation as they are of collusion"). This case is no different.

***New energy-efficiency standards and the AIM Act further increased Defendants' costs.*** While under inflationary pressure from COVID-19, Defendants were simultaneously investing billions to adapt to an entirely new regulatory framework. In January 2017, the U.S. Department of Energy published "the new SEER2 energy conservation standards in the Federal Register, which set minimum efficiency requirements for new HVAC Equipment sold beginning on January 1, 2023." EUIPP ¶ 335; DPP ¶ 228; CIPP ¶ 11. Then, in December 2020, Congress enacted the AIM Act, which mandated an 85% phasedown of HFC production and consumption over 15 years. DPP ¶ 113; EUIPP ¶ 154. This federal statute applied to R-410A, the primary refrigerant used in residential air conditioning condensers and heat pumps, and prohibited the manufacture or import of new R-410A systems beginning January 1, 2025. *Id.* Plaintiffs acknowledge that the transition cost manufacturers "billions of dollars." EUIPP ¶ 337; DPP ¶ 230; CIPP ¶ 15. These

regulatory mandates also caused HVAC manufacturers to redesign product lines, retool factories, qualify new refrigerants, and manage parallel inventories of legacy and next-generation equipment—costs that necessarily flowed into pricing. *See* EUIPP ¶¶ 232, 237, 336 (quoting various statements discussing refrigerant transition); *see also* DPP ¶ 229; CIPP ¶ 15.

***Tariffs increased raw material costs.*** The Complaints concede that, beginning in 2025, tariffs further increased the costs of critical inputs for HVAC Equipment such as steel, aluminum, and copper. EUIPP ¶¶ 232, 237, 333; DPP ¶ 219 (screenshot of ACHR article from October 2025 explaining that "[p]rices are up across the board, mostly due to copper cost increases"). The tariffs are more "common stimuli" that explain Defendants' alleged pricing conduct and preclude a plausible inference of conspiracy. *Twombly*, 550 U.S. at 556 n.4.

***Plaintiffs' only response is conclusory.*** Plaintiffs allege that Defendants' contemporaneous, publicly stated justifications for their price increases—COVID-19 supply chain disruptions, changes in energy efficiency standards, the AIM Act's refrigerant phasedown, and tariffs—were "pretextual." *See, e.g.*, DPP ¶¶ 225–31; EUIPP ¶¶ 332–37; CIPP ¶ 244. But the Complaints themselves undermine this conclusory allegation.

*First*, Plaintiffs acknowledge that COVID-19 disrupted supply chains industry-wide, that raw material costs "continued to rise significantly" during the

Class Periods, and that the AIM Act required manufacturers to redesign equipment for new refrigerants beginning in 2025. *See, e.g.*, DPP ¶¶ 7, 110, 226–29; EUIPP ¶¶ 1, 333–36; CIPP ¶¶ 11, 100. The allegation that Defendants raised prices while facing well-documented inflationary pressures "suggests rational pricing behavior in an interdependent market, not conspiracy." *Tires I*, 767 F. Supp. 3d at 731.

*Second*, Plaintiffs allege that HVAC prices outpaced the CPI and Household Appliance PPI, and therefore the price increases cannot be explained by cost pressures. But the Complaints allege no facts explaining why household appliances (like toasters) are appropriate comparators for HVAC systems. Even assuming residential HVAC equipment could be characterized as a "household appliance," commercial HVAC systems—chillers, rooftop units, and VRF systems used in office buildings, warehouses, and hotels, many exceeding $100,000—plainly are not. *See, e.g.*, EUIPP ¶ 119. Nor do Plaintiffs allege facts that suggest the household appliance industry was subject to the AIM Act, new energy efficiency standards, and tariffs. Indeed, the AIM Act, which cost the industry "billions," primarily impacted HVAC manufacturers. EUIPP ¶ 337; DPP ¶ 230; CIPP ¶ 15.

