**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| IN RE HVAC EQUIPMENT ANTITRUST LITIGATION<br><br>*This Document Relates to:*<br>*All Actions* | No. 2:26-cv-10949-SKD-EAS<br><br>Hon. Susan K. DeClercq |

**DEFENDANT MITSUBISHI ELECTRIC TRANE HVAC US LLC'S MOTION FOR AN ORDER DISMISSING THE COMPLAINTS FOR LACK OF SUBJECT MATTER JURISDICTION OR IN THE ALTERNATIVE FOR FAILURE TO STATE A CLAIM**

Defendant Mitsubishi Electric Trane HVAC US LLC ("METUS") hereby respectfully moves this Honorable Court for an Order dismissing the Complaints against METUS for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) or, in the alternative, for failure to state a claim under Fed. R. Civ. P. 12(b)(6). As described in the accompanying brief, METUS only distributes products like those expressly excluded from the Plaintiffs' product market, and therefore METUS did not cause the Plaintiffs' alleged injury as required for standing under Article III. In the alternative, Plaintiffs have failed to state a claim against METUS because they have not provided allegations about METUS's actions specifically; instead,

Plaintiffs seek to attribute the actions of several distinct companies to METUS as part of a "group" of Defendants.

Pursuant to Local Rule 7.1(a), counsel for METUS conducted a meet and confer via video conference on October 1, 2026, with counsel for Plaintiffs in this case, who did not consent to this motion and thus the meet and confer was unsuccessful.

WHEREFORE, for the reasons set out herein and detailed in the attached brief in support of METUS's motion, METUS respectfully requests that this Honorable Court enter an Order as follows:

(1) ENTERING an Order dismissing the Complaints as against METUS pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, or;

(2) ENTERING an Order dismissing the Complaints as against METUS pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

Dated: October 9, 2026

Respectfully submitted,

**BUTZEL LONG, a professional corporation**

s/ *Mitchell S. Zajac*
Mitchell S. Zajac (P82498)
150 West Jefferson, Suite 100
Detroit, MI 48226-4452
(313) 225-7000
zajac@butzel.com

Colleen M. Lauerman (DC No. 459766)
Green Lauerman Chartered PLLC
1050 30th Street NW
Washington, DC 20007
202-213-9795
colleen@glclaw.net
***Attorneys for Defendant Mitsubishi Electric Trane HVAC US LLC***

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| IN RE HVAC EQUIPMENT ANTITRUST LITIGATION<br>*This Document Relates to:*<br>*All Actions* | No. 2:26-cv-10949-SKD-EAS<br><br>Hon. Susan K. DeClercq |

**DEFENDANT MITSUBISHI ELECTRIC TRANE HVAC US LLC'S BRIEF IN SUPPORT OF ITS MOTION FOR AN ORDER DISMISSING THE COMPLAINTS FOR LACK OF SUBJECT MATTER JURISDICTION OR IN THE ALTERNATIVE FOR FAILURE TO STATE A CLAIM**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

STATEMENT OF ISSUE PRESENTED .......... iv

CONTROLLING OR MOST APPROPRIATE AUTHORITY .......... v

I. INTRODUCTION .......... 1

II. STANDARD OF REVIEW .......... 1

III. BACKGROUND .......... 3

IV. REASONS FOR DISMISSAL .......... 6

V. CONCLUSION .......... 17

# TABLE OF AUTHORITIES

## CASES

*Bennett v. Am. Online, Inc.,* No. CIV. 06-13221, 2007 U.S. Dist. LEXIS 54816, at *13 (ED Mich, July 27, 2007)....................17

*Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir. 2012) ....................3

*Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014)....................2

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) ....................6

*Garavaglia v. United States*, 648 F.Supp.3d 887, 897 (E.D. Mich. 2022)....................3

*Glob. Tech., Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 810 (6th Cir. 2015)....................3