*Third*, the Complaints further allege that Defendants pretextually cited the AIM Act's HFC phasedown and the SEER2 standards as additional cost drivers. Plaintiffs reason that "the HVAC Equipment industry spent millions of dollars lobbying for the [AIM Act's] transition, and billions preparing for it," and had six

years' notice of the SEER2 standards. DPP ¶ 7; EUIPP ¶¶ 334–36. But there is "nothing odd or irrational" about each Defendant allegedly attempting to recoup their massive investments through price increases. *See Tires I*, 767 F. Supp. 3d at 732; *In re ICE LIBOR Antitrust Litig.*, 2020 WL 1467354, at *5 (cautioning "not to regard activity that may just as easily turn out to have been rational business behavior as a plus factor").

*Fourth*, Plaintiffs point to executive statements that they allege demonstrate that price increases "more than offset" rising costs. *See, e.g.*, DPP ¶ 125; EUIPP ¶¶ 195–96. But these allegations do not show "whether the real reason was interdependence or a conspiracy." *In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750, 775 (E.D. Pa. 2017); *accord Tires I*, 767 F. Supp. 3d at 733, 738–39 (applying same principle where defendant CEO allegedly stated price increases "more than offset costs"). At most, Plaintiffs allege rational firms are engaging in profit-maximizing behavior, which is not evidence of conspiracy. *See Tires I*, 767 F. Supp. 3d at 738 ("[E]ven if that notion were supported by well-pleaded factual allegations (it is not), it would still only suggest rational business decisions in an interdependent market — not prior agreement."); *Twombly*, 550 U.S. at 566 (finding "no reason to infer that [] companies had agreed among themselves to do what was only natural anyway").

*Fifth*, DPPs and EUIPPs halfheartedly suggest that Defendants pretextually

blamed price increases on the Trump Administration's tariffs in 2025. *See* DPP ¶ 226; EUIPP ¶ 333. That suggestion, however, is belied by Congress' own website that confirms, in 2025, the "Executive Tariff Actions" included 50% global tariffs on steel, aluminum, and copper—all raw materials used in HVAC Equipment.[13] *See* DPP ¶ 226 (referring to steel and aluminum as among the "raw materials" for HVAC Equipment); EUIPP ¶ 333 (same).

### C. Plaintiffs Fail to Allege Facts Tying Each Individual Defendant to the Alleged Conspiracy

Plaintiffs' claims independently fail because the Complaints impermissibly lump Defendants together and make sweeping generalizations about "Defendants" and "Defendant Families." *See, e.g.*, DPP ¶¶ 30–33, 35–36, 39–40, 49–50, 55–56, 61–62. As a result, the Complaints "furnish[] no clue as to which of the . . . [Defendants] (much less which of their employees) supposedly agreed to fix prices." *Twombly*, 550 U.S. at 565 n.10. Plaintiffs refer generically to "Defendants" without identifying who allegedly agreed on what, how, or where. *See Travel Agent*, 583 F.3d at 905 ("vague allegations" referring to "defendants" is "precisely the type of naked conspiratorial allegations rejected by the Supreme Court in *Twombly*"); *Total Benefits Plan. Agency, Inc.,* 552 F.3d at 437 ("bare allegations without any reference

---

[13] *See* Lee Decl., Ex. 10 at 1 (https://www.congress.gov/crs-product/R48549). The Court is permitted to take judicial notice of official government websites. *See, e.g., Smith v. Gidley*, 2020 WL 2573184, at *1 (E.D. Mich. May 21, 2020) (taking judicial notice of website for Michigan Department of Corrections).

to the 'who, what, where, when, how or why' . . . do not supply facts adequate to show illegality' as required by *Twombly*"). Nor can a parent-subsidiary relationship impute liability because a "parent corporation generally is not liable for the acts of its subsidiary, even if its subsidiary is wholly owned." *Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 724 (6th Cir. 2007) (citing *United States v. Bestfoods*, 524 U.S. 51, 61 (1998)).

### D. CIPPs and EUIPPs Fail to Plausibly Allege State Law Claims

CIPPs and EUIPPs bring a variety of state-law claims predicated on the same conspiracy allegations underlying their Sherman Act Section 1 claims. "Because [their] Sherman Act claims [are] not well pled," their state law claims should be "dismissed as well." *In re German Auto. Mfrs. Antitrust Litig.*, 612 F. Supp. 3d 967, 986 (N.D. Cal. 2020); *Tires I*, 767 F. Supp. 3d at 744 (similar). And many of these state-law claims fail for additional, independent reasons, described further below.