*In re Packaged Ice Antitrust Litigation*, 779 F.Supp.2d 642, 659 (E.D. Mich. 2011) ....................7

*In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009) ......3

*Myslivecek v. FCA US LLC*, No. 23-129802026 U.S. Dist. LEXIS 105990, at *8-9 (E.D. Mich. May 13, 2026)....................3

*Roberts v. Progressive Preferred Ins. Co.*, 167 F.4th 955, 960 (6th Cir. 2026) .......6

*Thole v. U. S. Bank N.A*, 590 U.S. 538, 540 (2020) ....................6

*Travel Agent*, 583 F.3d at 903....................17

*Yueh-Lan Wang ex rel. Wong v. New Mighty U.S. Trust*, 841 F. Supp. 2d 198, 201-202 (D.D.C. 2012)....................2

## STATUTES

Fed. R. Civ. P. 12(b)(1)....................1, 2

Fed. R. Civ. P. 12(b)(6)....................1, 3

## OTHER AUTHORITIES

13 Wright & Miller, Federal Practice and Procedure § 3522 (3d ed. 1998) ............2

2 James Wm. Moore, *Moore's Federal Practice* § 12.30[4] (3d ed. 2000) .............3

## STATEMENT OF ISSUE PRESENTED

1. Whether Mitsubishi Electric Trane HVAC US LLC ("METUS") should be dismissed from each of these actions for lack of subject matter jurisdiction because the Complaints exclude the products that METUS distributes.

   **Defendant METUS states: Yes**

2. Whether the Plaintiffs in these actions have failed to state a claim against METUS because they have failed to plausibly allege that METUS was involved in the alleged conspiracy.

   **Defendant METUS states: Yes**

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

*Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430 (6th Cir. 2012)

*Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014)

*In re Packaged Ice Antitrust Litigation*, 779 F.Supp.2d 642, 659 (E.D. Mich. 2011)

*In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896 (6th Cir. 2009)

*Roberts v. Progressive Preferred Ins. Co.*, 167 F.4th 955, 960 (6th Cir. 2026)

*Thole v. U. S. Bank N.A*, 590 U.S. 538, 540 (2020).

Fed. R. Civ. P. 12(b)(1)

## I. INTRODUCTION

Each of the operative Complaints in this matter expressly exclude "ductless mini-splits" from their definitions of the "HVAC Equipment" Defendants allegedly conspired to fix the prices of. Plaintiffs explain this exclusion by saying "mini-splits are sold through different distribution channels and at different price points than ducted HVAC Equipment." ECF No. 130, PageID.1494-1495 at ¶106, n.4. But mini-splits, along with other variable speed product offerings, are exactly what METUS distributes. Variable speed mini-splits use different technology and largely compete against a different set of manufacturers than those in the market for the traditional unitary HVAC systems alleged in the Complaints. As a result, there is no case or controversy, no cognizable injury, and therefore no subject matter jurisdiction. METUS thus respectfully moves this Court to dismiss the three amended and consolidated Complaints against it pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.

In addition, the Complaints are fatally flawed, and the Court should dismiss them under Fed. R. Civ. P. 12(b)(6), because they make no specific allegations about METUS's participation in the alleged conspiracy. METUS is simply lumped in as one of the "Trane Defendants," and Plaintiffs fail to make sufficient allegations as to how METUS was involved.

## II. STANDARD OF REVIEW

In the Sixth Circuit and elsewhere, Rule 12(b)(1) motions come in two varieties: facial attacks and factual attacks. *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). A facial attack on subject matter jurisdiction "goes to the question of whether the plaintiff has alleged [any] basis for subject matter jurisdiction . . ." *Id.* A factual attack on subject matter jurisdiction "challenges the factual existence of subject matter jurisdiction." *Id.* at 759. Because the question here is whether METUS's products are those that Plaintiffs have expressly excluded in their Complaints, this is a factual attack.