#### 1. Indirect Purchasers Cannot Assert Antitrust Claims in Puerto Rico, Consumer-Protection Claims in Arkansas and Montana, and Unjust-Enrichment Claims in Seven States

As indirect purchasers, CIPPs and EUIPPs have no standing to sue for damages under the Sherman Act. *See Ill. Brick Co. v. Illinois*, 431 U.S. 720, 746 (1977). Indirect-purchaser plaintiffs may bring claims for damages only under "express state statutory provisions giving such purchasers a damages cause of action." *California v. ARC Am. Corp.*, 490 U.S. 93, 100 (1989). But Puerto Rico's

antitrust statute expressly "precludes" suits by "indirect purchasers" so CIPPs' and EUIPPs' Puerto Rico antitrust claims must be dismissed. *In re Broiler Chicken Antitrust Litig.*, 2020 WL 4032932, at *4 & n.2 (N.D. Ill. July 15, 2020).

Similarly, "indirect" purchasers like CIPPs and EUIPPs lack standing to sue under Arkansas's consumer-protection statute. *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2015 WL 3988488, at *17 (N.D. Ill. June 29, 2015). And courts have held that "indirect purchasers . . . are barred from bringing claims under" Montana's consumer-protection statute. *See, e.g.*, *Humana Inc. v. Merck & Co.*, 2025 WL 2538859, at *14 (D.N.J. Sept. 4, 2025).

Additionally, CIPPs' claims for unjust enrichment are barred in Puerto Rico, Arkansas, and Montana because indirect purchasers "cannot circumvent" states' indirect-purchaser bars "by recasting an antitrust claim as one for unjust enrichment." *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 232 (S.D.N.Y. 2012) (collecting cases). Because Alabama, Louisiana, Maryland, and Massachusetts have not repealed *Illinois Brick*, CIPPs' unjust-enrichment claims under those laws are also barred. *See In re Seroquel XR (Extended Release Quetiapine Fumarate) Antitrust Litig.*, 2022 WL 2438934, at *23–24 (D. Del. July 5, 2022) (dismissing Alabama, Maryland, and Massachusetts unjust enrichment claims); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d

160, 170 (D. Me. 2004) (same as applied to Louisiana).[14]

### 2. **CIPPs' Unjust-Enrichment Claims Fail Pleading Standards**

CIPPs' state-law unjust-enrichment claims also fail because they are vague. For one, it is not clear from CIPPs' Complaint how many unjust-enrichment claims they purport to bring. In a footnote to their unjust-enrichment count, they list 37 states and territories and declare that their "[u]njust enrichment claims are alleged herein under the laws of" those states and territories. CIPP Compl., Count IV n.7. But CIPPs also allege that allowing Defendants to retain the supposed overcharges would violate "unjust enrichment principles under the laws of all states and territories of the United States, except California, Ohio and Indiana." *Id.* ¶ 262. When, as here, the plaintiff's "complaint utterly fails to allege with any particularity what statutory provisions she is claiming have been violated . . . , the [p]laintiff has failed to set forth claims that are 'plausible' on their face," and they must be dismissed. *Mitchell v. Roosen Varchetti & Oliver, PLLC*, 2014 WL 1775575, at *4

---

[14] Although it is not clear which states' unjust-enrichment laws CIPPs' Complaint invokes, *see* CIPP ¶ 262, to the extent they are asserting claims under Alaska, Georgia, Idaho, Kentucky, Oklahoma, Texas, Virginia, Washington, or Wyoming law, those claims also fail because those states have not repealed *Illinois Brick*. *See Miami Prods. & Chem. Co. v. Olin Corp.*, 546 F. Supp. 3d 223, 236–37 (W.D.N.Y. 2021) (Alaska); *State ex rel. Wasden v. Daicel Chem. Indus., Ltd.*, 106 P.3d 428, 432 (Idaho 2005) (Idaho); *Seroquel XR*, 2022 WL 2438934, at *23–24 (Georgia and Kentucky); *In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1175 (N.D. Cal. 2015) (Oklahoma, Texas, Virginia, Washington, and Wyoming).