When a party asserts a factual attack, "a court has broad discretion with respect to what evidence to consider in deciding whether subject matter jurisdiction exists, including evidence outside of the pleadings, and has the power to weigh the evidence and determine the effect of that evidence on the court's authority to hear the case." *Id*. at 759–60; *see also* 13 Wright & Miller, Federal Practice and Procedure § 3522 (3d ed. 1998) ("factual allegations in complaint bear closer scrutiny in resolving a Rule 12(b)(1) motion . . . unlike with a motion to dismiss for failure to state a claim, the court may consider materials outside the pleadings") (citing *Yueh-Lan Wang ex rel. Wong v. New Mighty U.S. Trust*, 841 F. Supp. 2d 198, 201-202 (D.D.C. 2012)). "Under a factual attack…the court can actually weigh evidence to confirm the existence of the factual predicates for subject-matter jurisdiction," including affidavits, documents, and other relevant evidence. *Carrier*

*Corp. v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir. 2012) (citing 2 James Wm. Moore, *Moore's Federal Practice* § 12.30[4] (3d ed. 2000)).

"When a court's subject-matter jurisdiction is challenged under Federal Rule of Civil Procedure 12(b)(1), the plaintiff has the burden to prove jurisdiction." *Myslivecek v. FCA US LLC*, No. 23-129802026 U.S. Dist. LEXIS 105990, at *8-9 (E.D. Mich. May 13, 2026) (citing *Glob. Tech., Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 810 (6th Cir. 2015)).[1] In the Sixth Circuit, a dismissal for lack of subject matter jurisdiction must be without prejudice because the Court lacks jurisdiction to review the merits. *Garavaglia v. United States*, 648 F.Supp.3d 887, 897 (E.D. Mich. 2022).

In addition to joining Defendants' Joint Motion to Dismiss under Fed. R. Civ. P. 12(b)(6), this motion also provides support for Rule 12(b)(6) dismissal specific to METUS. A motion under Fed. R. Civ. P. 12(b)(6) tests the sufficiency of the complaint. Courts reviewing a Rule 12(b)(6) motion "need not accept as true legal conclusions or unwarranted factual inferences, and conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009).

## III. BACKGROUND

---

[1] Copies of any unpublished cases relied upon herein are attached as **Exhibit 1**.

Plaintiffs' price-fixing conspiracy is based on the claim that the "HVAC Equipment," as they have defined it, is "fungible" and that "one supplier's [product] is readily substituted for another['s]." ECF No. 128, PageID.1270 at ¶139; ECF No. 130, PageID.1555-1557 at ¶¶288-292; ECF No. 129, PageID.1370 at ¶86. But Plaintiffs' definition of the "HVAC Equipment" at issue in their Complaints is, as Plaintiffs concede, not all-encompassing. Rather, the substance of their Complaints seeks to target traditional unitary HVAC systems that METUS does not distribute. Each Complaint excludes what METUS distributes because, according to Plaintiffs themselves, "mini-splits are sold through different distribution channels and at different price points than ducted HVAC Equipment." ECF No. 129, PageID.1370-1371 at ¶87; ECF No. 128, PageID.1248-1249 at ¶73. (describing three primary types of residential HVAC systems, the last of which, "[d]uctless mini-split systems[,] are not included in the product definition in this case"); ECF No. 130, PageID.1494-1495 at ¶106, n.4 ("Ductless mini-split systems are not included in the product definition…because mini-splits are sold through different distribution channels and at different price points").