(E.D. Mich. May 2, 2014); *Cortis v. City of Coleman*, 2011 WL 1518901, at *3 (E.D. Mich. Apr. 20, 2011) (similar).

Even assuming CIPPs bring unjust-enrichment claims only under the laws of the 37 jurisdictions in their footnote, "[s]tate law requirements under unjust enrichment law vary widely." *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 667 (E.D. Mich. 2011). "Where one state's version of some claim (whether common law or otherwise) materially differs from the elements of other states' claims, ignoring that difference and simply alleging 'substantial similarity' among various state laws does not satisfy Rule 8." *Hawes v. Macy's Inc.*, 2023 WL 8811499, at *5–6 (S.D. Ohio Dec. 20, 2023). These sorts of "undifferentiated unjust enrichment claims must be dismissed." *Packaged Ice*, 779 F. Supp. 2d at 667.

**3. <u>Two States' Antitrust Statutes and Four States' Consumer-Protection Statutes Bar Such Claims as Class Actions</u>**

Class action bars apply to CIPPs' claims under Illinois and Tennessee antitrust statutes and Arkansas and South Carolina consumer-protection statutes, as well as EUIPPs' claims under the Illinois antitrust statute and the Arkansas, Colorado, Montana, and South Carolina consumer-protection statutes.

Tennessee's antitrust statute expressly states that a "class action lawsuit must not be brought" to challenge antitrust violations. Tenn. Code Ann. § 47-25-106(c). And only Illinois's attorney general can bring class actions on behalf of indirect purchasers under the antitrust statute of Illinois. 740 Ill. Comp. Stat. 10/7(2); *see In*

*re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 1008 (E.D. Mich. 2014). Class action antitrust claims are also barred under Arkansas's, Colorado's, Montana's, and South Carolina's consumer-protection statutes. *See, e.g.*, Ark. Code Ann. § 4-88-113(f)(1)(B) (Arkansas); *Chapman v. Tristar Prods., Inc.*, 2016 WL 6216135, at *4 (N.D. Ohio Oct. 25, 2016) (Colorado); Mont. Code Ann. § 30-14-133(1) (Montana); *In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 150 F. Supp. 3d 593, 635 (D.S.C. 2015) (South Carolina).

### 4. <u>Price Fixing Is Not a Consumer-Protection Violation in 11 States</u>

CIPPs' and EUIPPs' consumer-protection claims in 11 states also fail because alleged antitrust violations like the ones here do not violate those states' statutes. Those consumer-protection statutes simply prohibit deceptive and unconscionable trade practices generally, and courts have held that alleged antitrust violations are not encompassed by those statutes and must be dismissed.[15] Specifically, the Court

---

15 *See Lidoderm*, 103 F. Supp. 3d at 1166 (Arkansas); *In re Crop Prot. Prods. Loyalty Program Antitrust Litig.*, 779 F. Supp. 3d 624, 658 (M.D.N.C. 2025) (Colorado); *Laughlin v. Evanston Hosp.*, 550 N.E.2d 986, 993 (Ill. 1990) (Illinois); *Davidson v. Microsoft Corp.*, 792 A.2d 336, 344–45 (Md. Ct. App. 2002) (Maryland); *New Motor Vehicles*, 350 F. Supp. 2d at 189, 200, 203 (Michigan, Pennsylvania, South Dakota); *Sickles v. Cabot Corp.*, 877 A.2d 267, 276 (N.J. Super. Ct. App. Div. 2005) (New Jersey); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1029–30 (N.D. Cal. 2007) (New Mexico); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1115 (N.D. Cal. 2007) (Oregon); *In re Photochromic Antitrust Litig.*, 2011 WL 13141933, at *6 n.18 (M.D. Fla. Oct. 26, 2011) (Wisconsin).

should dismiss (1) CIPPs' consumer-protection claims under Arkansas, Illinois, New Mexico, New Jersey, and Wisconsin law; and (2) EUIPPs' consumer-protection claims under Arkansas, Colorado, Illinois, Maryland, Michigan, New Mexico, Oregon, Pennsylvania, and South Dakota law.