Plaintiffs *do* include in their definition of HVAC Equipment two types of residential HVAC systems: "(1) split systems, which have separate indoor (furnace/air handler) and outdoor (condenser) components [, and] (2) packaged units, where all components are combined into one outdoor unit (often used in homes without basements)." ECF No. 130, PageID.1494 at ¶106; ECF No. 129, PageID.1370-1371 at ¶87 (describing split configurations and packaged units for residential HVAC systems); ECF No. 128, PageID.1248-1249 at ¶73 (same). Plaintiffs define the "principal commercial product categories" as: "(1) packaged units, self-contained systems that combine heating, cooling, and ventilation in a single cabinet, typically installed on rooftops but also at ground level or on mezzanines, and used primarily for smaller commercial buildings; (2) ducted split systems, pairing an outdoor condensing unit with an indoor air handler connected by ductwork; (3) variable refrigerant flow ('VRF') systems, which connect multiple indoor units to one or more outdoor units and provide room-by-room temperature control for larger structures such as offices and hotels; and (4) chillers, which produce chilled water to cool entire buildings." ECF No. 129, PageID.1489-1490 at ¶88; *see also* ECF No. 128, PageID.1249-1250 at ¶¶74-77; ECF No. 130, PageID.1496-1501 at ¶¶107-115. While Plaintiffs identify a variety of different HVAC technologies, the substance of their price-fixing allegation is about interchangeable systems that primarily compete on price: in other words, traditional

unitary HVAC systems.

## IV. REASONS FOR DISMISSAL

Plaintiffs have failed to show that they have standing under Article III to bring these actions against METUS. To satisfy the constitutional Article III requirement that federal courts only consider "Cases" or "Controversies," "plaintiffs must establish that they have standing to sue before courts can consider the merits of their claims." *Roberts v. Progressive Preferred Ins. Co.*, 167 F.4th 955, 960 (6th Cir. 2026). "To establish standing under Article III of the Constitution, a plaintiff must demonstrate (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U. S. Bank N.A*, 590 U.S. 538, 540 (2020).

When a defendant's products are expressly excluded from a purported class action complaint, as they are here, the logical conclusion is that the plaintiff has not suffered an injury caused by that product. "To establish standing at the pleading stage, a plaintiff's complaint must show causation," *Roberts*, 167 F.4th at 961, meaning the plaintiff's alleged injury "must be fairly traceable to the defendant's allegedly unlawful conduct," *Id.* (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006)). Where a complaint does not allege any wrongdoing tied to the excluded products, there is no basis for a defendant selling or distributing only those

products to remain in the litigation. In the Sixth Circuit, courts have held that plaintiffs lacked standing to assert claims under laws of states in which they suffered no injury, and the same reasoning applies to defendants against whom no injury is alleged because their products fall outside the complaints' scope. *See, e.g., In re Packaged Ice Antitrust Litigation*, 779 F.Supp.2d 642, 659 (E.D. Mich. 2011) ("The [amended complaint] simply fails to name plaintiffs who have suffered the injuries giving rise to claims under the laws of any of the states in which the named Plaintiffs do not reside. The current Plaintiffs have no standing to bring those claims.").

Plaintiffs' price-fixing conspiracy is based on a claim that is fundamentally incorrect when it comes to the products METUS distributes. "HVAC Equipment," as Plaintiffs define it, is "fungible" and "one supplier's [product] is readily substituted for another['s]." ECF No. 128, PageID.1270 at ¶139; ECF No. 130, PageID.1555-1557 at ¶¶288-292; ECF No. 129, PageID.1370 at ¶86. But "mini-split" HVAC systems (and, in fact, all of METUS's product offerings) – more accurately termed variable speed mini-split HVAC systems – are a wholly different product than the "HVAC Equipment" at issue in the Complaints. *See, e.g.*, **Exhibit 2**, pp. 2-12, Mike Haines, *Comparing Mini-Split Systems to Traditional HVAC: Pros and Cons*, AC DIRECT BLOG (November 2023), https://www.acdirect.com/blog/comparing-mini-split-systems-traditional-hvac/.[2]

---

[2] A compilation of the public articles referenced herein are attached as **Exhibit 2**.