#### 5. Two State Consumer-Protection Statutes Bar Claims by Purchasers for Resale

CIPPs' consumer-protection claims are also barred under Illinois and Vermont law, because those states' consumer-protection statutes apply only to purchases "not for resale." Ill. Comp. Stat. Ann. § 815.505/1(e); *accord* Vt. Stat. Ann. tit. 9, § 2451a(1). *See First Magnus Fin. Corp. v. Dobrowski*, 387 F. Supp. 2d 786, 794 (N.D. Ill. 2005) (dismissing Illinois consumer-protection claim because, "where a corporation makes a purchase for future resale, it is not a consumer"); *RSD Leasing, Inc. v. Navistar Int'l Corp.*, 319 A.3d 734, 739 (Vt. 2024) (dismissing Vermont consumer-protection claim for same reason).

#### 6. Consumer Protection Claims in Two States Must Be Dismissed for Failure to Plead All Essential Elements

CIPPs' Wisconsin consumer-protection claim fails because CIPPs do not allege that Defendants violated an order issued by the Wisconsin Department of Agriculture, Trade, and Consumer Protection. *Emergency One, Inc. v. Waterous Co.,* 23 F. Supp. 2d 959, 971 (E.D. Wis. 1998); *In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *21–22 (E.D. Mich. Apr. 9, 2013) (dismissing

claims on this basis). EUIPPs' Nevada consumer-protection claim also fails because EUIPPs do not allege that they are either "elderly" or have "a disability," *see* Nev. Rev. Stat. Ann. § 598.0977.

## VII. CONCLUSION

Defendants respectfully request dismissal of all Complaints with prejudice.

Dated: October 9, 2026

Respectfully submitted,

*/s/ David Marriott*
David Marriott (admitted, E.D. Mich.)
Lawrence E. Buterman
**LATHAM & WATKINS LLP**
1271 Ave. of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
david.marriott@lw.com
lawrence.buterman@lw.com

Belinda S Lee
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
belinda.lee@lw.com

Anna M. Rathbun
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
anna.rathbun@lw.com

Kimberly L. Scott (P69706)
**MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.**
101 North Main, 7th Floor
Ann Arbor, MI 48104
(734) 668-7696
Scott@millercanfield.com

A. Michael Palizzi (P47262)
**MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.**
150 W. Jefferson Ave., Suite 2500
Detroit, MI 48226
(313) 496-7645
Palizzi@millercanfield.com

*Counsel for Trane U.S. Inc. and Trane Technologies plc*

*s/ with consent of Michael W. Scarborough*
Michael W. Scarborough
Dylan I. Ballard
**VINSON & ELKINS LLP**
555 Mission St., Ste. 2000
San Francisco, CA 94105
Tel.: (415) 979-6900
mscarborough@velaw.com
dballard@velaw.com

Craig P. Seebald
**VINSON & ELKINS LLP**
2000 Pennsylvania Ave., Ste. 500 W.
Washington, DC 20037
Tel.: (202) 639-6500
cseebald@velaw.com

*Counsel for AAON, Inc. (Nevada), AAON, Inc. (Oklahoma), AAON Coil Products, Inc., and BASX, Inc.*

*s/ with consent of K. Winn Allen*
K. Winn Allen
Leah A. Hamlin
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Ave., N.W.
Washington, DC 20004
Tel: (202) 389-5000
winn.allen@kirkland.com
leah.hamlin@kirkland.com

Devin S. Anderson
Chris Mack
**KIRKLAND & ELLIS LLP**
95 State St.
Salt Lake City, UT 84111
Tel: (801) 877-8100
devin.anderson@kirkland.com
chris.mack@kirkland.com

Andrew C. Goetz (P71410)
**MILLER JOHNSON**
500 Woodward Ave., Ste. 3600
Detroit, MI 48226
Tel: (313) 435-2292
goetza@millerjohnson.com