While Plaintiffs allege that ductless mini-splits "are sold through different distribution channels and at difference price points," ECF No. 130, PageID.1494-1495 at ¶106, n.4, these variable speed mini-split units also are fundamentally different in design and operation from the "HVAC Equipment" Plaintiffs describe and cannot simply be plugged into a traditional unitary HVAC system's framework. Accordingly, the variable speed mini-split HVAC systems market involves different manufacturers than those Plaintiffs name as Defendants and these systems are categorized and rated differently than the traditional unitary HVAC systems that are the subject of these Complaints. Because all of METUS's products use this unique variable speed technology, not the traditional unitary "HVAC Equipment" technology, Plaintiffs do not have a "case or controversy" against METUS.

First, the variable speed technology is different from the traditional unitary HVAC equipment described in the Complaints. *See* **Exhibit 3**, Declaration of Brinnon Williams, at ¶5. Traditional unitary HVAC systems function like a basic light switch — they are either on or off. When a home reaches the desired temperature, the system shuts off. *Id*. at ¶4. When the room cools or warms slightly, traditional compressor systems kick on and send air at maximum capacity until the thermostat temperature is reached. *Id*. Once the thermostat temperature is reached again, the system again shuts down completely. *Id*. Anyone who has stood outside

their home and heard a unitary compressor system kicking on and turning off knows this phenomenon.

In contrast, METUS's variable speed systems utilize inverter-driven compressors, which do not operate in the same binary way. *Id*. at ¶6; *see also* Exhibit 2, pp. 13-18, *Fixed-Speed vs. Inverter Compressor Technology*, MITSUBISHI ELECTRIC HEATING AND AIR CONDITIONING (May 12, 2024), https://www.mitsubishicomfort.com/articles/fixed-speed-compressors-vs-mitsubishi-electric-inverter-technology. In METUS variable-speed systems, incoming alternating-current (AC) power passes through a converter circuit, where it is converted into direct-current (DC) power. Exhibit 3, at ¶6. Capacitors store and smooth the DC voltage to provide a stable DC bus for the inverter. *Id*. The inverter then uses high-speed power semiconductor switching and pulse-width modulation (PWM) to convert the DC power into a pulse-width-modulated three-phase output having a controlled frequency and voltage. *Id*. By raising or lowering the output frequency, measured in hertz (Hz), the system dynamically adjusts compressor motor speed to match real-time thermal demand. *Id*. Rather than repeatedly stopping and starting, the compressor can operate across a range of speeds, including reduced-speed operation, allowing system capacity to be continuously modulated to maintain the desired temperature. *Id*. The Department of Energy's definitions reflect this difference. *See* Exhibit 2, pp. 19-29, ENERGY STAR® *Program Requirements*

*Product Specification for Light Commercial HVAC Eligibility Criteria Final Draft, Version 4.0*, ENERGY STAR (Rev. May 2023), https://www.energystar.gov/products/spec/energy_star_light_commercial_hvac_version_4_0_pd (defining "Commercial Package Air-Conditioning and Heating Equipment" as "[e]lectrically operated, unitary central air conditioners and . . . heat pumps," with "Variable Refrigerant Flow Multi-Split" systems defined separately)

Plaintiffs' description of the equipment at issue and exclusion of "ductless mini-split" systems aligns with the Air-Conditioning, Heating, and Refrigeration Institute (AHRI) categorization of different HVAC systems and their general mode of installation. All of METUS's products fall into the mini-split or variable speed categories with AHRI.[3] AHRI Standard 210/240, Performance Rating of Unitary Air-Conditioning and Air-Source Heat Pump Equipment (residential), AHRI Standard 340/360, Performance Rating of Commercial and Industrial Unitary Air-conditioning and Heat Pump Equipment (commercial).

The distinction between "ductless" and "ducted" makes no difference with respect to METUS's products, which all rely on variable speed technology. Exhibit

---

[3] METUS also sells ducted mini-splits and variable refrigerant flow (VRF) systems, both of which use variable speed systems. AHRI's Standards documents are available on their website. Exhibit 2, pp. 30-33, *Published AHRI Standards and Guidelines*, AIR CONDITIONING, HEATING AND REFRIGERATION INSTITUTE, https://www.ahrinet.org/standards/search-standards (last visited Oct. 9, 2026).