*Counsel for Carrier Global Corp. and Viessmann Manufacturing Co. (U.S.), Inc.*

*s/ with consent of Mark H. Hamer*
Mark H. Hamer
Mark G. Weiss
Baker Mckenzie LLP
815 Connecticut Ave. N.W.
Washington, DC 20006
Tel: (202) 452-7000
mark.hamer@bakermckenzie.com
mark.weiss@bakermckenzie.com

Howard B. Iwrey (P39635)
**DYKEMA GOSSETT PLLC**
39577 Woodward Ave.
Bloomfield Hills, MI 48304
Tel: (248) 203-0700
hiwrey@dykema.com

Cody D. Rockey (P78653)
**DYKEMA GOSSETT PLLC**
2723 S. State St., Ste. 400
Ann Arbor, MI 48104
Tel: (734) 214-7660
crockey@dykema.com

*Counsel for Robert Bosch LLC; BHC Residential & Light Commercial LLC; Bosch Home Comfort LLC, and Bosch Thermotechnology Corp.*

*s/ with consent of James H. Weingarten*
James H. Weingarten
Anastasia Pastan

Milbank LLP
1101 New York Ave. N.W.
Washington, DC 20005
Tel.: (202) 835-7500
jweingarten@milbank.com
apastan@milbank.com

*s/ with consent of Brian Byrne*
Brian Byrne
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
151 University Avenue
Palo Alto, CA 94301
Tel: (650) 815-4110
bbyrne@cgsh.com

C. Lawrence Malm
Elsbeth Bennett
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
2112 Pennsylvania Ave., N.W.
Washington, DC 20037
Tel: (202) 974-1500
lmalm@cgsh.com
ebennett@cgsh.com

Perrin Rynders (P38221)
**VARNUM LLP**
Bridgewater Place, P.O. Box 352
Grand Rapids, MI 49501-0355
Tel.: (616) 336-6000
prynders@varnumlaw.com

Mark J. Chasteen (P81936)
**VARNUM LLP**
101 N. Main St., Ste. 525
Ann Arbor, MI 48104
Tel.: (734) 372-2900
mjchasteen@varnumlaw.com

*Counsel for Daikin Industries, Ltd., Daikin Comfort Technologies North America, Inc., Daikin Applied Americas Inc., Daikin Comfort Technologies Distribution, Inc. f/k/a Goodman Distribution Inc., and ThermalNetics, LLC*

David A. Ettinger
**HONIGMAN LLP**
660 Woodward Ave., Ste. 2290
Detroit, MI 48226
Tel: (313) 465-7368
dettinger@honigman.com

*Counsel for Lennox International, Inc., Lennox Industries Inc., and Allied Air Enterprises LLC*

*s/ with consent of Michael E. Martínez*
Michael E. Martínez
Lauren Norris Donahue

K&L Gates LLP
70 W. Madison St., Ste. 3300
Chicago, IL 60602
Tel: (312) 372-1121
michael.martinez@klgates.com
lauren.donahue@klgates.com

Michael Brady
Warner Norcross + Judd LLP
2715 Woodward Ave., Ste. 300
Detroit, MI 48201
Tel: (313) 546-6000
mbrady@wnj.com

*Counsel for Rheem Manufacturing Company and Rheem Sales Co., Inc.*

*s/ with consent of Colleen M. Lauerman*
Colleen M. Lauerman
Jeffrey T. Green
**Green Lauerman Chartered PLLC**
1050 30th St NW
Washington, DC 20007
Tel: (202) 213-9795
colleen@glclaw.net

Mitchell Zajac
Butzel Long
150 W. Jefferson Avenue Suite 100
Detroit, MI 48226
Tel: (313) 225-7000
zajac@butzel.com

*Counsel for Mitsubishi Electric Trane HVAC US*

**CERTIFICATE OF SERVICE**

I certify that on October 9, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filings to all counsel of record.

By: */s/ David Marriott*

David Marriott (NY Bar No. 2682565)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
T: (212) 906-1200
*david.marriott@lw.com*

*Attorney for Defendants Trane U.S. Inc. and Trane Technologies plc*