3, at ¶7. The fact that METUS's variable speed mini-splits can be adapted to work with existing ducts does not mean that they fall within the scope of equipment in the Complaints. *Id*. In those circumstances, a specialized air handler (most often indoors) is connected to the mini-split unit (most often outdoors) and warmed or cooled air travels through the existing ducts. *Id*. Crucially, however, the most significant (and expensive) piece of equipment remains the variable speed mini-split compressor. *Id*. The air handlers that are coupled with the variable speed units are unique equipment that operate only with variable speed units and cannot be used with the traditional unitary systems described in the Complaints. *Id*.

Nor is it the case that VRF commercial technology is technologically different from ductless mini-split technology in any material way; the primary difference, aside from size, is that VRF units are capable of heating and cooling at the same time. Exhibit 3, at ¶5. The market for VRF systems is therefore different than the market for traditional unitary systems, and the equipment is not fungible. *Id.* Accordingly, all of METUS's offerings are more accurately considered part of Plaintiffs' express exclusion.

Second, there are a significant number of competitors in the variable speed mini-split market, most of whom are *not* the Defendants named in these suits. *Id*. at ¶10. To be sure, Daikin, Rheem, Lennox, Carrier, and Trane compete in the mini-split market, but that is largely through either recent acquisition or partnerships with

other manufacturers.[4] Other players in this market include LG Electronics, Fujitsu General, Samsung HVAC, York, Mr. Cool, Senville, Toshiba, Midea, Gree, Pioneer, Durastar, Hisense, GE Appliances[5], Panasonic Corporation, and Cooper & Hunter. *Id*. at ¶10; *see also* Exhibit 2, pp. 34-41, *Best Mini Split Brands in 2025: Real Reviews & Real Advice*, MAXIMUM COMFORT HEATING & AIR CONDITIONING, https://maxcomfortheatandair.com/best-mini-split-brands/ (last visited Oct. 9, 2026). None of these latter companies are defendants in any of these actions, yet collectively (excluding METUS and Daikin) they control an estimated 40-50%

[4] Exhibit 3, at ¶10. Daikin is the parent company of Goodman, and both sell mini-split products with different specifications, pricing, and target markets. (Exhibit 2, pp. 42-60, *Best Mini Split Brands of 2026: Mitsubishi vs. Daikin vs. ACiQ vs. Goodman*, AC DIRECT BLOG, https://www.acdirect.com/blog/best-mini-split-brands-in-2025-top-picks-for-efficiency-budget-and-climate/ (last visited Oct. 9, 2026). Rheem acquired Fujitsu mini-splits in 2025 (Exhibit 2, pp. 61-64, Terry McIver, *DONE DEAL: Rheem Completes Fujitsu Integration*, RSES (Sept. 2, 2025), https://rses.org/news/709150/DONE-DEAL-Rheem-Completes-Fujitsu-Integration.htm); Lennox partnered with Samsung in 2025 to provide ductless mini-splits (Exhibit 2, pp. 65-68, Lennox International Inc., *Lennox Debuts 'Lennox Powered by Samsung' Mini-Split and VRF Product Lineups*, PRNEWSWIRE (Feb. 4 2025), https://www.prnewswire.com/news-releases/lennox-debuts-lennox-powered-by-samsung-mini-split-and-vrf-product-lineups-302367463.html); and Midea makes private label mini-splits for Carrier (Exhibit 2, pp. 69-70, *Carrier, Midea Launch Residential Ductless HVAC Joint Venture in North America*, CARRIER (Sept. 29, 2017), https://www.carrier.com/carrier/en/worldwide/news/news-article/carrier--midea-launch-residential-ductless-hvac-joint-venture-in-north-america.html).

[5] GE Appliances was purchased by Chinese company Haier in 2016. (Exhibit 2, pp. 71-73, Kim Freeman, *GE Agrees to Sell Appliances Business to Haier for $5.4B*, GE (Jan. 15, 2016), https://www.ge.com/news/press-releases/ge-agrees-sell-appliances-business-haier-54b).

percent of the combined light commercial and residential mini-split HVAC market. Exhibit 3, at ¶10.

Third, Plaintiffs concede that variable speed mini-split systems are sold at different price points than traditional unitary "HVAC Equipment," which Plaintiffs allege are standardized and "[p]urchasing decisions turn primarily on price" because "every manufacturer sells an equivalent product." *See* ECF No. 129, PageID.1370 at ¶86; *see also* ECF No. 128, PageID.1248-1249 at ¶73; ECF No. 130, PageID.1494-1495 at ¶106, n.4. But that is not the case as to METUS because, as described *infra*, METUS's variable speed mini-split systems are *not* equivalent to the traditional unitary HVAC systems at which Plaintiffs' allegations are directed. Variable speed systems offer greater zoning and individual temperature control in a way that traditional unitary HVAC systems cannot. Exhibit 2, pp. 74-80, *VRF Systems – Everything you need to know*, DAIKIN, https://www.daikinmea.com/en_us/knowledge-center/vrf-systems-explained.html (last visited Oct. 9, 2026).

Moreover, variable speed mini-split systems do not compete with traditional unitary systems on price. Exhibit 3, at ¶9. Mini-split systems typically are more expensive than traditional HVAC systems, particularly where more than one room – and therefore more than one zone or indoor unit – is required to heat and/or cool a space. *Id*. *See also* Exhibit 2, pp. 81-103, Rene Langer, *Mini Split Vs Central Air*

*Cost Comparison for U.S. Homeowners 2026*, PICKHVAC (June 27, 2025), https://www.pickhvac.com/mini-split/mini-split-vs-central-air-cost/. Purchasers of these systems are willing to pay higher upfront prices for a number of reasons, not the least of which is that variable speed mini-split products offer better energy efficiency. *Id.* For this reason, power companies like DTE Energy offer consumers rebates when they purchase mini-split systems. *See* Exhibit 2, pp. 104-108, *DTE can help you stay comfortable and cool inside your home when the temperature rises outside*, DTE ENERGY, https://www.dteenergy.com/us/en/residential/save-money-energy/rebates-and-offers/air-conditioners.html (last visited Oct. 9, 2026) (offering up to a $1,000 rebate for the purchase and installation of ductless mini-split heat pumps).

Other purchasers are attracted by lower environmental impacts both from increased efficiency and refrigerant upgrades that reduce the potential for global warming. *See* Exhibit 2, pp. 109-117, Eric Hansen, *METUS products and EPD coverage, explained*, EPD GUIDE (Dec. 21, 2025) https://epd.guide/manufacturers/metus-products-and-epd-coverage-explained ("[s]ustainability signals you can point to"). And still others are attracted to reduced noise. Declaration at ¶9. Because traditional units must instantly crank to full electrical draw upon starting up, they generate substantial noise (often above 60 decibels, almost as loud as a vacuum cleaner). *See* Exhibit 2, pp. 118-147, Caleb

Hilton, *How Loud Are Mini Splits?*, ZONE AIR (June 5, 2025) https://zone-air.com/blog/how-loud-are-mini-splits/. METUS components are engineered to scale down seamlessly, running continuously at decibel levels as low as 22 dB—which is quieter than a soft whisper or rustling leaves. *Id.* Perhaps most consumers seek all of these benefits, reflecting that the principal drivers for purchase of these systems are not simply price.

In addition to the arguments above, METUS joins Defendants' Joint Motion to Dismiss under Rule 12(b)(6) for failure to state a claim. Plaintiffs also have failed to allege that METUS participated in a price-fixing conspiracy. Plaintiffs seek to gloss over METUS's materially different product offerings and market, described above, and ask the court to presume that METUS distributes the kind of HVAC Equipment that falls within their alleged price-fixing conspiracy.

Plaintiffs attempt to bolster their lack of direct allegations of an agreement among Defendants by offering vague claims in support of their supposed plus factors, but they do not offer anything other than strained inference against METUS. For example, *none* of the Complaints raise a single allegation about the frequency, amount, products covered, or whether or how METUS announces price changes. Instead, Plaintiffs apparently hope to sweep METUS into their allegations pertaining to Trane, whose products METUS does not distribute or set prices for. Plaintiffs also do not allege that METUS used any "data aggregating tools" that they claim allowed

Defendants to monitor competitor price. *See, e.g.,* ECF No. 129, PageID.1419-1421 at ¶¶194-202. Nor do they allege that METUS sat on the Board of or participated in any committees at AHRI. *See, e.g.,* ECF No. 128, PageID.1253-1254 at ¶¶90-95. Rather, they seem to hang their hats on the unsurprising fact that "Mitsubishi" individuals may have attended a handful of industry conferences over the years, *see, e.g.,* ECF No. 130, PageID.1525,1563-1564 at ¶¶197, 315, and that one of them participated on a panel at one of the conferences, *see* ECF No. 130, PageID.1564-1565 at ¶318. Plaintiffs provide no information even suggesting that METUS entered into any agreement to fix prices on equipment in the traditional unitary market (products METUS does not distribute) or *any* equipment while at said conferences (or anywhere else).

Finally, Plaintiffs ask the Court to accept an additional unsupported inference: that METUS and the supposed other Trane Defendants operate as "a single enterprise under the direction and control of Trane Technologies." ECF No. 130, PageID.1481 at ¶68. Two paragraphs before, Plaintiffs allege that METUS is a "50/50 joint venture between Trane Technologies plc and Mitsubishi Electric US, Inc." ECF No. 130, PageID.1480 at ¶66. Plaintiffs provide no facts to support the assertion that this distinct legal entity with a second corporate owner is functionally controlled by Trane. Instead, they offer a single sentence that does not reference METUS's products: "Christopher J. Kuehn, Executive Vice President and Chief

Financial Officer of Trane Technologies plc, described to investors the strategic control Trane Technologies plc had over Trane's residential HVAC business, saying '*[w]e* guided residential down about 20% in the first quarter.' (Emphasis added)." ECF No. 130, PageID.1481 at ¶68. But "a casual remark in the popular media will not serve to establish a legal conclusion" about the structure of a corporate relationship. *Bennett v. Am. Online, Inc.,* No. CIV. 06-13221, 2007 U.S. Dist. LEXIS 54816, at *13 (ED Mich, July 27, 2007). METUS does not distribute Trane's traditional unitary offerings, Exhibit 3, at ¶4, and Plaintiffs' attempts to include METUS in the "Trane family" as the hook for naming METUS a Defendant in the first place underscores their fundamental lack of understanding about who METUS is and what it distributes.

Courts "need not accept as true legal conclusions or unwarranted factual inferences." *Travel Agent*, 583 F.3d at 903. And the Court here respectfully should not do so. As described further in Defendants' Joint Motion, the Court should dismiss all three of the Plaintiffs' Complaints for failure to state a claim.

## V. CONCLUSION

METUS respectfully requests that this Court dismiss all these actions against METUS.

Dated: October 9, 2026    Respectfully submitted,

**BUTZEL LONG, a professional corporation**

s/ *Mitchell S. Zajac*
Mitchell S. Zajac (P82498)
150 West Jefferson, Suite 100
Detroit, MI 48226-4452
(313) 225-7000
zajac@butzel.com

Colleen M. Lauerman (DC No. 459766)
Green Lauerman Chartered PLLC
1050 30th Street NW
Washington, DC 20007
202-213-9795
colleen@glclaw.net
***Attorneys for Defendant Mitsubishi Electric Trane HVAC US LLC***